# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF GEORGIA

# ATLANTA DIVISION

| | | |
|---|---|---|
| ALEXANDER WILLIAMS, by and through his Guardian, Conservator, and Next Friends, DOUGLAS WILLIAMS and LISA WILLIAMS; DOUGLAS WILLIAMS, and LISA WILLIAMS, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | CIVIL ACTION FILE |
| FULTON COUNTY SCHOOL DISTRICT, MELANIE PICKENS, FRANCES BOYD, PAULA MERRITT, VICKI DENMARK, RALPH LYNCH, JAMES WILSON, RONNIE WADE, STEPHANIE SCHUETTE, HARVEY BEASLEY, WILLIAM THOMPSON, NANCY WADEL, DOROTHY PETTES, NANCY SHELLEY, DONNA FAULKNER, EMMETT SHAFFER, STEPHANIE SOSEBEE, STACY WHITE, TEMPLYN AVERETT, KENNETH McGEE, CYNTHIA KANNER, MICHAEL VANAIRSDALE, J. RANDALL REECE, LANCE YOUNG, SHARON BUTLER, SARA WARE, KAREN WIENMANN, SHARON ETRIS, and SARA BIEGELSON, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | NO. _____  **JURY TRIAL REQUESTED** |
| Defendants. | ) ) | |

# COMPLAINT

COME NOW Plaintiffs Alexander Williams (hereinafter referred to as "Alex"), by and through his Guardian and Next Friend, Lisa Williams, and his Conservator and Next Friend, Douglas Williams and Douglas Williams and Lisa Williams, in their own right, and file this complaint, requesting an award by the Court of plaintiffs' fees and costs pursuant to the Individuals with Disabilities Education Act and Individuals with Disabilities Education Improvement Act (hereinafter collectively referred to as the "IDEA"), and Alex further requests a jury trial and determination on all other causes of action set forth herein.

Plaintiffs state in support of their claims as follows:

## **PARTIES**

### 1.

Plaintiff Alex is a disabled individual who from birth has had and continues to have hydrocephalus, cerebral palsy, hemiparesis, moderate mental retardation as defined by the Georgia Department of Education (hereinafter referred to as "GaDOE") regulations, motor impairment, and language impairment, and he has a past history of seizures.

2.

Before Alex suffered severe and ongoing abuse[1] from August 2006 to May 2007 in the Fulton County School District (hereinafter referred to as "FCSD"), he was a happy, social child who was learning and making progress, but all that changed after he was abused.  FCSD and other defendants named herein intentionally and maliciously placed Alex with Defendant Melanie Pickens (hereinafter referred to as "Pickens"), a known child abuser and teacher employed by FCSD, and Alex was violently and inhumanely abused for an entire school year, and he has suffered and continues to suffer due to the intentional, malicious, bad faith actions of all defendants named herein.

3.

Plaintiff Douglas Williams is Alex's father and his court appointed conservator.

---

[1] As used herein, the term "abuse" and any form thereof (i.e., abusing, abused, abusive) means any one or more of the following: hitting, slapping, yanking around, pushing, pushing down, screaming at, yelling at, cursing, name calling, throwing things at, kicking, kneeing, pushing into a locker, pushing into a wall, shoving, shoving into a wall, shoving into a locker, jacking up (which means to push a child face first into a wall or locker and lift the child up, sometimes with the child's feet coming off the ground), intentionally upsetting a child so the child self injures and/or cries and screams, putting buttocks in a child's face, putting breasts in a child's face, rubbing buttocks in a child's face, rubbing breasts into a child's face, passing gas on a child, passing gas in a child's face, allowing a child to rub an adult's buttocks or breast, abandoning a child, restraining a child to a chair, restraining a child to a chair and abandoning the child in a room without an adult, depriving of food, throwing a child down on a wedge, throwing a child into a wheelchair, spraying Lysol on a child, as well as pulling a child's ear or a child's hair.

4.

Plaintiff Lisa Williams is Alex's mother and his court appointed guardian.

5.

All plaintiffs reside in Fulton County, Georgia.

6.

Defendant FCSD is a public corporate body and a county political subdivision operating in Fulton County, Georgia and has the capacity to be sued.  FCSD allowed, orchestrated, facilitated, ensured, aided, promoted, ratified, and covered up the malicious and violent physical, verbal, sexual, and emotional abuse of Alex, causing Alex severe harm and lifelong damage.  FCSD, along with all defendants herein, through FCSD's policies, procedures, and customs, violated the clear laws of the State of Georgia and the United States and the civil, statutory, and constitutional rights of Alex as set forth herein.  From at least the time Alex attended FCSD to the present date, FCSD has received federal funds and still does.

7.

Defendant Pickens is a resident of Fulton County, Georgia, and she did reside at one time at 9165 Nesbitt Ferry Road, Unit 36, Alpharetta, Georgia  30022.  Pickens may currently be a resident of Fulton County,

Georgia and reside at 7505 Brigham Drive, Sandy Springs, Georgia  30350.

Pickens was hired by FCSD to teach disabled children with moderate,

severe, or profound mental impairment from 2002 to 2007, and during that

time, with FCSD's and other named defendants' knowledge and support, she

severely abused, in two different FSCD middle schools and at least one

FCSD elementary school, those disabled children, including Alex, whom

Pickens cruelly and shockingly abused from August 2006 to May 2007, and

because of this abuse, Alex has been severely harmed and irreparably

damaged.  From at least August 2004 to some time after May 2007, Pickens

was an educator licensed by the Georgia Professional Standards Commission

(hereinafter referred to as "GaPSC").

8.

Defendant Frances M. Boyd (hereinafter referred to as "Boyd") is a

resident of Charleston County, South Carolina and resides at 5 Greensward

Road, Johns Island, South Carolina  29455.  Boyd was the principal of

Hopewell Middle School (hereinafter referred to as "Hopewell") from some

time in 2004 to some time in 2007, and during that time, Boyd was a GaPSC

licensed educator.  Boyd was informed that Pickens abused disabled children

in the FCSD before Pickens came to Hopewell, and Boyd was repeatedly

and consistently informed by many different individuals that Pickens abused

5

disabled children at Hopewell beginning in 2004 and continuing until and

through 2007.  While Pickens was at Hopewell, Boyd allowed, facilitated,

endorsed, aided, promoted, and covered up Pickens' abuse of disabled

children, including the abuse of Alex.  Boyd also acted in concert for years

with other defendants herein to ensure Pickens' abuse of disabled children

was not reported to the Division of Family and Children Services

(hereinafter referred to as "DFACS"), the FCSD police, any other criminal

investigative agency, or the GaPSC.

9.

Defendant Paula Merritt (hereinafter referred to as "Merritt") is a

resident of Cherokee County, Georgia and resides at 315 Westbridge Lane,

Canton, Georgia  30114.  Merritt was an employee of FCSD and was a

FCSD instructional support teacher (hereinafter referred to as "IST") of

special education at Hopewell from 2004 to 2007.  All during that time,

Merritt was a GaPSC licensed educator, and she was informed numerous

and repeated times from 2004 to 2007 that Pickens abused disabled children

at Hopewell.  Merritt allowed, facilitated, promoted, aided, endorsed, and

covered up the abuse of disabled children by Pickens, including the abuse of

Alex.  Merritt also acted in concert with other defendants herein to ensure

Pickens' abuse of disabled children was not reported to DFACS, the FCSD police, any other criminal investigative agency, or the GaPSC.

10.

Defendant Vicki Denmark (hereinafter referred to as "Denmark") is a resident of Gwinnett County, Georgia and resides at 5614 Covena Court, Norcross, Georgia 30092.  Denmark was a FCSD area superintendent with supervisory responsibilities over Hopewell and Hopewell staff during 2004 and was a GaPSC licensed educator at that time.  Denmark was informed in 2004 that Pickens had physically abused one or more disabled children, including Jake Marshall (hereinafter referred to as "Jake"), and Denmark took no action to report, prevent, or stop the abuse and harm of disabled children but instead was one of the FCSD administrators who acted in concert and decided Pickens should not be fired and that Boyd should not mention Pickens' abuse of disabled students in Pickens' upcoming teacher evaluation and should not place Pickens on a formal corrective educator plan.  Denmark also acted in concert with other defendants herein to ensure Pickens' abuse of disabled children was not reported to DFACS, the FCSD police, any other criminal investigative agency, or the GaPSC.

11.

Defendant Ralph Lynch (hereinafter referred to as "Lynch") was the
FCSD superintendent of secondary personnel during some part of 2004 if
not all of 2004, and when Lynch was informed in 2004 by Boyd and perhaps
others that a FCSD nurse reported in writing that Pickens was abusing
disabled children, Lynch informed Boyd she was not to report the matter to
DFACS, the FCSD police, or any other criminal investigative body and that
Boyd was not to give Pickens a "Needs Improvement" on her next teacher
evaluation or place Pickens on a formal educator improvement plan.  At that
time, Lynch was not even licensed by the GaPSC to be in educational
leadership, but he was a GaPSC licensed educator in health and physical
education.  Lynch, acting in concert with Denmark and others, never
reported Pickens' abuse to the GaPSC, DFACS, the FCSD police, or any
other criminal investigative authority.

12.

Defendant James Wilson (hereinafter referred to as "Wilson") is a
resident of Cobb County, Georgia and resides at 4619 Old Stilesboro Road
NW, Acworth, Georgia  30101.  Wilson was the FCSD superintendent from
some time in 2005 to some time in 2008, and during that time, Wilson was a
GaPSC licensed educator.  Wilson learned and was informed of Pickens'

severe abuse of numerous disabled children with moderate, severe, or profound mental impairment and took actions to ensure Pickens continued to abuse disabled children and that the abuse was not reported to any of the children's parents (Jake's mother learned of the abuse), the GaPSC, DFACS, or any other criminal investigative authorities, except he permitted one incident of abuse of one child (Jake) on one day in May 2007 to be reported to DFACS and the GaPSC, but not to any criminal investigate agencies, including the FCSD police.

13.

Defendant Ronnie Wade, who is also called or known as "Ron Wade," (hereinafter referred to as "Wade") is a resident of Fulton County, Georgia and resides at 4502 Mystique Way NE, Roswell, Georgia  30075. Wade was the FCSD coordinator in 2004, an assistant superintendent in 2005, and has been the FCSD chief human resource officer since at least 2006.   Wade, who was from before 2000 to present, a GaPSC licensed educator, took actions to ensure that Pickens continued to abuse disabled children, including Alex, and that her abuse was allowed, promoted, aided, and covered up.

14.

Defendant Stephanie Schuette (hereinafter referred to as "Schuette") is a resident of Fulton County, Georgia and resides at 575 Kings Grant Walk in Roswell, Georgia  30075.  Schuette, a FCSD social worker and licensed GaPSC educator since 1998, investigated in 2004 abuse by Pickens of Jake and other disabled students at Hopewell, and at that time, Schuette took actions and did not take actions to ensure Pickens was not reported to the GaPSC, DFACS, the FCSD police, or any other investigative body and took actions and did not take actions to ensure parents of the disabled children were not informed at all or the abuse or not correctly informed in Jake's case.  Schuette ensured, allowed, and aided in Pickens continuing to abuse disabled children, including Alex.

15.

Defendant Harvey Beasley (hereinafter referred to as "Beasley") is a resident of DeKalb County, Georgia and resides at 2321 Crestknoll Circle, Decatur, Georgia 30032.  Beasley was the director of FCSD social work services in 2004 and a GaPSC certified and licensed educator and still is, and when he was informed of the abuse by Pickens of disabled students at Hopewell in 2004, Beasley took actions and did not take necessary actions in order to ensure Pickens continued to abuse disabled children and to ensure

parents of the disabled children were not being informed at all of the abuse or otherwise were not properly informed.  Beasley also ensured DFACS, the FCSD police, other criminal investigative agencies, GaPSC, and parents were not informed of Pickens' abuse.

16.

Defendant William Thompson, also called "Bill Thompson," (hereinafter referred to as "Thompson") was an assistant principal at Hopewell and a GaPSC certified educator during the time Pickens abused children at Hopewell from 2004 to 2007, and Thompson was informed of the allegations of Pickens' abuse of disabled children beginning in 2004 and throughout the time he and Pickens were at Hopewell, but Thompson did not report Pickens' abuse of disabled children to the GaPSC, DFACS, the FCSD police, any other criminal investigative agency, or the abused disabled children's parents.  Instead, Thompson gave Pickens a positive teacher evaluation report in 2007, writing "We appreciate all that you do for your very special students." Thompson also failed to cooperate with the November 2004 investigation of Pickens' abuse of disabled children at Hopewell.

17.

Defendant Nancy Wadel (hereinafter referred to as "Wadel") was the FCSD Executive Director of Services for Exceptional Children from some time in June 2004 to sometime after 2007, and all during that time, Wadel was a GaPSC licensed educator. Wadel was informed by Pettes of Pickens' abusive actions beginning in 2004, and Pettes continued to inform Wadel of Pickens' abuse of disabled children until 2007 or thereafter. Wadel never reported Pickens' abuse of disabled children to the GaPSC, DFACS, FCSD police, or any other criminal investigative agency, and she never told the parents of the abused disabled children that they had been abused. Wadel allowed, aided, and endorsed Pickens' abuse of disabled children.

18.

Defendant Dorothy Pettes, also called "Dottie Pettes," (hereinafter referred to as "Pettes") is a resident of Fulton County, Georgia and resides at 1106 New Haven Way, Roswell, Georgia 30075. Pettes was a FCSD Special Education Coordinator from 1998 to either December 2012 or January 2013, and during that entire time she was a GaPSC licensed educator. Pettes was informed numerous and multiple times from 2002 to 2007 that Pickens was abusing disabled children in two different FCSD middle schools, and Pettes discussed Pickens' abuse with numerous other

defendants named herein, yet Pettes never stopped the abuse, never reported it to DFACS, the FCSD police, any other investigative authority, the GaPSC, or the parents of the disabled children abused.  Pettes ensured, facilitated, promoted, and covered up Pickens' horrific and ongoing abuse of disabled children for five years.

19.

Defendant Nancy Shelley (hereinafter referred to as "Shelley") is a resident of Cobb County, Georgia and resides at 880 Randall Court NW, Marietta, Georgia  30064.  Shelley was the FCSD Executive Director for Exceptional Children from at least August 2002 to June 2004, and during that time, Shelley was a GaPSC licensed educator.  Shelley was informed of Pickens' abuse of disabled students during the 2002-2003 or 2003-2004 school year or both, and Shelley did not report Pickens' abuse to the GaPSC, DFACS, the FCSD police, any other criminal investigative agency, or the abused disabled children's parents.  Shelley allowed Pickens to continue to abuse disabled children for years.

20.

Defendant Donna Faulkner (hereinafter referred to as "Faulkner") is a resident of Gwinnett County, Georgia and resides at 2998 Stockbridge Way, Dacula, Georgia  30019.  Faulkner was the FCSD area IST over Holcomb

Bridge Middle School (hereinafter referred to as "Holcomb Bridge") during the 2002-2003 and the 2003-2004 school year, and all during that time, Faulkner was a GaPSC licensed educator. Faulkner was informed of Pickens' abuse of disabled children at Holcomb Bridge in 2002 and thereafter, and Faulkner did not report Pickens' abuse of disabled children to the GaPSC, DFACS, the FCSD police department, any other criminal investigative agency, or the disabled children's parents. Faulkner allowed and aided Pickens' abuse of disabled children for many years.

21.

Defendant Emmett Shaffer (hereinafter referred to as "Shaffer") is a resident of Fulton County, Georgia and resides at 300 Lirac Court, Johns Creek, Georgia  30022. During the 2002-2003 and the 2003-2004 school years, Shaffer was the FCSD principal of Holcomb Bridge, and during that time, he was a GaPSC licensed educator. Shaffer was informed that Pickens had abused disabled children at Holcomb Bridge, and Shaffer did not report Pickens' abuse to the GaPSC, DFACS, the FCSD police, any other criminal investigative agency, or the abused disabled children's parents. Instead, Shaffer accepted, promoted, allowed, and covered up Pickens' abuse of disabled children, and his actions ensured Pickens continued to abuse disabled children for years.

22.

Defendant Stephanie Sosebee (hereinafter referred to as "Sosebee") is a resident of Dawson County, Georgia and resides at 251 Mayapple Glenn, Dawsonville, Georgia  30534.  Sosebee was a special education teacher of students with moderate, severe, or profound mental impairment at Holcomb Bridge from at least 2002-2004 and from at least 2004-2007 at Hopewell, and all during those times, Sosebee was a GaPSC licensed educator. Sosebee was also the co-lead teacher or the lead teacher on G Hall during the 2005-2006 or the 2006-2007 school year or both.  Sosebee witnessed Pickens' abuse of disabled children with moderate, severe, or profound mental impairment, and Sosebee never reported Pickens' ongoing abuse to the GaPSC, DFACS, the FCSD police, any other criminal investigative agency, or the parents of the abused disabled children.  Instead, Sosebee allowed, endorsed, accepted, and covered up Pickens' abuse of disabled children and took direct actions to place Alex at Hopewell with Pickens even though Sosebee knew Pickens was a child abuser and would abuse Alex.

23.

Defendant Stacy White (hereinafter referred to as "White") is a resident of Fulton County, Georgia and resides at 430 Hunters Crossing Drive, Atlanta, Georgia  30328.  White was a special education teacher at

Hopewell from August 2004 to May 2007, and during that entire time, she was a GaPSC certified and licensed educator. White was also the lead special education teacher for the G Hall during the 2006-2007 school year. From 2004 to 2007, White was aware that Pickens repeatedly abused disabled children, yet White never once reported Pickens' abuse of disabled children to the GaPSC, DFACS, the FCSD police, any other criminal investigative agency, or the parents of the children abused. White's actions allowed and aided Pickens' continued abuse of disabled children.

24.

Defendant Templyn Averett, also known or formerly known as "Templyn Britt," (hereinafter referred to as "Averett") is a resident of Greenville, County, South Carolina and resides at 100 Tybee Drive, Simpsonville, South Carolina  29681.  Averett was the lead special education teacher on the G Hall at Hopewell during the 2004-2005 school year and had been informed more than once and had herself witnessed Pickens abuse disabled children with moderate, severe, or profound mental impairment, but Averett did not report Pickens' abuse of these disabled children to the GaPSC, DFACS, the parents of the disabled children, the FCSD police, or any other criminal investigative agency, and Averett knew the abuse was continuing and she herself allowed it to continue.

25.

Defendant Kenneth McGee, also called or known as "Ken McGee," (hereinafter referred to as "McGee") is a resident of DeKalb County, Georgia and resides at 864 Ashton Oak Circle, Stone Mountain, Georgia 30083.  McGee was the FCSD social worker at Hopewell from August 2004 to at least May 2007, and during that time was a GaPSC licensed educator. During this time, McGee was aware of the reports of Pickens' abuse of disabled children, and McGee never reported the abuse to his social work supervisor, the GaPSC, DFACS, parents of the disabled children abused, the FCSD police, and any other criminal investigative agency.  McGee allowed Pickens' abuse of disabled children to continue for years.

26.

Defendant Cindy Kanner (hereinafter referred to as "Kanner") was since at least May 2007 and currently is a FCSD Employee Relations Specialist, taking directives from Wade.  Acting intentionally and in bad faith and in concert with Wade and Wilson and for the purposes of improperly concealing the abuse of Alex and numerous other disabled children with moderate, severe, or profound mental impairment, Kanner did not report in May 2007 or thereafter Pickens' abuse to the FCSD police or any other criminal investigative agency, even though her position required

she do so.  Kanner also acted with others to alter government documents and destroy evidence.

27.

Defendant Michael Vanairsdale, also called "Mike Vanairsdale," (hereinafter referred to as "Vanairsdale") is a resident of Glynn County, Georgia and resides at 200 Salt Air Drive, Apartment 144, Saint Simons Island, Georgia  31522.  Alternatively, Vanairsdale is a resident of Fayette County, Georgia and resides at 107 Centennial Drive, Peachtree City, Georgia  30269.  Vanairsdale was a FCSD assistant superintendent in 2002, the superintendent or acting or interim superintendent in 2004, and a deputy superintendent in 2006, and at all times relevant to the facts herein, Vanairsdale was a GaPSC licensed educator.  Vanairsdale, Lynch, Denmark, Reece, Boyd, and others intentionally and maliciously determined that FCSD would not report Pickens' abuse of Jake and other disabled students at Hopewell to DFACS, the GaPSC, the abused disabled children's parents (other than Jake's mother and then only in part and not truthfully), the FCSD police, or any other criminal investigative agency.  Vanairsdale, acting in concert with others, including but not limited to Boyd, Lynch, Reece, and Denmark, also intentionally and maliciously decided and required that Pickens not be cited in writing in her *permanent* FCSD personnel file for her

abuse of disabled children at Hopewell during 2004 but that she would only be written up in part in a letter that was to be placed only in her Hopewell file, not her permanent personnel file.  Vanairsdale also acting in concert decided that Pickens would not be fired or placed on a formal improvement plan but would be allowed to continue her abuse of disabled children for years thereafter.

28.

Defendant J. Randall Reece, also called or known as "Randy Reece," (hereinafter referred to as "Reece") is a resident of Cobb County, Georgia and resides at 470 Stillwaters Drive SW, Marietta, Georgia  30064.  Reece was the FCSD chief of the human resources office in 2002, 2003, and 2004 and was also the FCSD Compliance Coordinator in 2004 and again in 2005, and at all times relevant to the facts asserted in this case, Reece was a GaPSC licensed educator.  Reece was informed during the 2002-2003 school year that Pickens was abusing disabled children, and Reece, in concert with Vanairsdale, Pettes, Shelley, Etris, Faulkner, Shaffer, Young, and others intentionally and maliciously decided to continue to allow Pickens to teach and to not have her abuse documented or reported to the GaPSC, parents of the children abused, DFACS, the FCSD police, or any other criminal investigative agency.  Reece's improper actions and inactions ensured that

Pickens would continue abusing disabled children for years, including Alex during the 2006-2007 school year.

29.

Defendant Lance Young (hereinafter referred to as "Young") was the Executive Director of Human Resources Operations in 2002 and at least until 2010, and at all times was a GaPSC licensed educator.  Young was informed at some time from 2002 to 2004 and thereafter that Pickens had abused one or more disabled children, and Young did not report the abuse to the GaPSC, the child's parents, DFACS, the FCSD police, or any other criminal investigative agency, and he also took actions to ensure Pickens continued teaching and abusing disabled children and that parents of the abused disabled children were never informed of the abuse.

30.

Defendant Sharon Butler (hereinafter referred to as "Butler") is and has been a FCSD behavior specialist from before the 2002-2003 school year to May 2007 and some time thereafter, and at all times she was a GaPSC licensed educator.  Butler was informed by Pettes, Faulkner, Etris, and perhaps others during the 2002-2003 school year and until 2007 that Pickens was abusing disabled children with disabilities, and Butler did not report the abuse to the GaPSC, DFACS, the children's parents, the FCSD police, or

any other criminal investigative agency, and she did not prevent the abuse.

Instead, acting in concert with other named defendants, Butler allowed

Pickens to continue abusing disabled children.

31.

Defendant Sarah Ware (hereinafter referred to as "Ware") was a

FCSD Special Education Coordinator of elementary schools and a special

education supervisor over Woodland Elementary School ("Woodland")

and/or an IST over Woodland during the years from 2003 to 2006.  Ware

was informed that Pickens abused one or more disabled children attending

school during the summer of 2001, 2003, 2004, 2005, 2006 or two or more

of those summers, and Ware did not report the abuse to the GaPSC, DFACS,

the parents of the disabled children abused, the FCSD police, or any other

criminal investigative agency.  Instead, Ware took concerted actions with

other defendants to allow Pickens to continue abusing disabled children for

years.

32.

Defendant Karen Wienmann (hereinafter referred to as "Wienmann")

is a resident of Forsyth, Georgia and resides at 1775 Whispering Circle,

Cumming, Georgia  30040.  Wienmann was the FCSD IST at Hopewell

during the 2007-2008 school year, and Wienmann informed Hopewell

educators assigned to the G Hall they were not, under any circumstances, to

inform any parent of Pickens' abuse of disabled children, which included

Alex.  Wienmann was an instrumental part of FCSD's and other defendants'

cover up of the abuse, thereby preventing Alex's parents and other parents of

abused disabled children from learning of the abuse of their children and

from getting the abused children necessary medical and other care and from

preventing further harm to their children.

33.

Defendant Sharon Etris (hereinafter referred to as "Etris") was the IST

at Holcomb Bridge when Pickens taught there during the 2002-2003 and

2003-2004 school years, and Etris knew about and was informed of Pickens'

abuse of disabled children with moderate, severe, or profound mental

impairment, yet Etris did not report Pickens' abuse of the disabled children

to the abused disabled children's parents, GaPSC, DFACS, the FCSD police,

or any other criminal investigative agency.  Instead, Etris took concerted

actions with other defendants to allow Pickens to continue abusing disabled

children.

34.

Defendant Sarah Biegelson (hereinafter referred to as "Biegelson") is

a resident of Cherokee County, Georgia and resides at 703 Conley Drive,

Canton, Georgia  30115.  Biegelson was an assistant principal at Hopewell during the 2006-2007 school year to some time thereafter, and at all times was a GaPSC licensed education.  Biegelson was in charge of special education and she knew about the abuse of disabled children by Pickens during the 2006-2007 school year, and she did not inform the GaPSC, DFACS, the FCSD police, any other criminal investigative body, or the parents of the abused disabled children, and after the 2006-2007 school year, Biegelson instructed Hopewell employees not to reveal the abuse to anyone, including parents, which caused Alex and other disabled children further harm.

## JURISDICTION AND VENUE

### 35.

This Court has jurisdiction pursuant to 20 U.S.C. § 1415 (i) (3) (A), 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

### 36.

This Court has venue because one or more of the defendants reside in Fulton County, Georgia and a substantial part, if not all, of the events giving rise to the claims set forth herein occurred in Fulton County, Georgia.

## **FACTS – ALEX BEFORE HE WAS ABUSED**

37.

When Alex attended FCSD in elementary school, he made progress in walking, talking, academics, and motor skill development, and he was a happy, social child who enjoyed attending school.

38.

On November 20, 1995, Alex was found eligible for special education as a child with disabilities pursuant to, at that time, the Individuals with Disabilities Education Act ("IDEA") as a child with a speech and language impairment, and on December 11, 1995, Alex was also found eligible under the IDEA as a child with a significant developmental delay.

39.

Since March 10, 1999, Alex had been eligible as a student with disabilities under the IDEA with an intellectual disability (referred to as "mental retardation" under the IDEA) and a speech and language disability.

40.

Alex attended the FCSD during the 1997-1998 school year, and FCSD reported in writing that Alex (then age 5) "frequently use[d] 2 and 3 word phrases spontaneously and ha[d] expanded to use some sentences and questions …."  That was a correct report about Alex at the time.

41.

By May 11, 2000, FCSD accurately reported in writing that Alex could *independently* 1) request help, 2) answer "what" questions, 3) call his teachers and peers by their names, 4) express himself using 3 to 5 words, 5) point to and name 5 colors, 6) point to 8 body parts, 7) sort objects by color, 8) consistently use a spoon, 9) use his right hand to participate in fine motor tasks, 10) continuously engage in a fine motor task for 5 minutes, 11) throw a soft ball 3.5 meters, 12) follow a first-then picture schedule to complete activities, and more.  Alex, however, never has been able to go home and tell his parents what happened during his school day, due to his disabilities.

42.

On April 13, 2001, Alex continued to be a student in the FCSD, which accurately described Alex at that time as follows:

> Alex is a happy child who enjoys looking at books and sweeping the floor.…  He is able to express his wants and needs himself verbally....  He will answer questions and comment in circle time and group activities.  He interacts with his peers and enjoys walking the track....  He can identify himself and his name.  He is able to count from 1-10, and can identify numbers 1-5 with 80 % accuracy.…  He enjoys playing on the computer and is able to use the computer using the mouse.  Alex wi[ll] work on the computer to help with shapes, numbers, and letters.  He can identify triangle, circle, and square. Alex is able to match objects to pictures and identify an object[']s place.  (Shown a picture of a toothbrush, when asked where can you find this he will tell you bathroom).

43.

In Alex's IEP dated February 5, 2002, FCSD accurately reported in

writing some of the following:

> Alex is beginning to refer to other people by appropriate names.  He
> enjoys verbal interaction with adults….  He understands the concept
> of first/then to complete his work activities ....  Alex enjoys
> community trips.  His behavior has been very good on his trips.  He
> can rote count to 15.  He is able to pick his name from a group….
> Alex enjoys listening to stories and can answer simple "what" and
> "who" questions about the story.  Alex is able to use a fork and spoon
> correctly to feed himself….  Alex seldom wants to use his walker and
> asked that it be "folded up." Alex is able to participate in activities,
> request and comment with 3-5 words.

44.

By the end of the 2001-2002 school year when Alex was 9 years old,

Alex could independently do the following:  1) answer yes/no questions, 2)

answer "who" questions (regarding classmates and teachers), 3) stay on

topic for two turns regarding a book or activity, 4) describe a picture or

object using a color word, 5) verbally name 10 out of 15 pictures related to

school, 6) listen to a story and identify a sequence by pictures, 7) count out

requested numbers of objects from one to three, 8) match the letters of his

first name, 9) make 7 marks on appropriate surface using a writing or art

utensil, 10) cut three snips with adaptive scissors, 11) complete 2 steps of a

fine motor art or work project, 12) throw a softball 3.5 meters, and more.

45.

In Alex's IEP dated May 5, 2003 (Alex was 10 at this time), FCSD accurately reported that Alex could answer simple what and who questions about a story; answer first/then questions; communicate his wants for lunch and leisure time; stay seated in a chair with no behaviors for lunch, music, speech, and circle time; eat independently; use a fork to pierce food and spoon to scoop food correctly; cut across a page of paper; color 50 % of a picture or art project; walk without support; participate in group activities for 30 minutes; matching the letters of his name; match numbers 1 through 10; order food at a restaurant; answer yes/no questions; describe an object as big or little; describe a picture or object using a color word; and verbally name 5 new vocabulary words each month.

46.

In his IEP dated March 28, 2005, FCSD accurately reported this about Alex:

> Alex is able to express his wants and needs using complete sentence[s] rather than single word responses....  Alex is a social child who is able to effectively communicate his wants and needs. Alex is able to [sequence] 1-10 in correct o[r]der….  Alex can spell his name[,] identify all of the peers and staff in his class as well as in Ms. Boyd's co-taught morning group….  Alex has made tremendous gains in his ability to walk independently this school year.  Alex is able to participate in turn taking activities with peers independently. He continues to initiate play and engage in both structured and unstructured play with peers for approximately 15-20 minutes. . . .

Alex has begun to show greater interest in engaging in appropriate play and will often share his toys. Alex is able to remove his coat and place it in his cubby with verbal cues to start.... Alex continues to take pride in work done independently and enjoys receiving verbal praise for a job well done. Alex has done extremely well with gross motor skills this year. He is able to walk independently for 25 meters on the outside track without loss of balance. He is able to rise from a classroom chair and walk around his classroom independently. He throws a soft ball over[] 3 meters. He is able to pedal an adaptive tricycle during PE. Alex also is able to stoop down and pick up a small ball from the floor without losing his s[t]anding balance.

47.

In Alex's IEP dated March 30, 2006, FCSD accurately stated Alex

had no behaviors impeding his learning or the learning of others and

described Alex's abilities as follows:

He is able to make requests for wants and needs using complete sentences with minimal prompts…. He is able to complete the same skill independently 4/5 times when requesting a highly motivating item or activity…. Alex is a pleasure to work with. He has a great sense of humor and enjoys laughing with his teachers and peers. Alex has made great progress in his self help skills, especially in the area of toileting. He is staying dry all day and even beginning to ask to use the restroom. Alex is also working independently on his vocational tasks. His independence moving about the classroom has improved and he is more attentive to his peers and teachers. Alex is fun to work with and we will miss him as he moves on to middle school…. Alex is all smiles when he gets off the bus. He requires some assistance getting down the bus stairs but can walk into the school independently…. Alex is able to locate his name on the coat hooks and remove his coat and hang it up. He likes to please his teachers and will often say, hey Ms. Shannon, look at me. Alex loves positive attention from the adults and he will let you know when he thinks he has done something worthy of praise…. Alex takes in more information than he is able to demonstrate…. He is very motivated to physically get to all these places and has no trouble transitioning to

them…. Alex can identify the pictures on the schedule and we are working on reading the schedule words when paired with pictures…. Alex recognizes his name and recognizes the names of his classmates…. Alex can kick a ball, jump from a height of 3 feet on to a mat with stand by assist for the landing and he can walk side stepping on a balance beam with assistance for balance…. Alex throws the softball 4 meters. Alex walks around our track 1/8 of a mile two times per week. Alex rides the bike for 100 feet…. Alex's personal care skills have really improved this year…. Alex enjoys his classmates. They are a very active group and Alex does a good job keeping up with them. Alex enjoys recess when he can run around outside. Alex gets along well with his peers…. He has improved his ability to play a game (cards or some other type of game) at the table…. Alex has improved his willingness to complete fine motor and vocational activities. We use a job chart with Alex. He has to complete 3 tasks before he gets to have leisure time and this has been very effective with Alex. He understands the concept of work first, then play. We use positive reinforcement with Alex as much as possible because he likes to earn stuff…. Alex is fun to work with, he has a good sense of humor and he says some very funny things. I have enjoyed working with Alex this year and will look forward to hearing about his continued progress.

## FACTS –ABUSE BEGINS AT HOLCOMB BRIDGE AND ESY

48.

From January 2002 to May 2002, Defendant Pickens' was a student teacher, and her performance as a student teacher was reported in writing to be *unsatisfactory* in the following areas: planning and preparing work efficiently, utilizing a variety of teaching methods and skills, exercising appropriate pupil control and classroom management techniques, and fulfilling responsibility in a dependable manner. Pickens' college coordinator reported in writing that she would not employ Pickens as a

teacher for her own child.  FCSD was provided this information in writing prior to FCSD hiring Pickens to teach disabled children with moderate, severe, or profound mental impairment in FCSD.

49.

Having been informed in writing of the facts asserted in paragraph 39 above, FCSD hired Pickens as a special education teacher on or about August 5, 2002.

50.

When FCSD hired Pickens to teach children with mental impairment at Holcomb Bridge in FCSD during the 2002-2003 school year, Pickens was not certified to teach those disabled children without having a properly certified teacher in the class.  Defendants FCSD, Shelley. and Pettes were also aware of this in 2002.

51.

FCSD placed Pickens at Holcomb Bridge to teach disabled children during the 2002-2003 and 2003-2004 school years, and FCSD was aware that during the very first year Pickens taught in FCSD, Pickens was abusing disabled children with mental impairment in her class.  FCSD was aware through its employees and administration that Pickens was abusing disabled children during Pickens' second year as a teacher at Holcomb Bridge.

52.

Pickens was very rough with the disabled children at Holcomb Bridge, and she yanked the children around, she screamed and yelled at them, she pulled at least one child's ear, she pulled at least one child's hair, and she placed disabled children alone in the bathroom in the dark.

53.

FCSD, Pettes, Etris, Faulkner, Shaffer, Young, Reece, Shelley, Butler, Pickens, Sosebee, and other FCSD employees witnessed and/or were informed of Pickens' abuse of her disabled students while Pickens was at Holcolmb Bridge, including some or all of the abuse reported as set forth in paragraph 52 above.

54.

A child in Pickens' class while Pickens taught at Holcomb Bridge reported to his mother that Pickens would place children in the bathroom with the lights out and the door shut.  This mother was a FCSD bus driver, and she informed FCSD staff of the fact Pickens was placing disabled children in the bathroom with the lights out and the door shut, and this mother's child was removed from Pickens' classroom, but other disabled children remained with Pickens.

55.

FCSD paid Pickens to teach extended school year services (hereinafter referred to as "ESY") to disabled children during either the summer of 2001, 2003, 2004 or any combination thereof.  During one or all of those summers during ESY, it was reported to one or more FCSD employees, including Ware, Pettes, and Shelley as well as other defendants that Pickens had been physically rough with one or more disabled children during the ESY program.  To this date, FCSD and Pettes have not provided any documentation whatsoever of Pickens' abuse of one or more disabled children during ESY.

56.

On November 7, 2011, Pettes testified under oath at an IDEA due process hearing requested by Alex's parents (hereinafter referred to as "the IDEA due process hearing") that it was reported to her by the principal, who was Shaffer, that a referral had been filed with DFACS regarding Pickens' abuse of disabled children while Pickens was at Holcomb Bridge.  However, Pettes informed Mr. Umbarger, an investigator, in an interview in 2007, that FCSD did not conduct any official investigation or even involve a social worker into the allegations of abuse of the disabled children by Pickens at Holcomb Bridge.

57.

FCSD, Pettes, Etris, Faulkner, Shaffer, Young, Reece, Shelley, Butler, Pickens, Sosebee and other FCSD personnel never reported Pickens' abuse of disabled children while Pickens was at Holcomb Bridge or during ESY at Woodland Elementary School to any social worker, DFACS, FCSD police, any other criminal investigative agency, or the parents of the disabled children being abused.  One or more did, however, report Pickens' abuse to FCSD administration, including an area superintendent, superintendent, director of human resources or any combination thereof, and were told to maintain Pickens as a FCSD teacher of disabled children and to not report Pickens to any authority or note in her teacher review her abuse of disabled children.  Shaffer told Pettes that Pickens would continue to be a teacher after he was advised to do so by FCSD administration.  Shaffer has since lied about his knowledge of Pickens' abuse, stating he never was once told of any issues of Pickens being too rough with disabled children when in fact he was well aware of Pickens' abuse of disabled children.

58.

FSCD administration, including Young and Reece, advised Shaffer, Pettes, and Shelley (who all were FCSD administrators themselves) that Pickens would continue teaching in the FCSD, would not be written up or

put on a professional development plan, would not have her abuse

documented in her teacher review, and would not be reprimanded in writing.

FCSD, Pettes, Etris, Faulkner, Shaffer, Young, Reece, Shelley, and Butler

did not reprimand Pickens in writing for her abuse of disabled children at

Holcomb Bridge, and they never reported Pickens' abuse of disabled

children to the GaPSC, DFACS, the abused disabled children's parents, the

FCSD police, or any other criminal investigative agency.  Instead, they

allowed, sanctioned, permitted, ratified and endorsed Pickens' abuse of

disabled children with mental impairment.  Sosebee at the time also had

knowledge of Pickens' abuse of disabled children at Holcomb Bridge.

59.

During the IDEA due process hearing, Alex and his parents

subpoenaed all documents from FCSD regarding any abuse or alleged abuse

by Pickens, and the administrative law judge (hereinafter referred to as

"ALJ") ordered all such documents be produced, yet FCSD did not produce

even one document regarding any abuse or alleged abuse by Pickens of any

children at Holcomb Bridge.  This is so even though documents involving

Pickens' abuse of disabled children at Holcomb Bridge existed and still

exist.

60.

FCSD has taken intentional actions to destroy, delete, and not produce documents involving Pickens' abuse of disabled children while Pickens was employed by FCSD, including when she taught at Holcomb Bridge, Woodland Elementary School, and Hopewell.

61.

FCSD had and still has, unless it deleted or destroyed the documents, documents, including emails, directly involving the abuse by Pickens of one or more students while Pickens taught at Holcomb Bridge, Woodland Elementary School, and Hopewell.

62.

In 2003 or 2004, Pettes recommended to Shaffer, the Holcomb Bridge principal, that Pickens' FCSD contract to teach not be renewed, but Shaffer responded to Pettes (in meaning and not perhaps these exact words) that Pettes' job was not personnel, that her job was to provide support, and FCSD's expectation was that she would train Pickens.  Shaffer told Pettes this because FCSD administration, including the FCSD human relations department and at least one assistant superintendent, made this decision. Pickens never responded to any training or help when she was at Holcomb Bridge but instead continued to abuse disabled children, and FCSD, Pettes,

Shaffer, Etris, Faulkner, Shelley, Sosebee, Reece, Young, Ware, and Butler were aware of this at the time.

63.

When Pickens taught at Holcomb Bridge, Pettes had concerns about Pickens and her abuse of disabled children, and at some point in time during either the 2002-2003 or the 2003-2004 school year, Pettes recommended to Shelley, her FCSD special education supervisor, that Pickens' FCSD contract to teach not be renewed.  In response to this suggestion, Shelley responded to Pettes in meaning and not perhaps these exact words that Pettes' job was not personnel, that her job was to provide support, and the expectation from FCSD was that she would train Pickens.  Shelley discussed the matter with, at the least, the FCSD human resources department.

64.

During the time Pickens taught at Holcomb Bridge, Pettes was informed during that time that Pickens had harmed a disabled student, and Pettes has testified under oath to this fact.  Shaffer, Shelley, Faulkner, Etris, Butler, and Pettes had all been informed during the time Pickens was employed by FCSD at Holcomb Bridge that Pickens had harmed a disabled child.  Pettes talked to Shaffer about Pickens harming a disabled child, and Pettes has testified to this under oath.

36

65.

Shaffer told Pettes he had reported Pickens' abuse to a FCSD social worker.  Shaffer lied when he told Pettes this.  Alternatively, Pettes lied under oath when she testified that Shaffer told her he had reported Pickens' abuse to a FCSD social worker.

66.

Shaffer told Pettes he had reported Pickens' abuse to a DFACS. Shaffer lied when he told Pettes this.  Alternatively, Pettes lied under oath when she testified that Shaffer told her he had reported Pickens' abuse to a FCSD social worker.

67.

When Pickens taught at Holcomb Bridge, Pettes would sit down with Pickens and Faulkner and discuss with both Pickens' abuse of one or more disabled children Pickens taught.

68.

When Pickens taught at Holcomb Bridge, Pettes would sit down with Pickens and Butler and discuss with both of them Pickens' abuse of the disabled children Pickens taught.

69.

When Pickens taught at Holcomb Bridge, Pettes would sit down with Pickens and Shaffer and discuss with both of them Pickens' abuse of the disabled children Pickens taught.

70.

When Pickens taught at Holcomb Bridge, Pettes would sit down with Pickens and any combination of Faulkner, Butler, Etris, Pickens, and Shaffer and discuss with them Pickens' abuse of the disabled children Pickens taught.

71.

When Pickens taught at Holcomb Bridge, Pickens had a very quick temper with the disabled children in her class, and Pickens would become angry easily at the children and would abuse the disabled children.  When Pickens taught at Holcomb Bridge, Pickens would also improperly and excessively and cruelly discipline the disabled children in her class due to her temper and anger toward the children.

72.

During the time Pickens was at Holcomb Bridge, Pettes, Faulkner, Etris, Shelley, Butler, Pickens, and Shaffer knew Pickens had a short, quick

temper and would get angry with the disabled children she taught and abuse them and improperly discipline them.

73.

When Pickens was at Holcomb Bridge, Pickens would not implement the teaching techniques she was told how to do, and Pettes, Faulkner, Butler, Etris, Shelley, and Shaffer knew this.

74.

When Pickens was at Holcomb Bridge, FCSD, Pettes, Faulkner, Butler, Etris, Shelley, Young, Reece, and Shaffer knew Pickens was not certified to teach the disabled children she was teaching during the 2002-2003 or 2003-2004 school year or both.

**FACTS – ABUSE OF A DISABLED CHILD DURING SUMMER**

75.

During the summer of 2001, 2002, 2003, 2004, 2005, or 2006, Pickens taught ESY and Pickens was very physically rough with a disabled child and harmed the child.  Because of Pickens' abuse of the disabled child during the summer, FCSD insisted Pickens take an anger management course, which Pickens did not take.

76.

During one of the summers listed in paragraph 75, Pickens grabbed a disabled child's penis so hard or otherwise did something to the child's penis to cause the child to suffer damage and harm to the disabled elementary school child's penis and to cause him to suffer a penile embolism, requiring medical care. Pickens admitted she grabbed the child's penis, saying the child was falling in the bathroom so she grabbed the child by his penis to stop him from falling.

77.

Due to Pickens' physical harm to a disabled child during one of the summers listed in paragraph 75 above, FCSD entered into a settlement agreement with the parent or parents of the disabled child who suffered the penile injury and embolism, and as part of the settlement agreement, the parent was not, by contract, allowed to share the facts of what happened to her child with others. FCSD paid the child's parent or parents $75,000 as part of the settlement agreement, which required that the incident and abuse by Pickens could not be disclosed. After this abuse, FCSD continued to allow Pickens to teach disabled children with moderate, severe, and profound mental impairment.

78.

After Pickens physically harmed the disabled child during one of the summers set forth in paragraph 75 above and as set forth in this section, FCSD, Reece, Vanairsdale, Young, Ware, Shelley, Pettes, Butler, and Faulkner, at the least, did not report Pickens' abuse of a disabled child to DFACS, the GaPSC, the parents of the child, the FCSD police, or any other criminal investigative agency, nor did they take any action to prevent ongoing abuse of disabled children by Pickens.  Instead, they continued to take actions to allow the abuse to continue and to cover it up.

## FACTS – ABUSE OF DISABLED CHILDREN AT HOPEWELL

79.

After FCSD, Shelley, Pettes, Shaffer, Reece, and Young, as well as others, had become aware Pickens was abusing disabled children, they all took actions to allow Pickens to continue to abuse disabled children and in fact to do so with less visibility from other teachers, students, and parents by transferring Pickens from Holcomb Bridge to Hopewell for the 2004-2005 school year to teach on the G Hall, a segregated hall for children with moderate, severe, or profound mental impairment.

80.

The disabled children FCSD placed on G Hall in Pickens' class could not go home and tell their parents the abuse they suffered at Hopewell due to their disabilities, which included moderate, severe, or profound mental impairment and language impairment.

81.

During the 2004-2005, 2005-2006, and 2006-2007 school years, no regular education student was educated on the G Hall, and no disabled child who did not have a moderate, severe, or profound mental impairment was educated on G Hall.

82.

During the 2004-2005, 2005-2006, and 2006-2007 school years, Pickens' classroom was the last or next to last classroom down G Hall from the interior of the building.

83.

Pickens began abusing disabled students with moderate, severe, or profound mental impairment at Hopewell the day she started at Hopewell in August 2004 or within a week or so thereafter.

84.

Before Pickens began teaching at Hopewell or shortly thereafter and no later than August 31, 2004, Pettes informed Boyd, who was the principal of Hopewell, that Pettes had concerns with Pickens and her rough treatment of disabled children while Pickens was at Holcomb Bridge and because of this Pettes would be bringing FCSD employees over to train and work with Pickens.  Boyd denies Pettes informing her of this, but Pettes has testified under oath she did this.

85.

In talking to others in reference to the disabled students placed on G Hall, Boyd stated to at least three individuals that they should have "cut the cord" on those children a long time ago.

86.

Boyd, who did not like the disabled children with moderate, severe, to profound mental impairment placed on the G Hall at Hopewell, was the principal of Hopewell and as such it was her duty to oversee all operations at Hopewell, supervise teachers and staff, report child abuse of students by staff, oversee staffing and hiring of staff at her school, and ensure the safety of the disabled children attending Hopewell.

87.

Merritt, as the IST, was the supervisor at Hopewell who oversaw and supervised special education and special education staff at the middle school, and her job duties included reporting child abuse of disabled students, overseeing the day-to-day operations of the special education department at Hopewell, overseeing hiring of special education staff, and among other duties, directly training and supervising special education staff, including teachers and paraprofessionals (hereinafter referred to as "paras").

88.

Both Boyd and Merritt had authority to recommend and have their recommendations followed regarding the hiring of staff.

89.

Yasaland King (hereinafter referred to as "King") was hired in August or September 2004 to be a para at Hopewell on the G Hall, and King testified Merritt hired her.  When King was hired by Merritt, Merritt told King she wanted King to be Merritt's eyes and ears on G hall.  When King began working at Hopewell, Merritt had already been informed that Pickens was abusing one or more disabled students on G Hall.

90.

King saw Pickens abuse disabled children at Hopewell, if not the first day King began working at Hopewell, within a week or two, and King reported the abuse she saw to Merritt at least five times.  King also reported Pickens abuse of disabled children on G Hall to Boyd at least two times. After each report by King of the abuse, King continued to witness Pickens abusing disabled children on the G Hall.

91.

In November 2004, Judy Reddick (hereinafter referred to as "Reddick"), a then FCSD nurse, reported to Boyd that Pickens was abusing disabled children, but Boyd refused to accept Reddick's written report of this, and Boyd did not inform FCSD social services department but instead her FCSD supervisors.  After Boyd refused Reddick's report of abuse by Pickens, Reddick then told Meadows, the FCSD head of nursing services what had happened, and Meadows herself directly reported the abuse to FCSD's social work services.  Meadows also told Reddick to give a written statement or letter of the abuse to some administration at Hopewell.  When Boyd learned that Reddick had reported Pickens abuse to Reddick's supervisor, Boyd was not pleased that Reddick had done so, and Boyd told Reddick this.

92.

After talking to Meadows, Reddick addressed her letter to and gave it to Merritt on November 16, 2004, stating, inter alia, that Reddick had "personally witnessed" "on many occasions" Pickens hit a disabled student "usually in the head." Reddick, stated in her letter that "the hitting at times seems quite hard" and further reported "[t]he student frequently cowers and covers his head when he feels he is about to be disciplined." The nurse also reported in writing that when Pickens hit the child, he was not doing anything improper.

93.

Reddick reported as well in her November 2004 letter to Merritt, which Merritt, Thompson, and Boyd were all provided with in November 2004, that Pickens sprayed Lysol on a disabled student and left the disabled child in the hall by herself and that this had been reported to her (Reddick) and that she (Reddick) had witnessed this herself. This disabled child was Repheka Persadi (hereinafter referred to as "Repheka").

94.

Defendant Schuette, a then FCSD social worker, was told by Defendant Beasley, the FCSD head of social work services, to go to Hopewell, investigate the alleged abuse, and complete a report within 24

hours regarding the investigation.  Vanairsdale, Reece, Young, Denmark, and Lynch communicated about the matter, decided to not fire Pickens, to not bring a dismissal action against her, to not write her up, and to allow her to continue teaching, and these defendants, in some combination, and at least Boyd, Denmark, and Lynch, wanted Schuette at Hopewell at 2 p.m. on November 17, 2004.

94.

FCSD had never had a social worker investigate Pickens' abuse of disabled children prior to November 2004.  Alternatively, FCSD had a FCSD social worker investigate Pickens' abuse of disabled children and has destroyed all documents related thereto or otherwise never provided any documentation of this to Alex's parents, Jake's parents, or any other parents of disabled children whom Pickens abused.

96.

Defendant Thompson and Boyd, acting in concert with FCSD and other FCSD administrators, did not cooperate with the investigation regarding abuse of disabled children by Pickens, and they did not inform Jake's mother of Pickens' alleged abuse of Jake.  Thompson and Boyd did not complete paper work, did not collect statements from witnesses, did not provide necessary information for use by Schuette, and did not initially

collect a statement from Pickens about the allegations of abuse by the FCSD

nurse.  This is because FCSD, Boyd, Thompson, Lynch, Denmark, Reece,

Young, and Vanairsdale had already decided before Schuette came to

Hopewell the outcome of the investigation and the report by Reddick, which

was to not report the abuse to the GaPSC, DFACS, the FCSD police, or any

other criminal investigative agency and to allow Pickens to continue

teaching disabled students without reprimand on Pickens' teacher evaluation

and without a formal improvement plan.

97.

Schuette did not collect statements about Pickens' alleged abuse but

only took limited notes from some of the witnesses.  Schuette she did not

thoroughly investigate Pickens' abuse of disabled students by taking

statements or by talking with one or more visiting regular education high

school students who had gone to Hopewell and saw some of Pickens' abuse.

98.

When Boyd first heard about the FCSD nurse's allegations of abuse of

disabled students by Pickens, Boyd contacted her supervisors, Defendant

Lynch, who was at the time the FCSD superintendent of secondary

personnel, and Defendant Denmark, who was at the time the FCSD area

superintendent with supervisory responsibilities over Hopewell.  Boyd's

FCSD supervisors informed Boyd she was not to give Pickens a "Needs Improvement" on Pickens' upcoming teacher evaluation, and Boyd gave Pickens only a positive evaluation.  Boyd was instructed by her supervisors to write a letter to Pickens, which was placed allegedly in Pickens' file at Hopewell, but which was not placed in Pickens' permanent educator file with FCSD at the main office.  Boyd's FCSD supervisors informed Boyd Pickens was not to be fired.

99.

Two witnesses (a FCSD nurse and a FCSD physical therapist) reported in November 2004 to Schuette that they had witnessed themselves more than once Pickens hit Jake in the head hard.  A para reported to Schuette that she had seen Pickens slapping Jake's hands and taking him for a walk alone and that this would upset Jake.  The FCSD nurse, therapist, and para all reported hearing Pickens cursing in front of the disabled children, calling them curse names, or both.  The FCSD physical therapist also reported to Schuette that the therapist had heard Pickens calling the disabled children "little sh_ts" and using the word "fu_k" in their presence.[2]  The therapist also reported to Schuette that Pickens restrained a disabled child's

---

[2] The missing letter in "sh_ts" is an "i," and the missing letter in the word "f_ckers" is a "u." That is so throughout this complaint.

arm to a wheelchair and said something like this:  "I know we are not supposed to restrain kids, but we won't call this a restraint."

100.

When Reddick was interviewed by Schuette, Reddick told Schuette that Pickens called the disabled children "little sh_ts" and "little f_ckers." Reddick also told Schuette that Pickens restrained one or more disabled children to a chair and placed the child alone in a room by himself.  Schuette discarded or otherwise did not produce her notes of her interview with Reddick, and she did not include in her report that Pickens was placing one or more disabled children restrained to chairs in a room by themselves.  The FCSD physical therapist told Schuette she had seen Pickens hit Jake harder in the head than a pat on more than once occasion, abandon Repheka in the hall, and restrain a child's arm to a chair while Pickens said she knew restraint was not allowed but they just wouldn't call it restraint.

101.

Schuette prepared an Investigation Report of the allegations of abuse on November 18, 2004.  Schuette has not maintained that original report, and although FCSD received a copy of the original report, FCSD has never provided that report, even though it was subpoenaed.  Schuette had a folder on Jake Marshall and the November 2004 investigation of abuse by Pickens,

but FCSD did not produce that folder or the documents in it (except for a few) pursuant to subpoena at the IDEA due process hearing in this matter involving Alex even though the folder and its contents were responsive to the subpoena served upon FCSD.

102.

Schuette testified under oath that her investigation began on November 18 and ended on November 19.  Schuette sent Thompson an email about the investigation of alleged abuse by Pickens.  Even though abuse was alleged to have occurred to Jake, it was also alleged to have occurred to Repheka, but no one informed Repheka's mother of any allegation of abuse, and Thompson and Boyd did not inform Jake's mother.

103.

Thompson and Boyd did not timely obtain a statement from Pickens at first, even though Pickens orally admitted hitting Jake in the head, for Thompson and Boyd, both supervisors and FCSD administrators, were waiting for word from Lynch, Denmark, Vanairsdale, and others as to how to proceed regarding the allegations.

104.

FCSD, Lynch, Denmark, Young, Reece, and Vanairsdale, at the least, made a decision that Pickens was not to be fired or given a "Needs

51

Improvement" on her upcoming evaluation for hitting and slapping Jake, a disabled child in the head and hands, and for calling students fowl names, and these Defendants as well as Schuette, Beasley, Thompson, Pettes, Shelley, Merritt, McGee, and Boyd, at the least, all agreed with allowing, adopting, ratifying, and following that recommendation.  All defendants named in this paragraph intentionally, maliciously, and willfully decided to allow a known child abuser to continue being with disabled students who because of their disabilities, could not talk at all or otherwise could not tell someone they were being abused by Pickens.  All these defendants named in this paragraph all decided and acted in concert maliciously and with intent to harm disabled children, not to inform the GaPSC, the FCSD police, any other criminal investigative body, or DFACS of Pickens' abuse in November 2004, and not one of them informed any of these agencies of the child abuse by Pickens in 2004 or anytime thereafter.

105.

Beasley, acting in concert with FCSD and all or some of those defendants named in paragraph 104 above, told Schuette to not report Pickens' actions investigated in November 2004 by Schuette as abuse and to not report Pickens' actions to DFACS.

106.

Schuette was aware that Pickens was abusing disabled children in November 2004 without intervention.  Schuette had concerns about Jake's safety, and she testified under oath that FCSD administrative staff above her were the ones to make decisions about Jake's placement and Jake's safety in that environment.

107.

From 2002 until at least April 2007, it was FCSD's policy, practice, and procedure to not report abuse of disabled children with moderate, severe, or profound mental impairment by teachers to DFACS, not to fire teachers who abused these students for the teacher's abuse, to cover up the abuse, and to allow it to continue, and this is exactly what the defendants named in paragraph 104 above did, and this ensured that when Alex was placed by FCSD and other defendants at Hopewell in August 2006, he was going to be severely abused, and he was.

108.

Schuette prepared her investigative report involving Pickens' reported abuse of disabled children on November 18, 2004 and provided it to FCSD on that day, yet on November 22, 2004, she altered that report, but did not note it as an amendment, nor did she prepare a new report with a correct date

of November 22, 2004.  Schuette maintained a copy of the altered investigative report but did not retain a copy of her original investigative report, even though she was served with a subpoena by Alex and his parents during the IDEA due process hearing and Schuette's original report was responsive to the subpoena served upon her.

109.

Schuette was informed during her investigation that Merritt was aware of earlier abuse by Pickens, but Schuette never obtained a statement from Merritt or interviewed Merritt, and Merritt never provided a statement to Schuette.

110.

When Schuette was served with a subpoena to bring to Alex's IDEA due process hearing all documents involving in any way Pickens' abuse or alleged abuse of one or more disabled students, Schuette cut and pasted a few parts of a few responsive emails and then deleted all of the responsive emails from her computer.  When FCSD, through its counsel, was asked at the hearing if FCSD had produced all documents involving in any way any abuse by Pickens or alleged abuse, FCSD, through its counsel, stated it had and that no witnesses subpoenaed to the IDEA due process hearing had any documents not already provided.  This was not true, but Alex, his parents,

and his counsel did not know this and in reliance on this incorrect representation from FCSD's counsel, Schuette was released from the subpoena served upon her.

111.

When FCSD was subpoenaed during the IDEA due process hearing for all documents involving abuse or alleged abuse by Pickens, FCSD never even asked Schuette to provide to FCSD even one document related to the reported abuse FCSD knew Schuette had investigated abuse in 2004 and even though FCSD required Schuette to keep a file on each investigation.

112.

Due to her training from FCSD, Schuette does not find a teacher hitting a disabled child upside the head is child abuse or that calling a child a "little sh_t" is verbal abuse.

113.

Even though Schuette was informed by two witnesses (a nurse and physical therapist) that they had seen on more than one occasion Pickens hit Jake on the head hard enough to hurt and by a para that she had seen Pickens slap Jake's hands, Schuette prepared a final investigative report (after her first report) claiming this abuse was merely "poor choices and discipline strategies."

114.

Schuette omitted from her final report some important facts reported to her, such as Pickens slapping Jake's hands and putting him in a room alone and restrained to a chair as well as other such relevant information. Schuette did all that which has been set forth in this section of the complaint in concert with the defendants named in paragraph 104 above.  During her deposition, in reference to Schuette's involvement with Pickens' abuse of disabled children, Schuette was asked:  "Do you believe you have done anything wrong in this matter?"  Schuette replied, "I don't know how to answer that." When asked again, Schuette responded, "I can't answer that.  I don't know how to answer that." Then, when Schuette was asked, "Why can't you answer it?," Schuette replied, "I don't know how to answer it."

115.

After November 22, 2004, Pickens continued to abuse Jake and the other students in her class in front of many FCSD employees and many FCSD administrators were informed of Pickens' ongoing abuse of disabled students with moderate, severe, or profound mental impairment.  Many FCSD employees reported Pickens' ongoing abuse from 2004 to 2007 to Boyd, Thompson, Merritt, Wadel, Pettes, FCSD, Butler, Ware, Biegelson, and others.

116.

Pettes testified during the IDEA due process hearing that FCSD was aware that Pickens was hurting children for many years.  Pettes was aware that Pickens was hurting disabled children for many years as well.

117.

Just by November 2004, Pickens abuse of disabled students who could not themselves report the abuse was known by, at the least, ***27 different FCSD educators***, including two FCSD principals at two different middle schools (Shaffer and Boyd); one assistant principal (Thompson); some FCSD teachers and assistants at Holcomb Bridge (Etris, Sosebee, a bus driver, and others); a FCSD middle school special education coordinator (Pettes); a FCSD behavior specialist (Butler); two FCSD special education directors (Shelley and Wadel); two FCSD social workers (Schuette and McGee); a FCSD special needs nurse (Reddick); a FCSD physical therapist (Lina); the FCSD coordinator of student health services (Meadows); the FCSD head of social worker services (Beasley); three FCSD IST's at two different middle schools and at one elementary school (Faulkner, Ware, and Merritt); at least two FCSD classroom assistants (Massey and King); the FCSD director of secondary personnel (Lynch); a FCSD area superintendent (Denmark); one superintendent (Vanairsdale); and two FCSD directors of

human resources (Reece and Young); and at least two teachers at Hopewell (Averett and Sosebee), and the FCSD and the named defendants herein allowed this horrific abuse of disabled children to continue for more than two more years.  Each of the above named individuals had either seen directly Pickens' abuse a disabled child or children or had received one or more reports that Pickens was abusing, as defined in footnote 1 of this complaint, disabled children.  It is because of the actions of the defendants named herein, including the FCSD, that Alex was so severely abused on a daily basis by Pickens for an entire school year.

118.

From 2002 to 2007 or during some time between 2002 and 2007, Pettes and all other named defendants had knowledge that Pickens was doing one, some, or all of the following to disabled children who could not themselves report the abuse:  screaming at them, pulling ears, pulling hair, placing disabled children in a bathroom restrained and alone and at times with the lights out, being rough with them, yanking them, calling them "little fu_kers," calling them "little sh_ts," shoving them, strapping them in or otherwise restraining them in a chair and leaving them in a room alone (sometimes in the dark), kicking them, jacking them up, shoving them into lockers, shoving them into walls, pushing them down on hard surfaces,

throwing hard objects at them, putting and rubbing her buttocks in their faces, putting and rubbing her breasts in their faces, letting them touch her buttocks while saying you know you like that to the student, depriving them of food, passing gas directly in their faces, making them stand instead of sit until their legs were so weak they could stand no more, spraying Lysol on a child, slamming a disabled child down on a wedge, slamming a disabled child down in his wheel chair, abandoning disabled children restrained to Rifton chairs while they spread feces on themselves, telling disabled children their mother did not love them or was on crack or was jacked up, intentionally frightening and startling the children, slamming them face first into metal lockers and cement walls, and more.

### 119.

Alex and the other students feared Pickens so much, as one para explained, all the children cowered when Pickens came at them upset or angry.

### 120.

Numerous FCSD paras, several teachers, two nurses, a custodian, therapists, and others at Hopewell, as well as bus driver and a parent, reported to Merritt and Boyd that Pickens was abusing disabled children throughout the three school years Pickens was at Hopewell, and many if not

all of these reports were provided directly to Pettes, and she received reports of abuse from Hopewell teachers and para as well.

121.

Merritt and Pettes had numerous discussions about Pickens' abusing disabled children and so did Pettes and Boyd.  However, when Merritt and Boyd answered interrogatories in Jake's case pending before the United States District Court for the Northern District of Georgia, Merritt and Boyd both intentionally failed to disclose any of these numerous discussions with Pettes when they were directly asked to identify everyone they talked to about Pickens' abuse or alleged abuse of disabled children while Pickens was at Hopewell.

122.

Pettes intentionally lied to the GaPSC when she told its investigator Judy Franklin during a taped interview in 2008 that she (Pettes) did not know about any abuse from November 2004 until the May 2007 incident.

123.

During Pettes' deposition taken in Jake's case, while under oath, Pettes admitted that she was repeatedly informed of the reports of abuse during the entire time Pickens was at Hopewell and that she also had many

discussions with Boyd and Merritt, as well as had at least three meetings with Boyd and Pickens about the reports of Pickens' abuse.

124.

Pettes also admitted during her deposition that she discussed Pickens' ongoing abuse of disabled children at Hopewell with her then supervisor, Wadel and prior to Wadel, with her supervisor, Shelley.

125.

From 2004 to 2007 and throughout that time, Pettes discussed with Hopewell paras and teachers, Boyd, Pickens, Merritt, and Wadel Pickens' abuse of disabled students many, many times.

126.

Pickens apologized for her mistreatment of disabled children at different times to Merritt, Sosebee, White, Boyd, Pettes, Faulkner, Shaffer, Etris, Thompson, Butler, and others.  Pettes never heard Pickens deny the abuse, but instead only heard Pickens apologize and say she would try to do better and that she would try to control her anger.

127.

In November 2004, Pickens admitted hitting and slapping Jake, but lied and alleged she hit and slapped Jake gently.

128.

Pickens admitted in an audio taped interview to the GaPSC to passing

gas in one or more student's face, shaking her buttocks in a disabled

student's face, putting disabled children in rooms alone restrained to a chair

with the door closed, and screaming in a child's face (she called it "scream

therapy").

129.

Pickens attorneys had a copy of Pickens' taped interview with the

GaPSC containing some of Pickens' admissions when they filed, on

Pickens' behalf, an answer to a complaint filed by Jake and pending in

federal district court, denying Pickens ever did any of these acts, including

ones Pickens had admitted to doing during her taped interview and admitted

to doing in writing, which Pickens' counsel also had.  Pickens' counsel had

Pickens' oral taped statement to the GaPSC transcribed, and they knew

when they filed Pickens' answer to Jake's case that they were filing a

pleading denying accusations that Pickens herself had admitted to doing

during a taped interview with the GaPSC.

130.

Pickens and her counsel had Pickens' tape recorded statement

containing Pickens' admissions regarding Pickens shaking her buttocks,

passing gas, screaming, and leaving children in rooms alone with the door
shut, but Pickens, through her counsel, "vehemently" denied and continues
to deny the allegations Pickens earlier admitted to the GaPSC.

131.

There are at least 12 different eye witnesses who have testified under
oath to having seen firsthand Pickens abusing, as defined herein, one or
more disabled children at Hopewell, and there are additional witnesses who
saw the abuse but who have not yet testified.

132.

White, the special education head department chair/lead special
education teacher at Hopewell, saw Pickens slam Jake into a wall, push
students, give Jake wedgies, and kick Jake.  White informed the GaPSC
investigator that she had "never worked in a school when they basically
looked the other way when a teacher was abusing a student and students."

133.

White reported Pickens' abuse to the former department head
(Averett) when White first arrived at Hopewell during the 2005-2006 school
year.  White also reported Pickens' abuse to Boyd and Merritt.  White,
however, knew Pickens' abuse of disabled children continued, and White,
acting in concert with Merritt, Boyd, Thompson, Sosebee, Pettes, Wadel,

and other defendants, never reported Pickens abuse of disabled children to

the GaPSC, DFACS, the FCSD police, any other investigative agency, or the

parents of the disabled children.

134.

The teaching assistants (paras) at Hopewell were afraid to work with

and did not want to work with Pickens because of the way Pickens abused

disabled children and because Pickens was called into Boyd's office at times

due to her abuse of the disabled children.

135.

Denise Baugh, a para in Pickens' class during the 2006-2007 school

year, testified that she witnessed, and in fact she did witness, Pickens burp in

disabled children's faces, scream at them, push and shove them, kick them

(by leaning back and kicking like Pickens was kicking a ball), push them

into lockers face first, scream at children in their faces, press her breasts and

buttocks into disabled children's faces, shake her breasts in their faces, pass

gas in their faces, and more.  Baugh testified she had never seen a school

district allow a teacher to abuse so many children for so long.

136.

While at Hopewell, Pickens abused disabled children every day, and when Pickens was angry, she would take her anger out on almost all of the disabled students in her class by being abusive to them.

137.

When a teacher or para tried to intervene on behalf of a disabled child being abused, Pickens would either angrily or rudely tell that individual to mind her own business or worse, abuse the disabled child or children more.

138.

At times, Pickens' abuse of disabled mentally impaired students was excessive and cruel corporal punishment.  Pickens would abuse physically disabled children, at times, because they did not do their work or else finish their work, or because they cried or made noises, or sometimes because they simply did not walk fast enough.

139.

While Pickens abused disabled children, including Alex, at Holcomb Bridge and Hopewell as excessive and cruel corporal punishment, Pickens also abused Alex and his classmates just because Pickens could and because she enjoyed harming the children.  Pickens also abused disabled children at

Hopewell because she had a temper and would take her anger out on the defenseless children who could not report the abuse.

140.

Due to the defendants' collective actions allowing, promoting, and covering up Pickens' abuse and not reporting the abuse, Pickens believed and knew she could continue abusing disabled children, including Alex, and that it was accepted by FCSD and others and that no one was going to stop her from doing so.

141.

Each year Pickens was a Hopewell, Pickens' abuse of disabled children worsened in intensity and frequency, and Boyd, Merritt, White, Thompson, Sosebee, Pettes, Biegelson, McGee, and others continued to be informed of Pickens' abuse but they continued to allow it, for FCSD and its top administration, including but not limited to Denmark, Lynch, Wilson, Wade, Beasley, Shelley, Wadel, Vanairsdale, Reece, Young, had intentionally and maliciously decided FCSD would and could abuse disabled children who could not report the abuse.

142.

A FCSD special education nurse named Goodman reported Pickens' abuse of disabled children in January 2006 to Defendants White (who said,

"We're working on her, you know, on things."), Boyd, and Meadows, and Meadows again reported the abuse to her supervisor and social work services, but FCSD and other named defendants ignored the abuse, did not have a social worker investigate Pickens' ongoing abuse, did not take actions against Pickens to dismiss her, did not remove Pickens from continuing to abuse the disabled children, and allowed Pickens to continue to abuse the disabled children for almost another year and one-half. Goodman reported that Pickens told a disabled child his mother was a "crack-head," and she reported again when she saw Pickens "jack up" a disabled child.

143.

Goodman reported to Boyd and others that Pickens told a disabled child that his mother didn't "give a sh_t about" him.

144.

Goodman reported to Boyd and others that Pickens would scream or yell at disabled children in her class and bang the table to intentionally startle them, and the children would flinch.

145.

Goodman saw Pickens talk "nasty" about disabled children's parents to the disabled students, and she reported this to Boyd and others, as well as

the fact that Pickens was placing disabled children, some with serious health issues, alone in a room by themselves.

146.

When Goodman began reporting the abuse Goodman had seen to Boyd, before Goodman ever said Pickens' name, Boyd asked, "Now what has Melanie done?"

147.

After Reddick reported Pickens in 2004, Boyd did not wish for Reddick to continue teaching at Hopewell, and Reddick transferred to a cluster of schools that did not include Hopewell.

148.

After Reddick reported Pickens' abuse of disabled children, Boyd told Pickens who had reported her, and after Goodman reported Pickens' abuse of disabled children, Boyd told Pickens that Goodman had reported her.

149.

Goodman told Averret that Pickens was too rough with the disabled children during the 2005-2006 school year, and Averett replied that the administration was well aware of that.  Averret, as the lead teacher on G Hall that school year, told both Merritt and Boyd that Pickens was abusing disabled children, but Averret did not report Pickens to the GaPSC, DFACS,

the FSCD police, any other criminal investigative agency, or the abused

disabled children's parents.

150.

Goodman told the GaPSC investigator in 2008, after Pickens resigned,

that she (Goodman) would not trust Pickens with her four children, all of

whom can walk and talk, because Pickens could lose her temper as fast as

one can snap her fingers.

151.

Pickens placed disabled students confined to chairs in rooms by

themselves and would leave them there sometimes for hours.  Everyone who

was a teacher or a para on G Hall from 2004 to 2007 knew this, and Boyd,

Pettes, Wadel, Butler, Merritt, and others had been informed throughout that

time that Pickens was placing disabled children in rooms restrained to chairs

by themselves.

152.

The disabled children abused by Pickens stopped liking to come to

school.

153.

All the time when Pickens abused disabled children at Hopewell, Boyd, and at least on one occasion, Thompson, gave Pickens completely positive teacher reviews.

154.

The disabled students, including Alex, Pickens abused at Hopewell could not defend themselves and they could not, due to their mental impairment and language disabilities, report to anyone that Pickens was in fact abusing them.

**ABUSE OF ALEX**

155.

Sosebee, a very good friend of Pickens and a co-teacher of Pickens at both Holcomb Bridge and Hopewell, had seen some of Pickens' abuse of disabled children and had heard of other of Pickens's abuse, yet Sosebee attended a meeting for Alex in Spring 2006, and as part of Alex's IEP team, determined that Alex would be placed at Hopewell on the G Hall when Sosebee knew that Pickens was abusing disabled children on the G Hall.

156.

Sosebee had a duty to protect Alex from abuse and to inform Alex's parents that the Hopewell placement was an abusive placement, but Sosebee

kept that a secret and hid it from Alex's parents and instead informed Alex's mother that Hopewell would be a good placement for Alex, which resulted in Alex being brutally abused for an entire school year.

157.

G Hall was where FCSD "housed" disabled students who were more severely involved.

158.

G Hall was called the "severe profound wing" by some FCSD employees and administrators, yet FCSD, Sosebee, Pettes, Wadel, Merritt, and others knowingly placed Alex on the G Hall when Alex only had moderate impairment, knowing Alex would be abused by Pickens, for Pickens had been abusing students at Hopewell for two prior years and FCSD disabled students with mental impairment for four prior years, and said defendants were well aware of the abuse.

159.

During the 2006-2007 school year, Pickens started pushing Alex down on the hard tile floor (which was placed on top of cement) or outside on the cement or pavement.

160.

A para name Denise Baugh told Defendant White that she had witnessed Pickens push Alex down.

161.

A bus driver reported he saw Pickens push or jerk Alex down on the pavement, and several paras reported this abuse.

162.

Boyd, Merritt, White, Sosebee, Pettes, Wadel, Thompson, McGee, and Biegelson had been informed that Pickens was pushing or had pushed Alex down during the 2006-2007 school year, yet not one of these defendants stopped or prevented this ongoing abuse, and not one reported it to DFACS, the GaPSC, Alex's parents, the FCSD police, or any other criminal investigative body, and they all hid and covered up this abuse while allowing it to continue.

163.

The defendants named in paragraph 162 above allowed Alex to be abused and covered it up by acting in concert with FCSD and other named defendants, as it was all defendants' policy, custom, and practice to allow disabled children with moderate, severe, or profound mental impairment to

be abused in the FCSD based upon their mental impairment and inability to report the abuse.

164.

A student witnessed Pickens push Alex down and reported it, and Boyd, Merritt, Pettes, Wadel, Thompson, Biegelson, White, Sosebee, McGee and others were aware of this report.

165.

One or more bus drivers witnessed Pickens push Alex down and reported it, and Boyd, Merritt, Pettes, Wadel, Thompson, White, Sosebee, Biegelson, McGee and others were aware of this report.

166.

When Pickens pushed Alex down, he would get hurt and have scrapes and or bruises on his hands, arms, and knees, but Pickens never prepared an incident report or told Alex's parents truthfully how Alex had been injured.

167.

No defendant has ever informed Alex's parents, even to this day, that Pickens pushed, shoved, and jerked Alex down on hard surfaces. Pickens would instead report to Alex's mom that Alex fell down, leaving out the fact Alex hit the ground because Pickens pushed, shoved, jerked, and yanked Alex down.

168.

Alex could not report to his parents that Pickens was repeatedly for nine months pushing, shoving, and jerking Alex down on hard surfaces or the injuries and pain he suffered from being pushed down, due to Alex's disabilities, and all named defendants knew this.

169.

Another para, Amanda Mathis Grover, saw Pickens pushing Alex down on the hard tile floor, cement, and pavement and yelling at him simply because Alex, due to his disabilities, walked slowly.

170.

Pickens acts of pushing and shoving Alex down were so severe and frightening, Grover reported this abuse to Boyd, crying about Pickens' abuse of Alex and begging Boyd to stop it.  Boyd, however, did not stop the abuse but instead once again stated, as she had in the past to numerous individuals reporting Pickens' abuse, that the matter was being addressed or taken care of when in fact it was not.

171.

Merritt told those who reported Pickens' abuse of Alex and other students the same thing, that it was being taken care of or addressed, yet it never was.

172.

No defendant named in the complaint stopped Pickens' abuse of Alex during the entire 2006-2007 school year, and all named defendants took actions to cover up Pickens' abuse of disabled children.

173.

Pickens also deprived Alex of lunch about two days a week for an entire school year or almost an entire school year.

174.

Pickens would throw Alex's book bag at him and knock him down on the hard tiled floor, pavement, or cement.  This too was reported to White, Sosebee, Merritt, Boyd, Thompson, Pettes, Wadel, and Biegelson, and again, these defendants covered up this abuse and allowed it to continue.

175.

Pickens screamed at Alex and cursed at him and in front of him, and she called him a "retard," "stupid," and other names, including a "little sh_t" and a "little fu_ker."

176.

Pickens abandoned Alex on the bus because he could not get off by himself because he was fatigued due to his disabilities and effort that day.

177.

Pickens placed Alex restrained to a Rifton chair or a Rifton bathroom chair and left him either in a dark room or a dark storage closet/bathroom by himself weekly, if not daily.

178.

Many witnesses have testified to seeing Alex alone restrained to a chair with the lights out, and Pickens in fact did do this.

179.

When Pickens restrained Alex to the Rifton bathroom chair, his legs would dangle, not touching the floor, and when Pickens restrained him to the Rifton chair, he was made to lean back many times, as the chair back had a 45 degree angle, as it was broken because some restrained children would kick, hit, and rock in the chair, trying to get out.

180.

At least once when Alex was abandoned in a dark bathroom restrained to a chair, he spread feces on himself and his clothes.  This happened to Jake at least three times.

181.

Pickens violently slammed Alex face first into metal lockers, ***if not every day, almost every day.***  Pickens would slam Alex face first into a

metal locker so violently that a teacher in classroom with her door shut could hear Pickens slamming Alex into a metal locker.

182.

Pickens would snatch and/or jerk Alex violently, making him fall, and she did this throughout the 2006-2007 school year.

183.

As Pickens kept abusing Alex by restraining him for long periods of time causing muscle weakness and atrophy and by shoving him down and into walls and lockers, Alex became more and more afraid of walking, and he would want to hold onto the wall or a hand when walking, but Pickens would refuse to allow him to hold onto the wall or hold her hand when he walked, and he would fall down, as his ambulation skills regressed severely during the 2006-2007 school year when Pickens was abusing Alex.

184.

When Pickens would shove, push, yank, or jerk Alex down, Pickens would start screaming at Alex to get up, and this abuse would so upset Alex that at times he would bang his head on the cement, pavement, or tile floor, wherever it was where he hit the floor.  Pickens would continue screaming at Alex to get up, and sometimes she would start pulling and yanking on Alex to get up.

185.

More than once, after Pickens pushed or jerked Alex down, Pickens allowed Alex to bang his head on a hard surface, including at least one time on the pavement.

186.

Pickens also passed gas in Alex's face, rubbed and shook her breasts and buttocks in Alex's face, and Pickens repeatedly, for an entire school year, yelled at Alex, intimidated him, and scared him.

187.

FCSD, Boyd, Thompson, Biegelson, Merritt, White, Sosebee, McGee, Pettes, Wadel, and other defendants never stopped or prevented Pickens from abusing Alex, and not even one ever informed Alex's parents their child was being abused at school or had been abused at school, and it is because of the conspiracy and individual and collective acts of all of the defendants named in this complaint that Alex was so severely abused for an entire school year and did not receive timely, necessary intervention, relief, medical support, and other help needed due to the horrific abuse he endured.

188.

When Alex was at Hopewell, he did not need a Rifton chair or a Rifton toilet chair and had been using regular chairs and toilets for years.

189.

The only reason Pickens placed Alex in a Rifton chair or Rifton toilet chair was so she could restrain and abandon Alex in a room, often turning the lights out and shutting the door.

190.

Pickens left Alex in a room by himself restrained to a chair with the lights out with the door shut anywhere from 30 minutes to hours at a time.

191.

Pickens restrained Alex to a chair and left him alone as punishment and otherwise abused Alex as set forth herein as a means of punishing Alex, and at other times, Pickens abused Alex as set forth herein just because she liked abusing disabled children or because it was convenient to her.

192.

Pickens abused Alex daily during the 2006-2007 school year, and this fact has been testified to by more than one eye witness.

193.

Pickens abused Alex by abusing other disabled students in front of Alex on a daily basis during the 2006-2007 school year.

194.

During the 2006-2007 school year, Alex and his classmates lived in daily fear for their well being and safety, and the abuse Alex suffered during that school year and the cover up of that abuse has harmed Alex for life, and he will never recover.

## SEVERE, LIFE-LONG HARM TO ALEX

195.

Because Pickens abused Alex as set forth above, Alex started not wanting to get off the bus at school, started not wanting to go to school, and began presenting to some FCSD educators as being afraid to come to school. That was not like Alex, for before the abuse, Alex had always wanted to come to school.  Many of the children Pickens abused stopped liking to come to school and would not want to get on or off the bus.

196.

Alex also started losing his toileting skills during the 2006-2007 school year and was soiling his clothes most days, and he has never regained his toileting skills to this time and is still working on this now that he is out of the FCSD.

197.

Alex began during the 2006-2007 school year to act as if he was afraid of the bathroom and would not want to go into the bathroom.  Alex also stopped asking to go to the bathroom, and he started stool (feces) holding, which caused medical issues for Alex and significant toileting accidents, for Alex would hold his stools until the weekend.

198.

To this day, Alex has not regained his toileting skill level before being abused, he does not ask to go to the bathroom, as he did before the abuse, and when he is anxious, he will hold his stool.

199.

Many of the children Pickens abused at Hopewell lost significant toileting skills, as did Alex, and none have gotten back to where they were before Pickens abused them.

200.

Alex started to be afraid of the dark and even partially darkened rooms during the 2006-2007 school year, requiring that at all times lights were on, even when it was bedtime, and this continued to worsen over time. To this day, Alex is traumatically afraid of the dark, and he will get upset at times even if lights are low.

201.

Alex is also is very afraid of being in a room with no windows, and he will not go a dark room or a room with no windows, or otherwise, he will show anxiety and often start saying, "lights on, lights on, rope, rope, tie it up, tie it up, check bottoms, check bottoms, Lysol, Lysol, little fu_kers, little fu_kers" or some other combination thereof.

202.

Now that Alex's parents have finally learned of some of the abuse Alex endured at Hopewell and have been able to obtain help regarding Alex's fears, they have worked on Alex's fear of rooms without windows and dark or dimly lit rooms, yet this still presents as a severe issue for Alex.

203.

The room and storage closet bathroom where Pickens abandoned Alex restrained to a chair both were both without windows, and Pickens would turn the lights out when she left Alex in the rooms alone restrained to a chair with the door closed.

204.

Pickens also would often say in an angry, upset tone when she smelled a soiled child, "check bottoms, check their bottoms."  Alex, when

upset or triggers his past trauma, will say, inter alia, "check bottoms, check bottoms, check bottoms."

205.

Witnesses have testified that Pickens "tied" children into the chairs where she abandoned and restrained them, and she did so at times, and straps were with some of the chairs used.  When something triggers Alex and the trauma he suffered, he will say, inter alia, "rope, rope, tie it up, tie it up."

206.

Sometimes Pickens used a tray up against Alex's and other disabled children's body's and at times used the tray to restrain Alex's and other children's body and arms to the chair.

207.

During the 2006-2007 school year, Alex's sleeping ability started to decline and became impaired, and he had trouble going to sleep at night and staying asleep during the night.  By the morning, Alex's bed sheets were all off the bed.  Alex to this day has difficulty going to sleep and staying asleep, especially if he has experienced a recent trigger of the trauma and abuse he suffered at Hopewell.

208.

During the 2006-2007 school year and thereafter, Alex began not to ambulate like he used to, became afraid and anxious to walk, and regressed to wanting to hold on to objects when he walked or to hold someone's hand when he walked, acting as if he were afraid.

209.

During the 2006-2007 school year and thereafter, Alex began to cower when he walked and he started looking nervously behind himself, but his parents did not understand why Alex did this until they learned that Pickens was pushing and yanking Alex down on hard surfaces and throwing things at Alex to make him fall.

210.

Since Alex suffered severe abuse during the 2006-2007 school year, Alex is hyper vigilant and over reactive to many things at the present time, including people walking behind him and learning.  Alex will call himself a "retard" and "stupid," as Pickens called him at times when he is learning.

211.

The bus driver who witnessed Pickens' pushing down Alex told Alex's mom she needed to do something because Alex was falling, but

Alex's mom did not know the bus driver was witnessing Pickens push and shove and jerk Alex down.

212.

Pickens continually told Alex's mom that she (Alex's mom) needed to do something because Alex was falling all the time.  Again, no one told Alex's mother that Pickens was shoving and yanking Alex down or that she was throwing things at him to knock him down.  Pickens would also make Alex walk with his backpack on, knowing that would impair his balance and make him fall.

213.

When Alex's mother informed Alex's doctor that Alex's teacher and bus driver were saying Alex was falling a lot and she reported the changes in Alex's walking, Alex's doctor recommended a medical procedure which would not have been recommended if the truth had been known.  This medical procedure was not needed, and the result was that it further impaired Alex's ability to walk for over a year.

214.

Ever since Pickens started abusing Alex, he has continued to regress in his ambulation skills, so much so, FCSD started putting Alex in a wheel chair when he was in a FCSD high school.

215.

Because Pickens restrained Alex to a chair throughout the 2006-2007 school year, Pickens caused Alex to lose very necessary muscle tone, stability, endurance, and balance for walking, and he still to this day is not fully recovered.

216.

During the 2006-2007 school year, Alex's parents noticed he started to become shy and withdrawn, which was unlike Alex, who had always been so social.  The following year, Alex continued at Hopewell, for FCSD and many of the named defendants herein withheld the fact Alex had been abused at Hopewell.  Alex continued to withdraw at Hopewell and became less and less social.

217.

During the 2006-2007 school year and thereafter, Alex started no longer enjoying or wanting to do things he so loved, like riding in the boat, swimming in the pool, eating outside, and swinging on the porch swing.

218.

Alex began the 2006-2007 school year loving to greet and talk to others, but as the year progressed and thereafter, Alex quit greeting others

and he stopped talking with people, which he had always loved to do in elementary school.

219.

When Pickens was getting Alex in from the bus or to the bus, if Alex stopped and talked to a teacher or para, Pickens would push, shove, jerk, or yank Alex, with the result being at times Alex going down on a hard surface. Educators learned it was safer for Alex for them to avoid Alex and not talk with him, because when they would stop and greet Alex and talk to him, this would infuriate Pickens, and she would physically and verbally abuse Alex.

220.

When Alex started back at Hopewell during the 2007-2008 school year, when Alex's mother took him to the room of his new teacher, Sosebee, Alex refused to go into the room and started saying "lights on, lights on, lights on." Alex's parents had no idea at that time Alex had been abused for an entire school year at Hopewell.

221.

When Alex started high school in FCSD, Alex got upset and started saying "lights on, lights on, lights on" and he did this for some period of time, before shutting down more and more.

222.

FCSD placed Alex in high school with a teacher with the same first name as Pickens in a room with no windows, all the while it withheld from Alex's parents the severe abuse Alex had endured.   Alex's teacher, not knowing about the prior abuse, often kept the room with no windows dimly lit, and Alex continued to withdraw more and more to the point that he had become almost catatonic.

223.

Alex's language skills started to regress when he was being abused during the 2006-2007 school year and continued to do so every year until he was removed from the FCSD.  Alex went from often speaking in 3-5 word sentences when he started at Hopewell and loving to talk with his teachers and others and from initiating spontaneous speech to not talking to individuals unless they spoke directly to him, holding his head down, avoiding eye contact, and speaking in mostly one word responses.

224.

Alex's language skills were rapidly increasing until he was abused at Hopewell, and ever since then, until he was removed from the FCSD, he regressed severely in communication, and he lost many valuable years of

making progress.  Alex continued to regress so severely that he would not even make requests or express desires.

225.

After Alex suffered a year of abuse, he no longer had his wonderful sense of humor, which was one of his most predominant personality traits that almost everyone who knew Alex liked and commented positively about.

226.

After Alex was abused for a school year at Hopewell, Alex stopped saying "I love you" to his mother and father, and he stopped hugging his family members.  Alex actually quit crying and showing any emotion, and he started presenting more and more with a flat affect.

227.

During and after the 2006-2007 school year, Alex started regressing in his eating.  He started to quickly eat all his food as fast as he could and then immediately leave the table.

228.

It has only recently been learned within the last year that Pickens would snatch Alex's and other disabled children's food away from them if she was angry, ready to go, angry because they did not eat fast enough, or for who knows what other reasons.

229.

It has only recently been learned in the last year that Pickens would abuse Alex and his classmates physically, emotionally, and verbally in the Hopewell cafeteria and especially when they went to eat out in restaurants in the community.

230.

Pickens so abused Alex and his classmates during trips to restaurants, other Hopewell teachers and paras would not sit with Pickens and her students, as they were ashamed of the way Pickens abused her students and did not want to be associated with her in public.

231.

Alex loves Mexican food, but he cannot eat at the Mexican restaurant Pickens took Alex and his classmates to on outings, as he becomes anxious, agitated, and traumatized and has to leave.

232.

During the 2006-2007 school year, Alex's eyes started moving in his head.  Alex's parents could not figure out why.  Garrett Lee, another child Pickens brutally abused, also started having this issue, but the parents of these two boys did not know each other at that time.  Both Alex and Garrett were checked for seizures, and neither were having seizures.  Both Alex's

and Garrett's parents figured out within the last year that the boys presented

with that issue when they were stressed and anxious from the abuse and

trauma they suffered at Hopewell.

### 233.

Alex continued to regress without any intervention for the cruel and

vicious abuse he suffered, and his parents did not know what was causing

the regression in Alex across all domains.  FCSD, Wienmann, Thompson,

and Biegelson told educators at Hopewell they could not inform anyone,

especially parents, about the abuse Alex and his classmates suffered.

### 234.

FCSD also told Alex's high school educators not to ever discuss the

abuse Alex suffered at Hopewell with his parents or any one else.

### 235.

Alex's parents only knew of a few incidents of abuse to Alex in late

July 2009, learned more during the IDEA due process hearing held in Fall

2011, have learned of a lot of the abuse in the past year due to depositions

being taken in Jake's case, and still do not know of all the abuse Alex

suffered, for all defendants have worked intentionally, maliciously, and

diligently to hide, cover up, and obscure the abuse Alex suffered.  This has

caused Alex significant additional harm, for this deprived Alex of

intervention and environmental changes as well as medical and psychological care to help address the trauma Alex has suffered.

236.

Alex's father is a medical doctor and his mother was a practicing nurse, and they were becoming increasingly worried about Alex, as he continued to regress and they had very limited knowledge of the abuse of their son.

237.

Alex's parents, totally unaware of the vast majority of abuse Alex suffered, wanted to ensure Alex's regression and loss of skills, interest, and personality was not due to a medical issue.  Thus, Alex's parents began working with Alex's medical doctors to try to figure out what was causing Alex to continue to regress.  Numerous medical tests were run, and nothing was found, and in an effort to ensure there Alex was not suffering from some medical issue, Alex was admitted to the hospital in October 2010.

238.

One evening when Alex was hospitalized in October 2010 and his room lights had been dimmed, Alex started acting very odd, started ringing his hands, started rocking, and started saying a lot of words all together. Those words were "check bottom, check bottom, rope, rope, Lysol, check

bottom, check bottom," and Alex said these words repeatedly, as if he were in a trance.

239.

Alex's neurologist examined Alex and requested the hospital psychiatrist check Alex, and when the psychiatrist asked if Alex had been abused, and his mother said yes, at Hopewell, Alex covered his face and for the first time in a long time, Alex started crying.

240.

Alex was diagnosed with post traumatic stress disorder (hereinafter "PTSD"), and his treating psychologist has confirmed that diagnosis.

241.

Today, even with belated intervention and medication, Alex still suffers from significant PTSD due to the violent and ongoing physical, emotional, mental, sexual, and verbal abuse he endured and due to the fact that he did not receive intervention, supports, necessary environmental changes, medication, psychological assistance, and parent training and information all needed to help address Alex's trauma from the abuse.

242.

All defendants acted together in concert to ensure that either Alex was abused and the abuse was hidden and covered up or that the abuse was

covered up and hidden after the fact, and all defendants' actions have caused Alex significant, lifelong harm.

243.

Alex has been placed on Zoloft, and this has helped somewhat, along with Alex's removal from FCSD, psychological support and training, parent training and information, some knowledge of triggers of anxiety and trauma becoming recognized, and other such measures and interventions, but even with all of this, while Alex is functioning much better than when he was being abused and thereafter while he was in the FCSD, he suffers severely from anxiety, fear, and trauma from the cruel, intolerable abuse he suffered for an entire school year and from the fact that Alex's parents were not informed of the abuse Alex suffered and still have not been informed of all the abuse Alex suffered.

244.

When Alex's parents were informed that Alex had PTSD from the abuse he suffered, which was mostly unknown, they began seeking all of Alex's educational records and the answers the FCSD refused to disclose to Alex's parents.

245.

Alex's parents had to know what happened to Alex so they could help their son.  As of October 2010, Alex's parents did not know hardly anything that had happened to Alex at Hopewell due to the FCSD and other defendants.

## THE FIVE-YEAR ABUSE AND COVER UP

246.

In addition to that set forth above, FCSD has intentionally and maliciously taken actions from 2002 to the present time to ensure that the parents of disabled children abused by Pickens, including Alex's parents, never learned of or at least never fully learned of the abuse of their children, including the abuse of Alex, and to ensure that the defendants' conspiracy to abuse disabled children with mental impairment and cover up that abuse was never exposed.

247.

FCSD and other named defendants, including but in no way limited to Schuette, Kanner, Beasley, Wade, Wilson, Pettes, Wadel, Faulkner, Butler, Weinmann, Tinsley, Biegelson, Merritt, Boyd, and Thompson, have destroyed, deleted, altered, or otherwise not produced documents, including subpoenaed documents, involving Pickens' abuse of disabled children since

2002.  FCSD also failed to even attempt to comply with the subpoena served upon it during the IDEA due process hearing, requiring FCSD to provide all documents related to any abuse or alleged abuse by Pickens.  FCSD's legal counsel has been an active part of FCSD's willful, malicious, and intentional failure to produce documents subpoenaed and to conceal the abuse of disabled children by Pickens.

248.

FCSD intentionally and willfully did not comply with the subpoena served upon it by Alex's parents in the IDEA due process hearing, as ordered to do; Schuette willfully and intentionally deleted emails involving Pickens' abuse **after** she was served with a subpoena; and FCSD willfully and intentionally, through its counsel, misrepresented it had provided all responsive documents related to any abuse or reported abuse by Pickens when in fact FCSD did not do so and knew it had not done so and did not even ask certain FCSD employees involved in Pickens' abuse of disabled students for the subpoenaed documents.

249.

FCSD and some of its employees have also intentionally and willfully altered or destroyed documents related to Pickens' abuse of disabled children, which began in 2002 and lasted until 2007.

250.

Merritt has reported there were emails and documents related to Pickens' abuse of disabled children, but Merritt and FCSD have never provided those emails, even when requested by subpoena or formal discovery.  FCSD has refused to provide any emails regarding Pickens' abuse of disabled children, including Alex.

251.

FCSD, through its counsel, employees, agents, board members, and/or other representatives, intentionally and willfully altered the investigative report of Pickens conducted by Stan Williams' company (referred to at times as the "Umbarger report" and hereinafter so referred).

252.

FCSD has at least three versions of the Umbarger report, and FCSD, through its counsel, employees, agents, board members, and/or other representatives, intentionally and willfully altered that investigative report.

253.

FCSD, through its counsel, employees, agents, board members, and/or other representatives, has intentionally and willfully deleted, destroyed, or otherwise not provided one or more of the audio recorded witness statements that were part of the investigation by Stan Williams' company and

Umbarger, including but not limited to Tallant's taped witness statement.
Defendant Wade attended Umbarger's interview of Tallant, but he testified
under oath he did not when in fact he did.

254.

FCSD, through its counsel, employees, agents, board members, and/or
other representatives, has intentionally and willfully not provided numerous
and multiple emails involving Pickens' abuse or reported abuse of disabled
children, beginning in 2002 and lasting until 2007.

255.

FCSD, through its counsel, employees, agents, board members, and/or
other representatives, has intentionally and willfully not provided numerous
and multiple documents involving Pickens' abuse or reported abuse of
disabled children, beginning in 2002 and lasting until 2007.

256.

FCSD has at all times until some time after November 1, 2011 failed
and/or refused to allow FCSD police to investigate Pickens' abuse of
disabled children.

257.

Defendants FCSD, Wade, Wilson, FCSD's legal counsel, and other
defendants, FCSD employees, and FCSD board members, including Schultz,

intentionally decided that FCSD police would not and/or would not be allowed to investigate Pickens' abuse of disabled children until after some time after November 1, 2011.

258.

The only reason FCSD, Wade, FCSD legal counsel, other defendants, and Robert Avossa (the then and current FCSD superintendent and hereinafter referred to as "Avossa"), Schultz, and other FCSD board members allowed FCSD police to investigate in November 2011 or thereafter Pickens' abuse of mentally impaired students years after Pickens' abused Alex and other mentally disabled children, is because of the persistent scrutiny and pressure CBS Atlanta (WGCL Television) and one of its reporters, Jeff Chirico (hereinafter referred to as "Chirico"), applied to Paul Howard, the Fulton County District Attorney (hereinafter referred to as "Howard").

259.

After CBS Atlanta and Chirico continued to ask Howard and his office why the ongoing abuse of disabled FCSD students had not been and was not being investigated and CBS Atlanta and Chirico continued to report the story of abuse and lack of criminal investigation, finally, in November 2011, it was announced the District Attorney's office would investigate the

abuse of disabled children by Pickens, but this did not happen.  Instead,
Howard reportedly told Wade and/or Avossa that it would be in FCSD's
"best interest" to investigate Pickens' abuse of disabled children.

260.

Prior to CBS Atlanta and Chirico's involvement and pressure for a
criminal investigation, FCSD, other defendants named herein, Avossa,
Schultz, other board members, FCSD legal counsel, and others refused to
allow FCSD police or any other criminal investigative agency to investigate
Pickens' abuse of disabled children.  The reason for this is because FCSD,
the named defendants, and other FCSD employees and board members were
all complicit with and in the abuse of numerous disabled children and the
cover up of the abuse and its allowance.  To FCSD and its then current
administration, or some of its then current administration and board
members, doing "damage control" was much more important than Alex's
parents and the other disabled children's parents being fully informed as to
what happened to their disabled children so they could help and get help for
their children and make informed decisions.

261.

In 2007, when FCSD hired Stan Williams' company to investigate the
abuse by Pickens of Jake on one day in May 2007, the investigative report

was provided to Wade and Kanner.  It was Kanner's job in the FCSD to report abuse of one or more students by an educator to the FCSD police, but Kanner intentionally and maliciously, at Wade's and FCSD's direction, did not do so.  Kanner was a part of the cover up of the abuse of disabled children.  It is FCSD's policy, practice, and custom to not only allow educators to abuse disabled children who cannot report the abuse, but to cover that abuse up and not inform all authorities of the abuse, unless forced to do so.

262.

To this day, FCSD has never thoroughly investigated the abuse Alex suffered, and FCSD refuses to cooperate in any way with Alex's parents in learning of the abuse Alex suffered so Alex can be better helped and his parents fully informed.  For example, FCSD obtained from the Milton Police Department FCSD's police investigation of the abuse of disabled children by Pickens, but it has never provided that report to Alex's parents, yet FCSD has tried to use that report, which is FCSD's own police report, against Garrett Lee and his family.  It also redacted the report so what abuse which child suffered cannot be discerned.  FCSD has never even informed Alex's parents of the conclusions or results of its police investigation into the abuse of Alex.

263.

FCSD, Wilson, Wade, Kanner, and others have taken numerous intentional actions to ensure Alex's parents never learned of the abuse Alex suffered, from withholding, destroying, altering, and not producing documents and information about Pickens' abuse of Alex and other children to informing FCSD personnel they cannot disclose the abuse of Alex or talk about it to Alex's parents to altering and redacting documents, and more. This has caused and continues to cause harm to Alex, as his parents must be fully informed of the abuse Alex suffered so Alex can have the proper environment, educational program, medical care, psychological care, and support.

264.

When Jake's mother began to learn of the abuse of her son and other mentally disabled students at Hopewell, she filed a police report with the FCSD police regarding the abuse Jake had suffered.  Defendants FCSD, Wade, Wilson, and others, including FCSD counsel, and upon information and belief, the FCSD board of education members or at least Linda Schultz (hereinafter referred to as "Schultz") decided that once again the abuse of disabled children by Pickens would be hidden, covered up, and obscured and that no police investigation would be had.

265.

When Jake's mother filed a police report with the FCSD police regarding Pickens' abuse of Jake and other disabled children, Wade, Wilson, Mark Muma (the then FCSD director of public safety), FCSD legal counsel, FCSD, other defendants named herein, other individuals, and one or more of the FSCD board members, including Schultz decided that the FCSD police would not investigate the abuse of disabled children by Pickens for they knew there had been a FCSD wide spread conspiracy to allow Pickens to abuse disabled children with moderate, severe, or profound mental impairment for years and an intentional cover up of the abuse.

266.

After Jake's mother filed a police report with the FCSD police, Wade; Muma; FCSD counsel; and former chief of FCSD police Chandi Green, also known as Chandi Ashmore (hereinafter referred to as "Ashmore"), at the least, all met together, and during that meeting, Wade told Ashmore that Pickens' abuse of disabled children was not to be investigated by the FCSD police department even though Jake's mother had filed a police report regarding Pickens' years of abuse with the FCSD police department. Instead, Wade told Ashmore the FCSD police department was to only look

into whether the FCSD had reported the abuse by Pickens of disabled

children to the FCSD police.

267.

Having received directions from Wade in the meeting set forth in

paragraph 266 above, Ashmore informed FCSD police officer Felipe Usury

(herein after referred to as "Usury") he was to look into whether the FCSD

had reported the abuse by Pickens of disabled children to the FCSD police

and other agencies, and Usury's limited investigation disclosed that the

FCSD had never reported the abuse of disabled children by Pickens to the

police.  At that point, based upon a decision by Wade, FCSD, Ashmore,

FCSD's counsel, Muma, and others, including Schultz and/or other FCSD

board of education members, Usury was not given permission to move

forward.  Instead, he was told to "ex-clear" the matter after he looked into

whether it had been reported.

268.

"Ex-cleared" means the matter is closed and the file shut without any

further investigation, according to Usury's testimony at the IDEA due

process hearing.  Usury also testified at the IDEA due process hearing that

although the statute of limitations had not expired for criminal prosecution,

Usury's superior (Ashmore) told him only to see if the abuse had been

reported, even though Usury was not even the north county police officer, but was instead he was the south county police officer, and the matter was a north county police matter.  Pickens should have been investigated and reported to the district attorney and there is no reason to "ex-clear" or close a file simply because the teacher is no longer employed by the FCSD.  Shortly after Usury testified and did not reveal during his testimony that Wade and other FCSD administration had decided and told Ashmore to ensure the matter was not truly investigated, FCSD, Wade, Schultz, and others made Usury the chief of the FCSD police.  Ashmore had told Usury that she (Ashmore) had been told that there was not to be an investigation of the abuse by Wade and Muma, but Usury did not reveal this during the IDEA hearing.

269.

An unbiased, meaningful criminal investigation would have revealed the large number of FCSD administrators, board members, and personnel who were actively involved in allowing Pickens to abuse disabled children with moderate, severe, or profound mental impairment and the criminal and civil conspiracy to allow the children to be abused for five years and the cover up of that abuse.  FCSD, Wade, Wilson, FCSD's counsel, FCSD's board, and others would not allow.  To this date, FCSD has held no one

accountable for the five years of abuse disabled students with mental

impairment suffered, except that it finally reported Pickens and Boyd only to

the GaPSC and it sent a discharge letter to Boyd, but then allowed her to

retire a year after she was to be discharged.

270.

When Alex's parents received limited information from Jake's mother

in late July 2009 that Alex had been abused, to some degree, during the

2006-2007 school year, they had only very limited information and a

redacted report about abuse mainly of Jake (FCSD limited its investigation

in 2007 to Jake, and it even limited the investigation to one incident on one

day, but witnesses told about other abuse).

271.

Desperate to find out what happened to Alex, his parents asked FCSD

for all of Alex's educational records on November 5, 2010, but all FCSD

provided were two pages of Alex's elementary school transcript.

272.

In February 2011, Alex's parents had to hire an attorney just to try to

obtain the report of abuse without Alex's name and associated

characteristics redacted and to obtain the accompanying witness statements,

106

and even with an attorney, it took months to obtain only some of the documents.

273.

Just for FCSD to finally provide some of the tapes of witness statements about some of the abuse, Alex's parents had to inform FCSD they were going to file a complaint against the FCSD with the State Attorney General, and they had to have their counsel send repeated requests to FCSD's counsel.

## THE IDEA DUE PROCESS HEARING

274.

On June 16, 2011, with only limited knowledge of the abuse Alex had suffered, Alex, by and through his parents, Douglas and Lisa Williams; Douglas Williams; and Lisa Williams requested a due process hearing pursuant to the IDEA.

275.

In their IDEA request for a due process hearing, Alex and his parents asserted that the FCSD, inter alia, intentionally, maliciously, and willfully denied Alex procedurally and substantively a free appropriate public education (herein after referred to as "FAPE") during the 2006-2007 school year and thereafter; that FCSD knew Pickens was a child abuser of disabled

children and intentionally and willfully intended to harm Alex by placing him at Hopewell with Pickens; that FCSD knew Pickens was abusing Alex and hid and concealed the abuse; that FCSD and its counsel refused to provide records to Alex and his parents; and that after Pickens abused Alex, FCSD denied and continued to deny Alex a FAPE and continued to cover the abuse up and hide it from Alex's parents.

### 276.

In response to Alex's and his parents request for an IDEA due process hearing, on June 24, 2011, FCSD, through its counsel, asserted that Alex was appropriately placed with Pickens at Hopewell and that he received during the 2006-2007 school year and thereafter a FAPE.

### 277.

FCSD, through its counsel, had earlier asserted FCSD had appropriately placed Jake and provided him a FAPE in response to Jake's hearing request.  Pickens abused Jake for three school years, and during that time, Pickens hit, kicked, pushed down, slapped, passed gas on, kneed, jacked up, slammed into concrete walls, bit, and did many other abusive acts to Jake.

278.

In response to Alex's and his parents request for an IDEA due process

hearing, on June 24, 2011, FCSD, through its counsel, did not admit or deny

that FCSD knew Pickens had been abusing children for years before it

placed Alex with Pickens or that Pickens abused Alex.

279.

On August 19, 2011, FCSD filed a motion to dismiss before the

Office of State Administrative Hearings (hereinafter referred to as

"OSAH"), arguing in bad faith that Alex's parents should have known that

FCSD and Pickens was abusing Alex.

280.

On August 29, 2011, the ALJ denied FCSD's motion to dismiss.

281.

When FCSD, Pickens, and other defendants acting in concert

therewith were abusing Alex, his parents were providing to FCSD free

medical services to disabled children.  So that FCSD would not have to pay

a physician to approve FCSD disabled students to participate in the Special

Olympics, Alex's parents, Dr. Douglas Williams, a pediatrician, and Alex's

mother, Lisa Williams, a nurse, were volunteering, as they had for years,

their time to save FCSD funds and assist FCSD disabled students to participate in the Special Olympics.

282.

The ALJ found that every witness asked about Pickens' conduct toward her disabled students agreed that such was "outrageous" and "appalling," yet FCSD and all defendants herein knew about that abuse and allowed it without reporting it until May 2007, when in fact the abuse began in August 2002.

283.

The ALJ found that FCSD did not inform Alex's parents of the abuse of Alex in 2007 even though many FCSD's witnesses testified that parents must be informed of abuse of their children to make informed decisions for their children's sake.

284.

The ALJ accurately found that FCSD allowed Pickens to resign and allowed Boyd to resign (effective June 30, 2008) as a curriculum support analyst.  FCSD in fact did do this.

285.

Boyd never served as a curriculum support analyst for FCSD although FCSD and Boyd represented in writing that she did so that Boyd would receive more beneficial retirement advantages without costs.

286.

FCSD asserted and allowed Boyd to assert Boyd was employed by the FCSD as a curriculum support analyst during the 2007-2008 school year when in fact Boyd never performed any work in that position.  This agreement between Boyd and FCSD allowed Boyd to accrue 30 years for retirement.

287.

After Boyd relocated from Atlanta to South Carolina, Boyd submitted to the College of Charleston a document alleging she was a principal with the FCSD at Hopewell until 2008 when in fact that was not so and Boyd knew it was not so.  When Boyd was asked to admit she did this in Jake's case, Boyd objected to admitting in formal discovery she had provided a document for employment purposes to the College of Charleston in which she had not accurately reflected her employment history with the FCSD. However , after Jake, through counsel, stated a motion would be filed and fees sought, Boyd admitted that she represented to the College of Charleston

that she was a principal until 2008, yet Boyd alleged in formal discovery in response to a request for admissions, that she "made a clerical error in her representation that she was employed as Principal by the FCSD in 2008."

288.

In ruling upon the IDEA due process hearing request filed by Alex and his parents and the overwhelming evidence presented during the hearing, the ALJ found, inter alia, that Alex's parents did not know and could not have reasonably known Pickens was abusing Alex during the 2006-2007 school year; Alex could not go home and tell his parents he was being abused at school in the FCSD; Alex's and his parents' procedural IDEA due process rights were violated by the FCSD, amounting to a denial of a FAPE; Alex's substantive due process rights to a FAPE were denied by FCSD; Pickens abused Alex during the 2006-2007 school year resulting in long term regression; FCSD allowed abuse of Alex and others due to their segregation on G Hall, with the ALJ finding in writing that "the isolation and restraint of Alex, Jake M., and other students in empty, dark rooms on G Hall was not dissimilar to the warehousing of disabled students in the 1970s, in its worse form."

289.

The ALJ properly found that "based on a preponderance of the evidence, that Alex's placement in Picken[]s'classroom was inappropriate, that Alex was physically and psychologically abused by Pickens during the 2006-2007 school year, and that such abuse has had a lasting effect on his progress in school.  Accordingly, Alex is entitled to compensatory education and services under IDEA." The IDEA does not allow monetary damages, so the ALJ could not award such.

290.

The ALJ also found that FCSD's "physical segregation of the mostly non-verbal disabled students to G Hall allowed the abuse to go unnoticed by others in the school community - such as parents and other regular education students - whose jobs were not dependent on Boyd's favor and who might have more readily complained of Pickens' misconduct."

291.

There is no discovery allowed in IDEA due process hearing requests in Georgia, and to this date, FCSD has refused to provide to Alex and his parents, Garrett Lee and his parents, and other abused disabled children and/or their parents all documents related to Pickens' abuse of disabled children.  Until FCSD is required to produce such documents, Alex's parents

113

and the parents of the other disabled children will never know what

happened to their children.

292.

The ALJ also found that FCSD's failure to fully inform Alex's parents

of the abuse he suffered was a significant procedural violation that amounted

to a denial of FAPE; that FCSD "failed to provide Mrs. Williams [Alex's

mother] access to a number of education records as required under IDEA.  In

addition to a properly redacted version of the [Umbarger] report, the School

District withheld other education records from Mrs. Williams, including the

data relating to Alex's Roswell High IEP goals, his attendance records, and

his therapy records.  Further, this procedural violation 'seriously infringed'

on the parents' opportunity to participate in the IEP process."

293.

The ALJ also found that "the data relating to [Alex's] 2010-2011 IEP

goals, once produced late in the hearing, revealed that Alex's teachers were

not implementing all of Alex's IEP objectives and that their data collection

was faulty. With respect to Alex's belatedly-produced attendance and

therapy records, such records demonstrated a pattern of shoddy record-

keeping and significant gaps in service over the past two years."  The ALJ

therefore concluded "that the denial of timely access to Alex's education

records was a procedural violation that had a demonstrable impact on th[e] proceeding."

294.

The ALJ further ruled that "in many areas, including toileting, speech and language, social interactions, and self-help skills, Alex regressed from year to year.  Moreover, Alex's IEPs were replete with goals that fostered prompt dependency, as opposed to independent skill acquisition." The ALJ concluded "that Alex's IEPs for the 2009-2010 and 2010-2011 school years were not reasonably calculated to lead to 'measurable and adequate gains in the classroom,' but rather were designed to confer 'a mere trifle of benefits' in violation of IDEA."

295.

Among other findings, the ALJ ruled that FCSD's IEP for Alex "for the 2011-2012 school year [wa]s not an appropriate education plan for Alex, both in terms of the services offered, the goals and objectives identified, and the proposed placement at Roswell High."

296.

The ALJ concluded as well, that "based on the unique circumstances of this case, including the history of Pickens' abusive conduct, the widespread knowledge of her actions by employees of the

115

School District, and the School District's failure to disclose the abuse to Alex's parents," that Alex's mother's "refusal of a placement within the School District is a genuine, understandable parental reaction to the facts that have come to light in this case."

297.

After carefully considering the evidence presented during the IDEA due process hearing, the ALJ ruled the following compensatory relief and reimbursement was appropriate:

1) Education and necessary related services, including occupational therapy, physical therapy, and speech therapy, as well as supplementary aids and services, to be provided by private providers primarily in Alex's home and community and pursuant to an individualized education plan designed by Dr. Mueller or another person qualified in developing educational programming for students with developmental disabilities. An initial individualized education plan shall be developed promptly after the following assessments are completed, by providers selected by Plaintiffs:

a) Comprehensive skills assessment;

b) Reinforcer assessment;

c) Psychological evaluation and consultation by a pediatric psychologist or psychiatrist, who is identified and selected by Plaintiffs and who is trained in diagnosis and treatment of PTSD.

2) Psychological counseling or therapy, to the extent and of the type recommended by a pediatric psychologist or psychiatrist, including family or play therapy.

3) The individualized education plan shall include, at a minimum, measureable goals and objectives, trial-based instruction and a provision for regular data collection, and a schedule for at least annual reassessment and review.  All reassessments shall include an evaluation from each private service provider regarding the level of service needed in the coming assessment period, and whether the level should be reduced.

4) A maximum of eight hours per day of instruction and services for a period of time equivalent to five 180-day school years, provided by private service providers pursuant to an individualized education plan.  Such instruction and services shall be paid for by the School District upon receipt of periodic invoices for services rendered. Such invoices shall be paid promptly, but the School District is not required to pay for services in advance.

5) Within one week of the development or reassessment of an individualized education plan for Alex, Plaintiffs shall provide the School District with a

copy of the plan.  If the School District wishes to do so, it may notify

Plaintiffs of alternative providers or supplementary aids or services that

might be available through the School District, including providers who are

employed by the School District or supplementary aids owned by or

procured through the School District.  Plaintiffs must consider the suggested

alternative provider or supplementary aid or service, but are not obligated to

use them.

6) If at any time, the pediatric psychologist or psychiatrist monitoring Alex

determines that education in a school setting no longer presents a risk of

harm due to PTSD or other psychological concerns, Alex's parents shall

notify the School District in writing within two weeks of this determination.

The parties shall convene a meeting, at a time, place, and location agreed

upon by the parties, to consider whether enrollment in a school-based

program, whether private or public, would meet Alex's educational needs

and be the least restrictive appropriate environment for his education

program. The parties may agree on such a placement at any time and under

any terms, but neither party is obligated to do so.

298.

The ALJ also found that Alex and his parents were "entitled to

reimbursement for appropriate, reasonable, private OT and PT services, as

well as the educational planning services provided by Dr. Mueller, to the

extent they were provided for Alex and not solely in anticipation of

litigation, since the filing of the due process complaint." The ALJ entered a

second order awarding Alex's parents $18,889.25 in reimbursement for

educational services covered by the IDEA that they had provided to Alex.

## COUNT ONE – AGAINST DEFENDANT FCSD

## RECOVERY OF ATTORNEY'S FEES AND COSTS UNDER IDEA

299.

Plaintiffs' incorporate paragraphs 1-2, 37-47, 274-298 above as if

fully set forth herein.

300.

"In an action or proceeding brought under [the IDEA], the court, in its

discretion, may award reasonable attorneys' fees as part of the costs to a

prevailing party who is the parent of a child with a disability."  20 U.S.C. §

1415 (i) (3) (B) (I).

301.

"[A]bsent special circumstances that would render an award unjust, a

prevailing plaintiff … should be awarded fees 'as a matter of course.'"

*Solomon v. City of Gainesville*, 796 F.2d 1464, 1466 (11th Cir. 1986)

(quoting  *Gates v. Collier*, 616 F.2d 1268, 1275 (5th Cir.1980), modified on

other grounds, 636 F.2d 942 (5th Cir.1981)).  "Thus, ordinarily in order to recover such fees, a plaintiff need only establish that he is the 'prevailing party' …." *Id.*

302.

"[I]n determining whether a civil rights plaintiff is a prevailing party …[i]f the plaintiff has succeeded on 'any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit,' the plaintiff has crossed the threshold to a fee award of some kind." *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.,* 489 U.S. 782, 792-793 (1989) (quoting *Nadeau v.* Helgemoe, 581 F.2d 275, 278-279 (1st Cir. 1978)).

303.

As set forth herein, Alex and his parents substantially prevailed in the IDEA due process hearing they filed and are entitled to an award of their fees and costs from this Court pursuant to the IDEA, which has jurisdiction to grant such an award against Defendant FCSD.

**COUNT TWO – ALL INDIVIDUAL DEFENDANTS**

**EXCESSIVE AND UNDULY SEVERE CORPORAL PUNISHMENT**

304.

Plaintiffs incorporate by reference paragraphs 1-2, 6-273 as if fully set forth herein.

305.

All  defendants herein were mandated reporters of child abuse

pursuant to O.C.G.A. § 19-7-5.

306.

All defendants herein were prohibited from committing any act of

child abuse, including any physical and verbal abuse of a child; committing

any act of cruelty to a child or any act of child endangerment; committing

any sexual act with a student; and engaging in harassment of or misconduct

toward any student  pursuant to Rule 505-6-.01 (3) (b) (1-4) of the Georgia

Code of Ethics for Educators.

307.

All defendants herein were required pursuant to Rule 505-6-.01 (3) (i)

of the Georgia Code of Ethics for Educators to report any child abuse

pursuant to O.C.G.A. § 19-7-5 and to report any violation of the Georgia

Code of Ethics for Educators.

308.

All defendants herein took intentional, malicious acts to not comply

with the Georgia Code of Ethics for Educators, thereby causing Alex to

suffer excessive, unreasonable, and unduly severe corporal punishment and

child abuse, child endangerment, improper sexual acts, and harassment.

309.

All defendants herein owed a duty of care to Alex and acted in loco parentis as to Alex.

310.

All defendants herein were required by law to share with Alex's parents information necessary for them to participate in the decision making process regarding their son's education, services, programming, and placement, but no defendant did this, resulting in Alex suffering for an entire school year excessive, unreasonable, cruel, and unduly severe corporal punishment.

311.

All defendants herein conspired and took actions to allow, promote, ensure, facilitate, and cover up the excessive, bad faith, cruel, and unduly severe corporal punishment of disabled children with moderate, severe, or profound mental impairment, including Alex and the other children in Pickens' classes.

312.

All defendants herein had a duty to protect Alex and not place him with a teacher it knew would abuse him and excessively and unduly severely punish him, but defendants instead intentionally, willfully, and maliciously

conspired and took acts to ensure Alex was unduly severely and excessively punished for an entire school year.

313.

All defendants herein, by allowing, promoting, ensuring, covering up, not reporting, and not disclosing Pickens' abuse and unduly severe and excessive punishment of disabled students for four years acted in concert with Pickens to unduly severely and excessively punish Alex and other students, and all defendants did so maliciously and intentionally.

314.

The conspiracy all defendants took part in was, in part, to excessively and unduly severely in bad faith punish for years disabled children with moderate, severe, or profound mental impairment who could not report the abuse they were suffering at school, including Alex.

315.

Defendants' excessive and unduly severe, bad faith corporal punishment of Alex and other disabled mentally impaired students was done in violation of clear law, including O.C.G.A. § 20-2-731, for Alex was not punished reasonably, within his IEP, the punishment was not administered in front of, at least at times if not always, a principal or assistant principal, and it was child abuse.

316.

Pickens and no other defendant acted in good faith in allowing Pickens to abuse, at times via excessive and unduly severe corporal punishment, Alex.

317.

It was not a good faith punishment of Alex for Pickens to slam him face first into a metal locker, if not daily, almost daily.

318.

It was not good faith for Pickens to push, shove, yank, and jerk Alex down on hard floors, cement, and pavement because his disability impairs his ability to walk fast.

319.

It was excessive, cruel, unreasonable, abusive and unduly severe on its face for Pickens to have done the acts set forth in the complaint to Alex, and having acted in concert with Pickens, each defendant herein is liable for the harm and damages Alex has suffered as if each defendant had himself or herself excessively and unduly severely punished Alex.

320.

Because of the defendants' actions, Alex has been caused severe harm and damages and is entitled to recover for said damages and harm.

## COUNTS THREE-FIVE – ALL INDIVIDUAL DEFENDANTS INTENTIONAL, MALICIOUS, WILLFUL PHYSICAL ASSAULT, PHYSICAL BATTERY, AND PHYSICAL ABUSE

### 321.

Plaintiffs incorporate by reference paragraphs 1-2, 6-273, 305-319 as if fully set forth herein.

### 322.

All defendants acting in concert intentionally, willfully, and maliciously in violation of clear law physically assaulted Alex through their conspiracy and Pickens' part of that conspiracy, including but not limited to Pickens' pushing, shoving, jerking, and yanking Alex down on hard surfaces and Pickens' slamming Alex face first into lockers if not on a daily basis, almost daily.

### 323.

The actions of all defendants acting in concert intentionally, willfully, and maliciously in violation of clear law also was child abuse and battery.

### 324.

Because of the defendants' assault, battery, and child abuse of Alex, Alex has been caused severe harm and damages and is entitled to recover for said damages and harm.

## COUNT SIX

## INTENTIONAL, MALICIOUS, WILLFUL SEXUAL ABUSE

### 325.

Plaintiffs incorporate by reference paragraphs 1, 6-154, 186-187, 192, 194-273, 305-319, and 322-323 as if fully set forth herein.

### 326.

Through the conspiracy and actions taken by all defendants to allow, cover up, not report, condone, and not disclose Pickens' sexual abuse of her disabled students, Pickens placed her breasts and buttocks in Alex's face and shook and rubbed her breasts and buttocks in Alex's face, and this amounts to malicious, intentional, willful sexual abuse for which Alex is entitled to recovery from all individual defendants.

### 327.

Because of the defendants' actions, Alex has been caused severe harm and damages and is entitled to recover for said damages and harm.

## COUNT SEVEN – ALL INDIVIDUAL DEFENDANTS

## INTENTIONAL, MALICIOUS, WILLFUL

## DEPRIVATION OF A MINOR

328.

Plaintiffs incorporate by reference paragraphs 1-2, 6-273, 305-319, 321-322, and 326-327 as if set forth herein.

329.

Through the conspiracy and actions taken by all defendants to allow, facilitate, cover up, not report, and not disclose Pickens' abuse of disabled children and deprivation to disabled children, including Alex, defendants deprived Alex of his education, food, physical safety, emotional well being, and proper adult care and control and this amounts to malicious, intentional, willful sexual abuse for which Alex is entitled to recovery from defendants.

330.

Because of the defendants' actions, Alex has been caused severe harm and damages and is entitled to recover for said damages and harm.

## **COUNTS EIGHT-TEN – ALL INDIVIDUAL DEFENDANTS INTENTIONAL, MALICIOUS, WILLFUL ABANDONMENT, UNLAWFUL CONFINEMENT, AND FALSE IMPRISONMENT**

331.

Plaintiffs incorporate by reference paragraphs 1-2, 6-154, 176-180, 183, 187-192, 194-273, and 306-316 as if fully set forth herein.

332.

Through the conspiracy and actions taken by all defendants to allow, facilitate, cover up, not report, and not disclose Pickens' abuse of disabled children and unlawful confinement and false imprisonment of disabled children, including Alex, Alex was restrained to a Rifton chair and a Rifton toilet chair and abandoned in a room or storage closet bathroom for hours at a time. At times, Alex was left in the dark, and the rooms did not have windows, and he could not remove himself from the Rifton chairs or the rooms, where he was abandoned for hours. This has caused Alex severe trauma and harm for which he is entitled to recover from all individual defendants.

333.

Restraining Alex to Rifton chairs and abandoning him in rooms violated Alex's personal liberty. It was also not safe for Alex to be restrained to a Rifton chair and be left alone in a room by himself due to his disabilities, and this caused Alex muscle atrophy. Alex, due to his disabilities, required and requires adult assistance and he could not obtain such assistance restrained to a Rifton chair abandoned in a room with the door shut.

334.

Because of the defendants' actions, Alex has been caused severe harm and damages and is entitled to recover for said damages and harm.

## COUNT ELEVEN – ALL INDIVIDUAL DEFENDANTS

## INTENTIONAL, MALICIOUS, WILLFUL

## INFLICTION OF EMOTIONAL DISTRESS

335.

Plaintiffs incorporate by reference paragraphs 1-2, 6-273, 305-319, 321-322, 326-327, 329, and 332-334 as if fully set forth herein.

336.

Through the conspiracy and actions taken by all defendants to allow, facilitate, cover up, not report, and not disclose Pickens' physical, verbal, sexual, and emotional abuse of disabled children and Pickens' intentional, malicious, and willful infliction of emotional distress to disabled children, including Alex, Alex suffered severe harm, emotional distress, trauma, and damages for which he is entitled to recover from all individual defendants.

337.

Defendants, through a conspiracy to abuse and harm emotionally and physically disabled children with moderate, severe, or profound mental impairment acted intentionally and their conduct was extreme and

outrageous and were the direct cause of Alex's severe emotional harm, distress, PTSD, and anxiety, and Alex to this day continues to suffer from the intentional and willful emotional distress the individual defendants caused him.

338.

Because of the defendants' actions, Alex has been caused severe harm and damages and is entitled to recover for said damages and harm.

## COUNT TWELVE – ALL INDIVIDUAL DEFENDANTS INTENTIONAL, MALICIOUS, WILLFUL CRUELTY TO A CHILD

339.

Plaintiffs incorporate by reference paragraphs 1-2, 6-273, 305-319, 321-322, 366,-327, 329, 332-334, 336-337 above as if they were fully set forth herein.

340.

Through the conspiracy and actions taken by all defendants to allow, facilitate, cover up, not report, and not disclose Pickens' physical, verbal, sexual, and emotional abuse of disabled children, including Alex, Alex was treated cruelly for an entire school year, and this has directly caused Alex severe harm, emotional distress, trauma, and damages for which he is entitled to recover from all individual defendants.

341.

Alex has PTSD directly caused by the individuals' child cruelty and abuse to Alex, and even with mediation and many others supports and even with being removed from the FCSD setting, Alex has been severely and irreparably harmed due to the individual defendants' child cruelty to Alex.

342.

Because of the defendants' actions, Alex has been caused severe harm and damages and is entitled to recover for said damages and harm.

**COUNT THIRTEEN – ALL DEFENDANTS**

**VIOLATION OF 42 U.S.C. § 1983**

**DENIAL OF U.S. CONSTITUTIONAL**

**FOURTH AMENDMENT RIGHT**

343.

Plaintiffs incorporate by reference paragraphs 1-2, 6-273, 305-319, 321-322, 366,-327, 329, 332-334, 336-337, 340-341 above as if they were fully set forth herein.

344.

The Fourth Amendment of the United States Constitution applies in the school environment, and the concerted acts of all defendant as set forth herein amounted to intentional and willful unreasonable seizures of Alex,

causing severe harm and damages to Alex, for which he is entitled to recovery.

345.

Because defendants acted in concert and because FCSD administrators, including but not limited to Boyd, Merritt, Pettes, Wadel, Shelley, Beasley, Denmark, Lynch, Thompson, Biegelson, Ware, Young, Reece, Faulkner, and Wade acted together to deny Alex's right to be free from unreasonable seizures, Alex was severely, irreparably harmed and damaged and is entitled to recover his damages from all defendants.

346.

Alex was a disabled child, and he was severely abused, being shoved, pushed, jerked, and yanked down on hard floors, cement, and pavement, often because he could not walk faster due to his disabilities.

347.

Alex was a disabled child with mental impairment, and he could not defend himself, did not abuse anyone, tried to please, and liked school before he was so violently and repeatedly abused by a FCSD teacher who FCSD administrators allowed to abuse Alex, ratifying, accepting, adopting, and condoning the abuse.

132

348.

Given Alex's age; his disabilities; his nature; the repeated, constant, and daily abuse he suffered; and all defendants' actions to willfully and intentionally abuse disabled children, including Alex, under color of state law, custom, policy, and practice, defendants' actions deprived Alex of his Fourth Amendment rights under the United States Constitution.

349.

In abusing and harming Alex severely for a school year, all defendants were acting under color of state law, as FCSD was an local educational agency empowered by the Georgia constitution and Georgia statutory law, and the administrators and educators were acting color of those laws and other statutory laws of the State of Georgia, including but not limited to O.C.G.A. §§ 20-2-738, 20-2-731, 20-2-101, 20-2-214.

350.

While acting under color of state laws, instead of creating a culture of learning and respect, all defendants herein created and maintained for years an horrific, brutal, corrupt culture of concerted sadistic abuse and excessive and intolerable punishment of disabled children with moderate, severe, or profound mental impairment, including Alex.

351.

Alex, due to his disabilities and their severity and his vulnerability and defenselessness, was entitled to heightened protections, yet all defendants acted in concert to intentionally, willfully abuse Alex for a prolonged period of time repeatedly, and Alex is therefore entitled under the Fourth Amendment of the United States Constitution to recover all of his damages from all defendants, in an amount to be determined by a jury and in excess of $100,000,000.

352.

Alex, a happy, severely disabled child, who sought to please and who loved school, suffered severely and will never recover from the year of horror he suffered at Hopewell, and FCSD and other defendants named herein as set forth above, placed Alex knowingly and maliciously in that setting so he could and would be abused and denied his constitutional rights.

353.

Acting under state law, as set forth in this complaint, all defendants denied Alex of his Fourth Amendment United States Constitutional Right, thereby causing Alex severe and lifelong harm, and he is entitled to recover all damages allowed by law.

## COUNTS FOURTEEN-FIFTEEN – ALL DEFENDANTS

## VIOLATION OF 42 U.S.C. § 1983

## DENIAL OF U.S. CONSTITUTIONAL RIGHT AND

## GEORGIA CONSTITUONAL RIGHT TO DUE PROCESS

354.

Plaintiffs incorporate by reference paragraphs 1-2, 6-273, 305-319, 321-322, 366,-327, 329, 332-334, 336-337, 340-341, 344-353 above as if they were fully set forth herein.

355.

Defendants' use of corporal punishment with Alex was so excessive and unreasonable and defendants' prolonged, brutal abuse of Alex was so malicious and sadistic, defendants, acting in concert and under state law, violated Alex's substantive due process rights under the Fourteenth Amendment of the United States Constitution and his due process rights under Article I, Section I, Paragraph 1 of the Constitution of the State of Georgia.

356.

Defendants' actions were a concerted custom, policy, and practice designed to and very sadly effective to severely abuse for a five-year period disabled children who could not, because of their moderate, severe, or

profound mental impairment, tell others they were being abused.  Alex was one of those children so abused.

357.

This is not a case where Alex was abused just a few times, nor is it a case where Alex was exposed to traditional applications of reasonable corporal punishment.  Instead, the facts alleged herein reveal a conscience shocking custom, policy, and practice by defendants acting under color of state law for five long years, where all defendants took actions to allow the sadistic, malicious, arbitrary, and conscience shocking, in a constitutional way, ongoing abuse of disabled children with moderate, severe, or profound mental impairment, including Alex.

358.

This is also not a case where any force or abuse was even necessary. Instead, this is a case where the defendants allowed, promoted, sanctioned, covered up, and ratified abuse of multiple significantly disabled children, including Alex, and worse, acting in concert, the defendants placed Alex knowingly and willfully in that abusive, brutal environment to be viciously and ruthlessly harmed, as he was, causing him a deprivation of his due process rights, and as such, Alex is entitled to recover all damages allowed by law due to the severe and lifelong harm he has been caused.

359.

Society cannot tolerate a corrupt government educational agency that fosters, allows, sanctions, and covers up and hides abuse of Alex and his classmates, who are among our most vulnerable and helpless citizens.

360.

Defendants' actions and their intentional and malicious custom, policy, and practice in allowing Pickens to continue to abuse disabled children and in allowing helpless children such as Alex being placed in such an abusive, harmful setting is arbitrary, capricious, wholly unrelated to any legitimate purpose, and conscience shocking under the United States and Georgia constitutions, and Alex is entitled to recover all of his damages, in an amount in excess of $100,000,000 to be determined by a jury.

**COUNTS SIXTEEN-SEVENTEEN – ALL DEFENDANTS**

**VIOLATION OF 42 U.S.C. § 1983**

**VIOLATION OF U.S. CONSTITUTIONAL AND GEORGIA**

**CONSTITUTIONAL RIGHTS TO EQUAL PROTECTION**

361.

Plaintiffs incorporate by reference paragraphs 1-2, 6-273, 305-319, 321-322, 366,-327, 329, 332-334, 336-337, 340-341, 344-353, 355-361 above as if they were fully set forth herein.

362.

All defendants intentionally, willfully, and maliciously undertook actions and concerted actions under color of state law to deprive Alex of his rights to equal protection of the law under the Fourteenth Amendment to the United States Constitution and Article I, Section I, Paragraph II of the Georgia Constitution.

363.

All defendants intentionally, willfully, and maliciously undertook actions and concerted actions under color of state law to deprive Alex, due to his moderate mental impairment and resulting inability to report the child abuse he was forced to suffer for an entire school year a safe, non-abusive education and learning experience as well as to be afforded his constitutional rights due process and be free from unreasonable seizure.

364.

All defendants deprived Alex of his rights to equal protection of the laws for no legitimate purpose, and there was absolutely no rational basis for depriving Alex of a safe educational environment and his constitutional rights because he was a child with mental impairment who could not inform others of the severe abuse defendants subjected Alex to for an entire school year.

365.

All defendants deprived Alex's rights to equal protection of the laws with a purposeful and malicious discriminatory intent.  Because Alex was so disabled he could not report the severe and prolonged abuse he suffered, all defendants intentionally and maliciously, acting in concert, abused him and his classmates, acting under color of state law.  Had Susan Tallant not insisted someone address the pathetic, shameful, and disgraceful intentional abuse of disabled children, including Alex, in the FCSD, all defendants would have continued to allow and promote that shocking abuse, as they had, acting in concert, for five years.

366.

Because defendants, acting in concert, intentionally and willfully denied Alex his rights to equal protection of the laws pursuant to the United States and Georgia constitutions, Alex is entitled to recover all of his damages, in an amount in excess of $100,000,000 to be determined by a jury.

## **COUNTS EIGHTEEN-NINETEEN – ALL DEFENDANTS**

## **VIOLATIONS OF ALEX'S ADA AND SECTION 504 RIGHTS**

367.

Plaintiffs incorporate by reference paragraphs 1-2, 6-273, 305-319, 321-322, 366,-327, 329, 332-334, 336-337, 340-341, 344-353, 355-361, and 362-366 above as if they were fully set forth herein.

368.

When Alex was at Hopewell during the 2006-2007 school year, he was entitled to the protections of Title II of the Americans with Disabilities Act of 1990 (hereinafter referred to as the "ADA") prohibiting any public entity, including any state or local government and those acting in concert therewith, from denying him the benefits of the services, programs, or activities of the public entity based upon his disabilities. Alex was also entitled under the ADA not to be subjected to discrimination by reason of his disabilities.

369.

When Alex was at Hopewell during the 2006-2007 school year, he was entitled to the protections of Section 504 of the Rehabilitation Act of 1973 (hereinafter referred to as "Section 504") prohibiting any public entity, including any state or local government and those acting in concert

therewith, from denying him the benefits of the services, programs, or activities of the public entity based upon his disabilities.  Alex was also entitled under Section 504 not to be subjected to discrimination by reason of his disabilities.

370.

Alex is a qualified individual within the meaning of the ADA and Section 504 with respect to the benefits, services, programs, and activities of the FCSD and his educational setting at Hopewell.  Alex's disabilities substantially limit Alex's major life activities, including but not limited to his caring for himself, his daily living skills, performance of manual tasks, walking, speaking, learning, working, and mental processes.

371.

By the intentional, malicious, and concerted acts and failures to act of all defendants set forth herein, all defendants, acting in concert, have denied Alex access to the same benefits of the services, programs, and activities of the FCSD based solely upon his disabilities and have discriminated against him based solely upon his disability.

372.

Solely based upon Alex's disabilities, all defendants, acting in concert, maliciously, intentionally, and willfully denied Alex a public

education free from abuse, excessive and unduly severe corporal punishment, and one free from a denial of his constitutional and statutory rights.

373.

Because of all defendant's concerted and intentional, willful, and malicious acts to deny Alex his rights under the ADA and Section 504 and their intentional, willful, and malicious discrimination of Alex based solely upon his disabilities, Alex has been severely harmed for life, and he is entitled to an award of damages in excess of $100,000,000, as determined by a jury.

374.

Students in the FCSD who did not have moderate, severe, or profound mental impairment who could not go home and report abuse in the FCSD, were not deprives of their rights to the same services, programs, and activities as non-disabled peers, but Alex, because he was in fact a child with a moderate mental impairment who could not report the horrific child abuse he had to endure for an entire school year, was discriminated against intentionally and willfully by all defendants herein because of that fact.

## COUNTS TWENTY-TWENTY-ONE – ALL DEFENDANTS

## VIOLATION OF 42 U.S.C. § 1983

## VIOLATIONS OF U.S. AND GEORGIA CONSTITUTIONAL

## RIGHTS TO BE FREE FROM CRUEL AND EXCESSIVE

## PUNISHMENT

375.

Plaintiffs incorporate by reference paragraphs 1-2, 6-273, 305-319, 321-322, 366,-327, 329, 332-334, 336-337, 340-341, 344-353, 355-361, 362-366, and 368-374 above as if they were fully set forth herein.

376.

Defendants, acting in concert, and as set forth herein, undertook malicious, intentional, and willful acts to cruelly and excessively punish Alex in violation of his Eighth Amendment United States Constitutional right to be free from such cruel and excessive punishment and Alex's right to be free from cruel and unusual punishment under Article I, Section I, Paragraph XVII of the Georgia Constitution.

377.

Because of defendants' acts as set forth herein, Alex was severely abused and harmed for life, and he is entitled to recover all damages allowed by law in an amount to exceed $100,000,000.

## COUNTS TWENTY-TWO-TWENTY-THREE

## DEFENDANTS NAMED HEREIN

## NEGLIGENT HIRING AND RETENTION

## AND RESPONDEAT SUPERIOR LIABILIY

378.

Plaintiffs incorporate by reference paragraphs 1-2, 6-273, 305-319, 321-322, 366,-327, 329, 332-334, 336-337, 340-341, 344-353, 355-361, 362-366, 368-374, 376-377 above as if they were fully set forth herein.

379.

Defendants FCSD, Boyd, Merritt, Denmark, Lynch, Wilson, Wade, Beasley, Thompson, Wadel, Pettes, Shelley, Shaffer, Vanairsdale, Reece, Young, Ware, and Biegelson, acting in concert, and as set forth herein, undertook malicious, intentional, and willful acts to hire and retain Pickens and all other defendants and allow, promote, facilitate, endorse, and ratify their violations of the law and their concerted abuse of disabled children for a five year period, ensuring Alex was horribly abused and harmed for life.

380.

All the defendants named in paragraph 379 above were supervisors and they all participated intentionally and willfully and/or knew about the violations of their subordinates in following the law, and they failed to act to

prevent them.  They actually allowed and promoted them as a matter of policy, custom, and practice.

381.

All the defendants named in paragraph 379 above were supervisors and they all participated intentionally and willfully and/or knew about the fact their subordinates were not trained to do their jobs and follow the law, yet they did not train them to do so or discharge them.  They actually allowed and promoted their subordinates violating the law and disabled children's rights and not doing their jobs as a matter of policy, custom, and practice.

382.

For the reasons set forth herein, the defendants named herein are liable to Alex for the severe harm and irreparable damage he suffered in an amount in excess of $100,000,000, to be determined by a jury.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request

That this Court exercise jurisdiction over plaintiffs' claims;

That this Court enter an order granting plaintiffs' costs and fees for the IDEA due process hearing in which they substantially prevailed,

including cost and fees expended before this Court for recovery thereof, as allowed by law;

That plaintiff Alex Williams be allowed a jury trial on all causes of action contained herein;

That judgment be entered in favor of Plaintiffs and against all Defendants jointly and severally for all damages Plaintiffs have incurred;

That Plaintiffs recover all attorneys' fees and litigation expenses and costs associated with this action; and

That this Court issue such other relief as may be just, equitable, and appropriate.

This 31st day of January 2011.


*Chris E. Vance*
Chris E. Vance
Ga. Bar No. 724199
Counsel for Plaintiff

**CHRIS E. VANCE, P.C.**
Suite 100
2415 Oak Grove Valley Road
Atlanta, GA 30345
Tel:  (404) 320-6672
Fax: (404) 320-3412