# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF GEORGIA

### ATLANTA DIVISION

ALEXANDER WILLIAMS, by and )
through his Guardian, Conservator, and )
Next Friends, DOUGLAS WILLIAMS )
and LISA WILLIAMS; DOUGLAS )
WILLIAMS, and LISA WILLIAMS, )
)
     Plaintiffs, )
)
v. )     CIVIL ACTION FILE
)
FULTON COUNTY SCHOOL )     NO. 1:14-CV-0296-AT
DISTRICT, MELANIE PICKENS, )
FRANCES BOYD, PAULA MERRITT, )
VICKI DENMARK, RALPH LYNCH, )
JAMES WILSON, RONNIE WADE, )
STEPHANIE SCHUETTE, HARVEY )     **JURY TRIAL REQUESTED**
BEASLEY, WILLIAM THOMPSON, )
NANCY WADEL, DOROTHY )
PETTES, NANCY SHELLEY, )
DONNA FAULKNER, EMMETT )
SHAFFER, STEPHANIE SOSEBEE, )
STACY WHITE, TEMPLYN )
AVERETT, KENNETH McGEE, )
CINDY, KANNER, MICHAEL )
VANAIRSDALE, J. RANDALL )
REECE, LANCE YOUNG, SHARON )
BUTLER, SARA WARE, KAREN )
WIENMANN, SHARON ETRIS, and )
SARAH MCCONNELL, )
)
     Defendants. )

## SECOND AMENDED COMPLAINT

COME NOW Plaintiffs Alexander Williams ("Alex"), by and through his Guardian and Next Friend, Lisa Williams, and his Conservator and Next Friend, Douglas Williams and Douglas Williams and Lisa Williams, in their own right, and file this Second Amended Complaint, requesting in Count One an award by the Court of Plaintiffs' fees and costs pursuant to the Individuals with Disabilities Education Act and Individuals with Disabilities Education Improvement Act (hereinafter collectively referred to as the "IDEA").  Alex further requests a jury trial and determination on all other counts set forth herein.

## PARTIES

### 1.

Plaintiff Alex is a disabled individual who from birth has had and continues to have hydrocephalus, cerebral palsy, hemiparesis, moderate to severe mental retardation, motor impairment, and language impairment, and he has a past history of seizures.

### 2.

Plaintiff Douglas Williams is Alex's father and his court appointed conservator.

3.

Plaintiff Lisa Williams is Alex's mother and his court appointed guardian.

4.

Defendant Fulton County School District ("FCSD") is a public corporate body and a county political subdivision operating in Fulton County, Georgia under the Georgia constitution and Georgia statutory law and has the capacity to be sued.

5.

All "individual Defendants" (which denotes all Defendants named herein except for Fulton County School District) were FCSD employees at some period of time from August 2002 or before.

6.

While the individual Defendants were employed by FCSD as set forth herein, each and every individual defendant was certified as a Georgia educator by the Georgia Professional Standards Commission ("GaPSC").

7.

From at least August 2002 to present, the GaPSC and GaPSC rules prohibited and prohibit Georgia educators certified by the GaPSC from committing any act of a) child abuse, including physical and verbal abuse;

b) cruelty to a child; c) child endangerment; d) sexual act to a child;
e) solicitation of a child; f) harassment toward a student that would violate
state or federal law; g) misconduct toward a student that would violate a
state or federal law; h) an inappropriate written, verbal, electronic, or
physical relationship with a student; and i) solicitation or encouragement of
an inappropriate written, verbal, electronic, or physical relationship with a
student.

8.

While the individual Defendants were employed by FCSD, each and
every individual Defendant was required by the GaPSC and GaPSC rules to
report any violation of the GaPSC rules or any abuse of a child to the
GaPSC.

9.

While the individual Defendants were employed by FCSD, each and
every individual Defendant was required to follow and comply with the laws
of the State of Georgia and the United States.

10.

All individual Defendants are being sued in their individual or
personal capacity, and all their acts set forth herein were within the scope of
their employment as FCSD employees.

4

## JURISDICTION AND VENUE

### 11.

This Court has jurisdiction pursuant to 20 U.S.C. § 1415 (i) (3) (A), 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

### 12.

This Court has venue because one or more of the defendants reside in Fulton County, Georgia and a substantial part, if not all, of the events giving rise to the claims set forth herein occurred in Fulton County, Georgia.

## COUNT ONE – FCSD

## RECOVERY OF ATTORNEYS' FEES AND COSTS UNDER IDEA

### 13.

On June 16, 2011, Alex, by and through his parents, Douglas and Lisa Williams; Douglas Williams; and Lisa Williams (Plaintiffs herein) requested a due process hearing pursuant to the IDEA and all other applicable laws.

### 14.

In their due process hearing request, Plaintiffs sought relief, inter alia, for the denial of a free appropriate education to Alex from August 2006 to the time of the hearing request.

15.

In their due process hearing request, Plaintiffs set forth IDEA,

FERPA, GORA, ADA, Section 504, tort, and state and federal constitutional

claims against the FCSD and each and every individual involved in the

abuse and complicity of the abuse.

16.

In their due process hearing request, Plaintiffs sought to ensure they

exhausted all administrative remedies allowed by law and requested they be

allowed to do so.

17.

In their due process hearing request, Plaintiffs raised, inter alia,

FCSD's denial of a free appropriate public education ("FAPE") to Alex from

August 2006 forward.

18.

Other than minimal redactions, a true and accurate copy of Plaintiffs'

due process hearing request is attached hereto as Exhibit A.

19.

In response to Plaintiffs' due process hearing request, FCSD asserted,

inter alia, that Alex was appropriately placed with Melanie Pickens at

Hopewell Middle School ("Hopewell") and that he received a FAPE during the 2006-2007 school year and thereafter.

20.

After a hearing was conducted over multiple days in 2011 and after Plaintiffs and FCSD submitted post-hearing pleadings, the administrative law judge ("ALJ") entered a Final Decision on February 1, 2012, finding in favor of Plaintiffs and awarding Alex substantial educational relief.

21.

A true and accurate copy of the Final Decision the ALJ entered on February 1, 2012 is attached hereto as Exhibit B.

22.

On March 19, 2012, the ALJ entered an order requiring, in addition to the substantial educational relief set forth in the ALJ's Final Decision, that FCSD pay to Plaintiffs within ten business days of the Order $18,899.25 for expenses Plaintiffs had incurred as of that time.

23.

As set forth in the Final Order attached hereto as Exhibit B, Plaintiffs prevailed in their due process hearing request.

24.

As set forth in the Final Order attached hereto as Exhibit B, Plaintiffs succeeded on at least one significant issue they raised in their due process hearing request.

25.

Plaintiffs substantially prevailed in their IDEA due process hearing request and are entitled to a court ordered award of their costs, including fees, pursuant to the IDEA.

## COUNT TWO – PICKENS

## EXCESSIVE AND UNDULY SEVERE CORPORAL PUNISHMENT

26.

Defendant Melanie Pickens was Alex's teacher at Hopewell in FCSD during the 2006-2007 school year.

27.

The facts set forth in the Final Order attached hereto as Exhibit B in paragraphs 1-2 and 15-42 (pages 2-3 and 10-26) and in the footnote citations to those paragraphs are true and accurate.

28.

Throughout the 2006-2007 school year, Pickens pushed Alex down multiple times on hard tile flooring.

29.

Throughout the 2006-2007 school year, Pickens pushed Alex down multiple times on cement or pavement.

30.

Throughout the 2006-2007 school year, Pickens jerked Alex down multiple times on hard tile flooring by grabbing his book bag or body part and moving him with force.

31.

Throughout the 2006-2007 school year, Pickens jerked Alex down multiple times on cement or pavement by grabbing his book bag or body part and moving him with force.

32.

Throughout the 2006-2007 school year, Pickens would push and jerk Alex down for not walking as fast as Pickens wanted him to, which Alex could not do due to his disabilities.

33.

Throughout the 2006-2007 school year, Pickens would push and jerk Alex down when Alex did not do something Pickens wanted him to do or when he did something Pickens did not want him to do.

34.

When Pickens pushed or jerked Alex down, he would get hurt and have scrapes and or bruises on his hands, arms, and knees.

35.

Throughout the 2006-2007 school year, on multiple occasions, Pickens threw Alex's book bag at him, knocking him down on the hard tiled floor, pavement, or cement.

36.

When Pickens threw Alex's book bag at him, she did so because Alex did not do what she wanted him to do or else did not do it fast enough.

37.

When Pickens threw Alex's book bag at him and knocked him down on the hard tiled floor, cement, or pavement, Alex would be physically injured and would have scrapes and or bruises on his hands, arms, and knees.

38.

One or more times when Pickens pushed or jerked Alex down or threw an object at him, knocking him down, Alex fell on his head.

39.

One or more times when Pickens pushed or jerked Alex down or threw an object at him, knocking him down, Alex fell on his head on the cement or pavement.

40.

Throughout the 2006-2007 school year, when Alex did not do his work or did not do something else Pickens wanted him to do, Pickens physically restrained Alex on multiple occasions to a Rifton chair and abandoned him in a room by himself, many times with the door shut and the lights out.

41.

Throughout the 2006-2007 school year, because Alex did not urinate or defecate when Pickens wanted him to or he did something she did not want him to do or he did not do what she demanded he do or did not do it fast enough, Pickens physically restrained Alex on multiple occasions to a Rifton toilet chair and abandoned him in a closet-like room that had a toilet, many times with the door shut and the lights out.

42.

When Pickens physically restrained and abandoned Alex she would do so for 30 minutes to hours at a time.

43.

When Pickens physically restrained and abandoned Alex on the Rifton toilet chair, Alex's feet could not touch the floor.

44.

When Pickens physically restrained and abandoned Alex in the Rifton chair, Pickens used, at least some of the time, a broken Rifton chair that had a broken back that inclined back at a 45 degree angle from the floor so that Alex either had not back support for hours despite his muscle weakness or he had to lay back in the chair in the dark room.

45.

During the 2006-2007 school year, Alex did not need a Rifton chair for any purpose.

46.

Throughout the 2006-2007 school year, Pickens violently slammed and or shoved Alex face and/or head first into metal lockers, ***if not every day, almost every day.***

47.

Pickens would slam and or shove Alex face or head first into a metal locker so violently that a teacher named Susan Tallant, who was in a

classroom with her door shut, could hear Pickens slamming Alex into a metal locker.

48.

Pickens slammed and shoved Alex into metal lockers face and or head first she did so because Alex did not walk fast enough for Pickens, did not pay enough attention for Pickens, did not put his belongings into the locker, did not get close to the locker to put his belongings away, or did some other act that Pickens found not to be, in her mind, appropriate.

49.

Pickens did the acts set forth above in this count to, inter alia, punish Alex for something Alex did or did not do or something he did not do fast enough, and when she removed Alex from the classroom and restrained and abandoned him, she will call this "time out."

50.

Pickens did the acts set forth above in this count to, at times, punish Alex for something a different disabled child did or did not do.

51.

The acts Pickens did to Alex set forth above in this count were unduly excessive and unduly severe and caused Alex physical injuries and severe, life-long emotional and mental pain and suffering.

13

52.

When Pickens did the acts set forth above in this count and Alex suffered visible physical injury, Pickens lied to Alex's mother and or father about how Alex was injured.

53.

Pickens liked physically punishing Alex, as well as several of his classmates, so she did so repeatedly throughout the 2006-2007 school year.

54.

Throughout the 2006-2007 school year, Pickens would intentionally do acts to Alex or place demands on him (such as demanding he write when he could not do so or attend for periods of time that he could not do so or walk with no assistance) so he would or could not do something she wished him to do or he did something she wished him not to do just so she could excessively and unduly severely punish him.

55.

Because Pickens excessively and severely punished Alex, he suffered severe, life-long harm and damages, lost skills never recovered, regressed, suffers from post traumatic stress disorder, has to take anti-anxiety medication, and is entitled to recover in an amount proven at trial.

## COUNTS THREE-FIVE – PICKENS

## INTENTIONAL, MALICIOUS, WILLFUL PHYSICAL ASSAULT,

## PHYSICAL BATTERY, AND PHYSICAL ABUSE

### 56.

Alex incorporates by reference paragraphs 1 and 26-55 above as if fully set forth herein.

### 57.

Pickens' pushing, shoving, jerking, and yanking Alex down on hard surfaces; Pickens throwing Alex's book bag at Alex and hitting him with it and knocking him down; Pickens' slamming Alex face and or head first into metal lockers; and Pickens repeatedly physically restraining Alex to Rifton chairs and abandoning him for up to hours was intended by Pickens to harm Alex and did in fact directly result in and cause physical and mental harm to Alex.

### 58.

Throughout the 2006-2007 school year, Pickens screamed at Alex if not daily, almost on a daily basis, often screaming painfully loudly right in his face and or his ears.

59.

Throughout the 2006-2007 school year, Pickens screamed at several of Alex's classmates if not daily, almost on a daily basis, doing so in front of Alex.

60.

Throughout the 2006-2007 school year, Pickens cursed at Alex if not daily, almost on a daily basis.

61.

Throughout the 2006-2007 school year, Pickens cursed at several of Alex's classmates if not daily, almost on a daily basis, doing so in front of Alex.

62.

Throughout the 2006-2007 school year, Pickens called Alex vile names, including but not limited to "little sh_t," "little f_cker," "retard," and "stupid." The letters omitted from "sh_t" and "f_cker" are i and u, respectively.

63.

Throughout the 2006-2007 school year, Pickens called Alex's classmates, in front of Alex, vile names, including but not limited to "little

sh_t," "little f_cker," "retard," and "stupid." The letters omitted from "sh_t" and "f_cker" are, respectively, i and u.

64.

Throughout the 2006-2007 school year, Pickens threw objects such as shoes and cameras at Alex's classmates, doing so in front of Alex, and she passed gas and burped in Alex's face and in his peers' faces in front of Alex.

65.

Throughout the 2006-2007 school year, Pickens consistently and repeatedly hit, slapped, shoved, shoved down, pushed, pushed down, bit, jerked, yanked, pulled, pulled down, kicked, kneed, restrained and abandoned, and "jacked up" (which means putting her knee in a child's crotch and lifting the child pressed against a wall or locker until his feet come off the ground) one or more of Alex's peers in front of Alex.

66.

Throughout the 2006-2007 school year, Pickens did the acts set forth in Count Two above and in these counts to intentionally harm and abuse Alex and to intentionally cause Alex to suffer apprehension of an immediate harmful contact from Pickens.

67.

Throughout the 2006-2007 school year, Pickens intentionally slammed her hand or an object down on a hard surface to make a loud noise so as to scare and intimidate Alex and cause Alex to suffer apprehension of an immediate harmful contact.

68.

Alex would cower and or flinch when Pickens intentionally made a loud noise in the classroom, screamed, or spoke in a mean or hateful tone, which Pickens did intentionally and repeatedly to scare and intimidate Alex and his peers.

69.

Alex lived in fear of Pickens harming him throughout the 2006-2007 school year.

70.

To this day, due to Pickens' pushing, shoving, jerking, and knocking Alex down on hard surfaces, Alex is fearful and anxious of someone who is not very close to him walking behind him, and he is hyper vigilant and scared when this occurs.

71.

Because of the Pickens' assault, battery, and abuse of Alex as set forth herein, Alex has been caused severe, life-long, irreparable injury, and he is entitled to recover for said damages and harm in the amount awarded by the jury after trial.

## COUNT SIX – PICKENS

## INTENTIONAL, MALICIOUS, WILLFUL SEXUAL ABUSE

72.

Alex incorporates by reference paragraphs 1 and 26 as if fully set forth herein.

73.

Throughout the 2006-2007 school year, Pickens placed, rubbed, and shook her breasts and buttocks in Alex's face on multiple occasions.

74.

Throughout the 2006-2007 school year, Pickens placed, rubbed, and shook her breasts and buttocks in one or more of Alex's classmates' faces in front of Alex on multiple occasions.

75.

At times when Pickens placed, shook, and rubbed her breasts in Alex's and one or more of his classmate's faces, Pickens wore a low cut

blouse so that her bare breasts touched Alex's and one or more of his peer's faces.

76.

Throughout the 2006-2007 school year, Pickens would allow one of Alex's classmates, Jake Marshall, to rub her buttocks in front of Alex, saying to Jake in front of Alex, at least on one occasion, "you know you like that."

77.

Because of Pickens' intentional acts of sexual abuse, as set forth herein, Alex has been caused severe harm and damages and is entitled to recover for said damages in an amount to be determined by the jury.

## COUNT SEVEN – PICKENS

## INTENTIONAL, MALICIOUS DEPRIVATION OF A MINOR

78.

Alex incorporates by reference paragraphs 1, 26-55, 57-71, and 73-76 as if fully set forth herein.

79.

During the 2006-2007 school year, Pickens intentionally and with malice deprived Alex of education by restraining him to a Rifton chair and

abandoning him in a room on multiple occasions, sometimes up to hours at a time.

80.

During the 2006-2007 school year, Pickens intentionally and with malice deprived Alex of proper care and safety by abandoning him in a room by himself, sometimes for hours, by knocking him down on hard surfaces, by slamming him into metal lockers, and by doing the other acts set forth above.

81.

Due to Alex's disabilities, it was not safe for Alex to be in a public school setting during the 2006-2007 school year by himself without adult supervision, even when restrained to a chair.

82.

During the 2006-2007 school year, at least on one occasion, Pickens abandoned Alex on a school bus without adult care and assistance, and this endangered Alex's wellbeing.

83.

During the 2006-2007 school year, Pickens deprived Alex of food by depriving him of lunch about two days a week for an entire school year or almost an entire school year.

84.

During the 2006-2007 school year, Pickens intentionally and willfully deprived Alex of food, physical safety, emotional well being, and proper adult care and control as set forth in Counts Two to Six.

85.

Because of Pickens' intentional deprivation as set forth herein, Alex has been caused severe, life-long harm and damages, and he is entitled to recover for said damages and harm in the amount to be determined by proof at trial.

## COUNT EIGHT– PICKENS

## FALSE IMPRISONMENT

86.

Alex incorporates by reference paragraphs 1, 26, and 40-45 as if fully set forth herein.

87.

Pickens' intentional unlawful restraint of Alex to Rifton chairs violated his right to personal liberty and freedom from restraint, and Pickens knew at the time she restrained Alex she was not allowed by law to do so.

88.

Pickens unlawful restraint of Alex to Rifton chairs caused Alex muscle atrophy, making it very difficult for Alex to walk and causing him to fall on hard surfaces, especially during, but not limited to, the time period right after the lengthy restraints.

89.

When Pickens restrained Alex to Rifton chairs throughout the 2006-2007 school year, Alex could not remove himself from the chairs, much less the rooms he had been abandoned in by Pickens, and after he was removed, he at times could not stand up or walk without significant assistance.

90.

When Pickens removed Alex from the classroom to restrain him to a Rifton chair, she violated non-discretionary Georgia statutory law.

91.

During the 2006-2007 school year, when Pickens removed Alex from the classroom because he did not do his work or he did not do something else Pickens wanted him to do or did something she did not want him to do, Pickens violated O.C.G.A. §§ 20-2-737 and 20-2-738 because Alex's actions did not allow classroom removal.

92.

During the 2006-2007 school year, when Pickens removed Alex from the classroom because he did not do his work or he did not do something else Pickens wanted him to do or he did something she did not approve of, Pickens violated O.C.G.A. §§ 20-2-737 and 20-2-738 because Pickens did not file with the principal or the principal's designee a written report describing the student's behavior.

93.

Pickens' false imprisonment and unlawful restraint of Alex throughout the 2006-2007 school year caused Alex severe trauma and harm for which he is entitled to recover all damages allowed by law.

94.

To this day, Alex traumatically fears dark or dimly lit rooms as well as rooms without windows, for Pickens restrained Alex in such rooms, and he also fears school buildings and the mention of the word "school."

95.

When Alex's prior trauma from being restrained is triggered or Alex is expected to access a dark or dimly lit room outside of his home or a room without windows, Alex will become visibly upset and at times repeatedly say, sometimes as if in a trance, "lights on, lights on, lights on, …."

96.

When Alex's prior trauma from being restrained is triggered or Alex is expected to access a dark or dimly lit room outside of his home or a room without windows, Alex will become visibly upset and at times repeatedly say, sometimes as if in a trance, "lights on, lights on, lights on, ...."

97.

When Alex's prior trauma from being restrained is triggered or Alex is expected to access a dark or dimly lit room outside of his home or a room without windows, Alex will become visibly upset and at times repeatedly say, sometimes as if in a trance, "lights on, lights on, rope, rope, tie it up, tie it up, check bottoms, check bottoms, Lysol, Lysol, little fu_kers, little fu_kers" or some other combination thereof.

98.

Because of the Pickens' false imprisonment of Alex, he has been caused severe, lifelong harm and damages, and is he entitled to recover for said damages and harm in the amount to be proved at trial.

## COUNT NINE – PICKENS

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

99.

Alex incorporates by reference paragraphs 1, 26-55, 57-71, 73-76, and 87-98 as if fully set forth herein.

100.

Pickens did the outrageous, extreme, and shocking acts to Alex that are set forth in prior Counts Two through Eight and in the paragraphs referenced in paragraph 99 above intentionally and with malice.

101.

Pickens' acts set forth in prior Counts Two through Eight and in the paragraphs referenced in paragraph 99 above directly caused Alex, at the time and ever since, severe emotional distress and harm.

102.

Pickens' acts set forth in prior counts two through eight and in the paragraphs referenced in paragraph 99 above directly caused Alex to suffer from post traumatic stress disorder.

103.

Because of Pickens intentional infliction of emotional distress and the directly resulting severe, life-long emotional harm, Alex has been significantly injured for life, he has never recovered the lost skills and abilities caused by the prolonged emotional distress, he suffers from

resulting post traumatic stress disorder, he lives in a constant state of hyper vigilance, he has anxiety attacks, he has to take anti-anxiety medication, and he is entitled to recover his damages in the amount determined by the jury.

## COUNT TEN – PICKENS

## INTENTIONAL AND MALICIOUS CRUELTY TO A CHILD

104.

Plaintiffs incorporate by reference paragraphs 1, 26-48, 58-68, 73-76, 79-83, 87-89, 91-95, and 101-104 as if fully set forth herein.

105.

Pickens intentionally treated Alex cruelly as set forth in Counts Two through Nine and the paragraphs cited in paragraph 104 above for an entire school year, and this directly caused Alex severe, life-long harm, emotional distress, regression, trauma, and damages for which he is entitled to recover in an amount determined by a jury.

## COUNT ELEVEN – FCSD, PICKENS, BOYD

## VIOLATION OF 42 U.S.C. § 1983

## DENIAL OF U.S. CONSTITUTIONAL

## FOURTH AMENDMENT RIGHT

106.

Alex incorporates by reference paragraphs 1, 4-10, 26-55, 57-71, 73-76, 87-95 as if fully set forth herein.

107.

Boyd was the principal of Hopewell from sometime at least from August 2004 to at least May 2007.

108.

As principal at Hopewell, Boyd had, inter alia, the legal duty and responsibility to protect all students attending Hopewell; to ensure FCSD policies and procedures were implemented at Hopewell; to hire properly certified educators at Hopewell; to suspend, fire, release, and recommend for suspension, dismissal, and release teachers who harmed their students, abused their students, or violated the law; to thoroughly and properly investigate any and all reports of improper teacher behavior to a student; to report any report of suspected wrongdoing by a teacher to a student to the FCSD social work department and GaPSC; to properly supervise and train teachers at Hopewell; to assign and re-assign teachers; to place teachers with more experienced, trained teachers in a co-teaching classroom; to inform parents of any harm to their children while at school; and to comply with the laws of the State of Georgia and the United States.

109.

Boyd, as principal of Hopewell, was informed in 2006 by Amanda Mathis Groover, a FCSD paraprofessional, that Pickens was shoving and pushing and knocking Alex down on hard surfaces and that Pickens was removing him from the classroom without Alex's statutory rights.

110.

Instead of investigating Ms. Groover's report of abuse, restraint, and excessive punishment as set forth in paragraph 109, Boyd told Ms. Groover, as she had told many others in the past when Pickens' improper acts were reported to Boyd, that it would be taken care of, when in fact, Boyd had no intention of taking care of anything, much less stopping, reporting, or investigating the abuse and excessive and cruel punishment by Pickens.

111.

Boyd started being informed by FCSD employees, students, and parents of students in August 2004 forward that Pickens sexually, verbally, physically, and emotionally abused and excessively and cruelly punished disabled children placed in her class and that Pickens did this repeatedly and often.

112.

By November 2004, Boyd had received reports by *at least* two different individuals of Pickens' abuse and excessive punishment to her students, including reports that Pickens rubbed and pressed her buttocks and breasts in disabled children's faces, passed gas in their faces, hit a student frequently in the head hard, sprayed Lysol on a student, cursed at students, calling them vile, abusive names, and more.

113.

Boyd received at least 10 reports of abuse and excessive and unduly severe corporal punishment by Pickens of her students from August 2004 to August 2006, and Boyd never properly investigated those reports, did not stop Pickens, did not report Pickens to the GaPSC (or any other authority), and did not report the abuse and excessive punishment to the children's parents even though she knew the children could not inform their parents of the abuse and punishment.

114.

Boyd was required by law to not allow Pickens to remove Alex from the classroom and restrain him in chairs, isolated and abandoned, pursuant to O.C.G.A. §§ 20-2-737 and 20-2-738, yet Boyd intentionally allowed Pickens

to remove Alex and other disabled children repeatedly over and over from the classroom without any compliance with those sections.

115.

Pickens did the acts to Alex that are set forth in Counts Two to Ten and set forth in the paragraphs referenced in paragraph 106 as a FCSD Georgia educator, and Boyd, as a FCSD principal, and FCSD had a duty to protect Alex and not allow him to be abused and excessively and unduly severely physically punished by a FCSD Hopewell teacher, to not allow him to be removed from the classroom without his rights set forth in O.C.G.A. §§ 20-2-737 and 20-2-738, to investigate and report any and all abuse and physical punishment of Alex, and to inform Alex's parents of the abuse and excessive punishment, but instead, as a matter of ongoing policy, custom, and practice, they instead allowed and covered up the acts contained in Counts Two to Ten.

116.

Given Alex's age; his disabilities; his kind, good hearted nature; the repeated, constant, and daily abuse and excessive and unduly severe punishment he suffered and given Pickens', FCSD's, and Boyd's custom, policy, and practice, under color of state law, to intentionally abuse and harm and excessively and unduly severely physically punish Alex and other

31

severely disabled children who could not report the abuse and punishment, FCSD, Boyd, and Pickens deprived Alex of his Fourth Amendment rights under the United States Constitution.

### 117.

In physically, emotionally, and sexually abusing and excessively and unduly severely physically punishing Alex for an entire school year and subjecting him to similar horrific abuse of his peers, as set forth in this Complaint, FCSD was acting as a local educational agency empowered by the Georgia constitution and Georgia statutory law and Boyd and Pickens were acting under those laws and other statutory laws of the State of Georgia, including but not limited to O.C.G.A. §§ 20-2-101, 20-2-214, 20-2-731, 20-2-737, 20-2-738.

### 118.

While acting under color of state law, instead of creating a culture of learning and respect, FCSD, Boyd, and Pickens intentionally created and maintained for years a demeaning, horrific, brutal, corrupt culture of concerted sadistic abuse and excessive and intolerable punishment of disabled children with moderate, severe, or profound mental impairment, including Alex, who could not report the unjustified intrusions on their personal security.

119.

It was Pickens', Boyd's, and FCSD's practice, policy, and custom to abuse disabled children who could not report the abuse they suffered at school, including Alex, and to deny them their right to be free from excessive force and unreasonable restraint and mistreatment, as Pickens and FCSD did this for five school years and at least one summer and Boyd did it for three school years.

120.

Since Pickens began teaching in the FCSD in 2002, FCSD, through Pickens, as a FCSD employee, repeatedly abused and excessively and unduly severely punished disabled children who could not report the horrific and shocking abuse and punishment due to their disabilities, including Alex, and Boyd, in violation of her duties as a FCSD principal and Georgia educator, allowed, condoned, covered up, and encouraged the abuse and excessive punishment; refused to investigate it properly; took actions to prevent proper investigation, and refused to inform the disabled children's parents.

121.

Alex, due to his disabilities and their severity and his vulnerability and defenselessness, was entitled to heightened protections, yet FCSD and Boyd

33

allowed and sanctioned Pickens' willfully and repeatedly abuse and

excessive and unduly severe punishment of Alex for a prolonged period of

time, and Alex is therefore entitled under the Fourth Amendment of the

United States Constitution to recover all of his damages, in an amount to be

determined by a jury and in excess of $100,000,000.

## COUNTS TWELVE-THIRTEEN – FCSD, PICKENS, BOYD VIOLATION OF 42 U.S.C. § 1983 (DENIAL OF U.S. CONSTITUTIONAL RIGHT TO SUBSTANTIVE DUE PROCESS) AND DENIAL OF GEORGIA CONSTITUTIONAL RIGHT TO SUBSTANTIVE DUE PROCESS

122.

Alex incorporates by reference paragraphs 1, 4-10, 26-55, 57-71, 73-

76, 87-98, 107-121 as if fully set forth herein.

123.

FCSD, Boyd, and Pickens, acting under color of state law authorizing

FCSD as a public school, Boyd as a FCSD principal, and Boyd and Pickens

as Georgia educators, and as a matter of ongoing custom, practice, and

policy, violated Alex's substantive due process rights under the Fourteenth

Amendment of the United States Constitution and his due process rights

under Article I, Section I, Paragraph 1 of the Constitution of the State of Georgia.

124.

Pickens' acts set forth in Counts Two through Ten and in the paragraphs referenced in paragraph 122 and Boyd's acts set forth in paragraphs 107-121 above, which were all done under the laws authorizing FCSD as public school agency, were done as a matter of ongoing custom, policy, and practice to intentionally, severely, brutally, and inhumanely deprive Alex of his rights to be free from bodily restraint, physical abuse, sexual abuse, emotional abuse, verbal abuse, excessive and unduly severe punishment, corporal punishment, a non-violent public educational setting and teacher, and a non-abusive public educational setting and teacher as well as his rights to food, education, safety, and adult supervision.

125.

Pickens' acts set forth in Counts Two through Ten and in the paragraphs referenced in paragraph 122, which were allowed, sanctioned, and covered up as set forth in paragraphs 107-121 above were shocking and were Boyd's and FCSD's appalling custom, policy, and practice for three years and a continuation of FCSD's custom, practice, and policy of two years.

35

126.

Pickens hit, kicked, slapped, pushed, pushed down, shoved, shoved down, jerked, jerked down, jacked up, screamed at, cursed at, pulled hair of, kneed, slammed, threw objects at, rubbed her breasts and buttocks in faces of, deprived lunch to, bit, and did other such shocking conscience shocking abusive and excessively punitive acts to disabled children as a matter of FCSD custom, practice, and policy starting in August 2002 and continuing until May 2007, and **at least** 30 FCSD employees, if not many more, knew of Pickens' acts.

127.

FCSD, Boyd, and Pickens, acting under color of state law as a Georgia public school and Georgia educators, and as a matter of policy, practice, and custom, intentionally violated Alex's substantive due process rights as the facts set forth herein establish, and Alex is entitled to recover from Pickens and FCSD all of his damages, in an amount in excess of $100,000,000, to be determined by a jury.

## COUNTS FOURTEEN-FIFTEEN - FCSD, PICKENS, BOYD

## VIOLATION OF 42 U.S.C. § 1983 (DENIAL OF U.S.

## CONSTITUTIONAL RIGHT TO PROCEDURAL DUE PROCESS)

## AND GEORGIA CONSTITUONAL RIGHT TO PROCEDURAL DUE

## PROCESS

128.

Alex incorporates by reference paragraphs 1, 4-10, 26-55, 87-98, and 107-121as if fully set forth herein.

129.

Pursuant to Georgia statutory law codified at O.C.G.A. §§ 20-2-737 and 20-2-738, Alex had the legal procedural right not be removed from his classroom (to be restrained, isolated, and abandoned) at Hopewell during the 2006-2007 school year because he had not repeatedly or substantially interfered with Pickens' ability to communicate effectively with the students in the class or with the ability of his classmates to learn, his behavior was not in violation of the student code of conduct, and his behavior did not pose an immediate threat to the safety of Alex's classmates or Pickens.

130.

Pursuant to Georgia statutory law codified at O.C.G.A. § 20-2-737, Alex had the legal procedural right not be removed from his classroom even

if he had repeatedly or substantially interfered with Pickens' ability to communicate effectively with the students in the class or with the ability of his classmates to learn and even if his behavior was in violation of the student code of conduct because Pickens did not file with Boyd a written report prior to removal of Alex from the classroom.

131.

Pursuant to Georgia statutory law codified at O.C.G.A. §§ 20-2-737 and 20-2-738, Alex had the legal procedural right to have his parents notified in writing each and every time Pickens removed Alex from his classroom to restrain, isolate, and abandon him.

132.

FCSD, Pickens, and Boyd all intentionally violated Alex's procedural due process rights by Pickens repeatedly removing Alex from the classroom for reasons not authorized by law, by Pickens failing to submit a written report to Boyd each time Alex was removed, by Boyd failing to require a written report, by Boyd failing to notify in writing Alex's parents of the removals, and by Boyd allowing Pickens to repeatedly remove Alex and all other students over and over without any compliance whatsoever with the statutory law on student removal from the classroom.

133.

Boyd, as principal of Hopewell, knew Pickens was removing multiple significantly disabled children, including Alex, from the classroom for their actions to place them in "time out," in direct violation of their statutory procedural rights set forth in paragraph 131 above.

134.

FCSD and Boyd intentionally failed to implement Alex's procedural rights set forth herein regarding classroom removal, intentionally violated O.C.G.A. §§ 20-2-737 and 20-2-738, and intentionally allowed Pickens to violate those rights and laws, although non-disabled children and disabled children who could tell their parents about their school day were afforded those rights.

135.

The damage and harm to Alex is severe, as he was intentionally deprived of his rights to be free from unlawful restraint, physical and emotional abuse, excessive corporal punishment, and corporal punishment and was intentionally deprived of his rights to the procedures required by State statutory law as well as his rights to education, safety, food, and humane conditions.

136.

Throughout the 2006-2007 school year, Boyd had been informed that Pickens was pushing, shoving, and jerking Alex down on hard surfaces and that Pickens was throwing his book bag at him and thus knocking him down and that Pickens was slamming Alex into lockers face first, yet Boyd allowed this corporal punishment by Pickens of Alex in violation of Alex's rights to procedural due process as set forth below.

137.

Pursuant to Georgia statutory law codified at O.C.G.A. § 20-2-730, FCSD was authorized by law to adopt policies and regulations relating to the use of corporal punishment.

138.

Pursuant to Georgia statutory law codified at O.C.G.A. § 20-2-730, FCSD adopted since 1987 or earlier regulations and written policies (that FCSD, Boyd, and Pickens intentionally violated as to significantly disabled children, including Alex, as a practice and custom) prohibiting the use of corporal punishment in any form.

139.

Without Alex's statutory rights to have the FCSD corporal punishment rule and written policy implemented, Pickens, Boyd, and FCSD

knowingly violated that right without notice and an opportunity to be heard, although non-disabled children and disabled children who could tell their parents about their school day were afforded that right.

140.

Even if FCSD had adopted a policy allowing reasonable corporal punishment, FCSD, Boyd, and Pickens violated Alex's lawful procedural rights to have corporal punishment administered in the presence of Boyd, an assistant principal, or one of Boyd's designees, as required by Georgia statutory law, as FCSD and Boyd knowingly allowed Pickens to physically punish disabled students, including Alex, without Boyd, an assistant principal, or a designee present, although non-disabled children and disabled children who could tell their parents about their school day were afforded that right.

141.

The intentional violations of Alex's procedural due process rights as set forth herein have caused Alex severe and lifelong harm by, inter alia, subjecting him repeatedly for an entire school year to excessive and unduly severe corporal punishment, to corporal punishment, and to removal from the classroom and learning environment, and Alex is entitled to recover all

41

damages allowed by law, in an amount in excess of $100,000,000, to be determined by the jury.

## COUNTS SIXTEEN-SEVENTEEN – FCSD, BOYD, PICKENS VIOLATION OF 42 U.S.C. § 1983 (VIOLATION OF U.S. CONSTITUTIONAL RIGHT TO EQUAL PROTECTION) AND GEORGIA CONSTITUTIONAL RIGHT TO EQUAL PROTECTION

142.

Alex incorporates by reference paragraphs 1, 4-10, 26-55, 57-71, 73-76, 87-95, 107-121, 132-134, and 136-140 as if fully set forth herein.

143.

Through Pickens' acts set forth in Counts Two through Ten and the FCSD's, Boyd's, and Pickens' acts set forth in the paragraphs cited in paragraph 142 above, Pickens, Boyd, and FCSD acted under color of state law and as a matter of custom, policy, and practice to deprive Alex of his rights to equal protection of the laws under the Fourteenth Amendment to the United States Constitution and Article I, Section I, Paragraph II of the Georgia Constitution.

144.

Pickens, Boyd, FCSD, acting under color of state law and as a matter of custom, practice, and policy, intentionally undertook the acts Pickens did

to Alex as set forth in Counts Two through Ten and the acts FCSD, Boyd, and Pickens did set forth in the paragraphs cited in paragraph 142 above to deprive Alex, due to his significant mental impairment and resulting inability to report the child abuse and excessive punishment he was forced to suffer for an entire school year, his equal rights to a safe, non-abusive education and learning experience, to due process, to be free from excessive and arbitrary corporal punishment, to be free from corporal punishment, to be free from physical harm, to be free from unreasonable seizure, and his legal rights to food, safety, and adult supervision at public school as well as his legal rights pursuant to O.C.G.A. §§ 20-2-730, 20-2-731, 20-2-737, and 20-2-738.

145.

Pickens, Boyd, and FCSD deprived Alex of his rights to equal protection of the laws for no legitimate purpose, and there was absolutely no rational basis for depriving Alex of equal protection under the law.

146.

Pickens, Boyd, and FCSD deprived Alex's rights to equal protection of the law with a purposeful and malicious discriminatory intent because of his significant disabilities, which included his inability to report what happened to him at school.

43

147.

Because Pickens, Boyd, and FCSD intentionally and willfully denied Alex his right to equal protection of the law pursuant to the United States and Georgia constitutions, Alex was severely injured and still suffers from the denial of his right to equal protection under the law, and he is thus entitled to recover all of his damages, in an amount in excess of $100,000,000, to be determined by a jury.

## COUNTS EIGHTEEN-NINETEEN – FCSD, PICKENS, BOYD VIOLATION OF 42 U.S.C. § 1983 (VIOLATION OF U.S. CONSTITUTIONAL  RIGHT TO BE FREE FROM CRUEL AND EXCESSIVE PUNISHMENT) AND GEORGIA CONSTITUTIONAL RIGHT TO BE FREE FROM CRUEL AND EXCESSIVE PUNISHMENT

148.

Alex incorporates by reference paragraphs 1, 4-10, 26-55, 57-71, 73-76, 87-98, 107-121, 132-134, and 136-140 as if fully set forth herein.

149.

As set forth in Counts Two through Ten and in the paragraphs referenced in paragraph 148 above, FCSD, Pickens, and Boyd undertook intentional and malicious acts to cruelly and excessively punish Alex in

violation of his Eighth Amendment United States Constitutional right to be free from such cruel and excessive punishment and Alex's right to be free from cruel and unusual punishment under Article I, Section I, Paragraph XVII of the Georgia Constitution.

150.

Because of the cruel and excessive punishment Alex suffered for an entire school year as set forth herein, Alex was severely harmed for life, lives in fear and a hyper aroused state, has to take prescribed medication, cannot tolerate things that trigger the trauma he suffered from being in Pickens' class, has post traumatic stress disorder, and regressed, and he is entitled to recover all damages allowed by law in an amount to exceed $100,000,000.

## COUNTS TWENTY- TWENTY-ONE

## VIOLATIONS OF ADA AND SECTION 504 RIGHTS - ALL

## DEFENDANTS EXCEPT WILSON, WADE, KANNER, WIENMANN

## COUNT TWENTY-TWO

## CONSPIRACY - VIOLATIONS SET FORTH IN COUNTS TWO

## THROUGH TWENTY-ONE

## ALL DEFENDANTS EXCEPT NOT FCSD AS TO COUNTS

## TWO THROUGH TEN DUE TO IMMUNITY RULING

151.

Alex incorporates by reference paragraphs 1, 4-10, 26-48, 58-68, 73-76, 79-83, 87-89, and 91-95 as if fully set forth herein.

152.

Before, during the time, and after the time Alex was at Hopewell during the 2006-2007 school year, Alex's disabilities substantially limited most, if not all, of his major life activities, including but not limited to his ability to learn, care for himself, perform daily living skills, complete any motor tasks with skill or speed, walk, speak, work, follow directions, and comprehend.

153.

During the time Alex was at Hopewell during the 2006-2007 school year, due to his disabilities, Alex could not dress himself, he could not bathe himself independently, he could not prepare food for himself, he could not cut up his food, he could not pour himself a glass of liquid, he could not walk at the same pace of or as far as his non-disabled peers, he could not use the toilet independently, he could not write, he could not read, and he could not inform anyone verbally or otherwise of what happened to him while he was at school or of the abuse and excessive, cruel punishment he suffered at Hopewell.

154.

When FCSD comprehensively evaluated Alex in November 2001, FCSD reported that Alex scored in the severely intellectually disabled range.

155.

During the time Alex attended Hopewell during the 2006-2007 school year, Alex was a gentle, non-violent, kind, sweet, loving, quiet, disabled child who did not cause disturbances.

156.

Non-disabled children who attended Hopewell during the 2006-2007 school year were not subjected to the acts set forth in Counts Two through Ten or the violations of their rights set forth in Counts Two through Nineteen.

157.

Non-disabled children who attended FCSD during the 2006-2007 school year were not subjected to the acts set forth in Counts Two through Ten or the violations of their rights set forth in Counts Two through Nineteen.

158.

Disabled children who were not significantly mentally disabled and severely language impaired and who attended Hopewell during the 2006-

2007 school year were not subjected to the acts set forth in Counts Two through Ten or the violations of their rights set forth in Counts Two through Nineteen.

159.

Disabled children who were not significantly mentally disabled and who attended FCSD during the 2006-2007 school year were not subjected to the acts set forth in Counts Two through Ten or the violations of their rights set forth in Counts Two through Nineteen.

160.

As more fully set forth below, Defendants, except with the information currently known possibly not Wilson, Wade, Kanner, and Weinmann, directly intentionally discriminated against Alex and excluded him from and denied him the benefits of the services, programs, and activities of FCSD and Hopewell based solely upon his disabilities.

161.

Defendants, except with the information now known possibly not Wilson, Wade, Kanner, and Weinmann, directly intentionally discriminated against Alex and excluded him from and denied him, based solely upon his disabilities, a non-violent educational setting and teacher, a non-abusive setting and teacher, food, education, safety, adult supervision, freedom from

excessive and unduly severe corporal punishment, freedom from corporal punishment, freedom from sexual abuse, freedom from physical abuse, freedom from verbal abuse, freedom from emotional abuse, freedom from inhumane treatment, freedom from ongoing abuse, and Defendants did not deny these rights to non-disabled children or disabled children who were not significantly mentally impaired and severely language impaired.

162.

As set forth below, Defendants, except possibly with the information now know not Wilson, Wade, Kanner, and Weinmann, knew that harm to the benefits of the activities, programs, and services and lawful rights set forth in paragraph 161 above was substantially likely and they all failed to act on that likelihood.

163.

All Defendants, including Wilson, Wade, Kanner, and Weinmann, as set forth in detail for each Defendant below, were part of a mutual understanding, agreement, and plan to allow Pickens to be the teacher of and abuse and excessively punish significantly mentally impaired and severely language impaired students, including Alex; to allow this abuse and punishment to continue, to not report it, and to cover it up.

164.

Alex has been severely and irreparably damaged by the acts set forth herein and the trauma he suffered for an entire school year and afterwards and by the lack of intervention timely after the abuse, and he is entitled to recover all damages allowed by law in an amount in excess of $100,000,000, as determined by a jury.

## Pickens – ADA, Section 504, Conspiracy

165.

Pickens was an employee of FCSD from at least August 2002 to May 2007, and throughout that time she did the acts to Alex set forth in Counts Two through Ten and committed the violations set forth in Counts Two through Nineteen.

166.

Pickens intentionally and with malice did those acts set forth in Counts Two through Ten and intentionally, maliciously committed the violations set forth in Counts Two through Nineteen.

167.

Because Alex could not do the work or tasks Pickens gave him, including writing, due to his disabilities or he could not do the work or tasks as fast as Pickens demanded because of his disabilities, Pickens intentionally

deprived him of lunch two days a week due solely on the basis of his disabilities.

168.

Because Alex could not do his work or tasks due to his disabilities or could not do them as fast as Pickens demanded because of his disabilities, Pickens intentionally deprived him of a safe environment, education, adult supervision, school activities, food, his freedom from restraint, and his freedom from harm by doing to Alex the acts set forth in Counts Two through Ten.

169.

Because Alex could not urinate or defecate independently due to his disabilities, Pickens intentionally deprived him of a safe environment, education, adult supervision, school activities, necessary adult assistance, education, food, his freedom from restraint, and his freedom from harm by restraining him to a toilet Rifton chair and abandoning him in a closet like room, often with the door shut and the lights out.

170.

Because Alex could not move fast enough due to his disabilities, Pickens intentionally shoved, pushed, jerked him down on hard surfaces and

threw his book bag at him to knock him down solely on the basis of his disabilities.

171.

Because Alex could not report Pickens severe abuse and cruel, excessive, unduly severe punishment of Alex and of Alex's peers, due solely to his disabilities, Pickens intentionally verbally, sexually, physically, and emotionally abused and wrongfully punished Alex as set forth in Counts Two through Ten and violated his rights as set forth in Counts Two through Nineteen and subjected him to witness such horrific behavior to his peers as set forth below, solely on the basis of his disabilities.

172.

When Pickens first starting teaching in the FCSD in August 2002, she was the lead teacher of moderately, severely, and profoundly disabled students at Holcomb Bridge.

173.

Pickens knew she was not properly certified to be the lead teacher of moderately, severely, and profoundly disabled students in FCSD.

174.

Some time shortly after Pickens began teaching in 2002 at Holcomb Bridge in the FCSD, she started hitting, yanking, shoving, and screaming at

significantly disabled children, and she called them vile names and abandoned them in "time out" rooms, including at least one bathroom, with the lights out.

175.

Defendants Butler, Pettes, Shelley, Shaffer, Faulkner, Etris, Young and other FCSD employees and educators whose names are not known and have not been disclosed, were fully aware of Pickens' mistreatment, abuse, and excessive punishment of FCSD significantly disabled students and intentionally and maliciously allowed Pickens to continue teaching and abusing and excessively punishing the disabled children and did not report or stop the abuse and cruel punishment, as the plan was for Pickens to continue being the teacher of and abusing significantly disabled children in FCSD and to cover it up and not report it, and Pickens in fact continued to abuse and excessively punish disabled children in FCSD until FCSD allowed Pickens to resign in May 2007.

176.

FCSD relocated Pickens from Holcomb Bridge to Hopewell in August 2004, and Pickens continued abusing and excessively, cruelly punishing significantly disabled children by hitting, slapping, kicking, kneeing, jacking up, shoving down, jerking down, biting, and doing such other violent acts to

them, including restraining them to chairs, isolating, and abandoning them for hours a day.

177.

All individual Defendants, except for possibly Wilson, Wade, Kanner, and Wienmann, were aware of Pickens' abuse and excessive punishment of significantly disabled children, and all intentionally, by mutual plan and agreement, took acts to allow the abuse and cruel punishment to continue, to not report it properly, to not investigate it properly, and to cover it up.

178.

Because of the mutual understanding and plan that Pickens would continue to work for FCSD despite the fact she abused and excessively punished disabled children, and the mutual plan to ensure it was not reported or investigated properly and was instead covered up, Pickens continued and worsened in her horrific abuse and punishment of disabled children.

179.

The conspiracy to allow Pickens to continue as a FCSD teacher of significantly mentally impaired students and abuse and excessively punish them without proper investigation or report functioned to empower and encourage Pickens in her abuse and sadistic punishment of significantly

disabled students, as Pickens knew that the plan was to in fact allow her to continue abusing and punishing the disabled children and to cover it up.

180.

Part of the plan to prevent proper reporting of the abuse and unduly severe punishment was to intimidate anyone who reported Pickens, and when Pickens was told who reported her, she would harass and intimidate them by being hostile and verbally abusing them.

181.

When Merritt told Pickens in November 2004 that a FCSD nurse named Judy Reddick reported Pickens to Merritt, Thompson, and Boyd for Pickens repeatedly hitting a disabled child hard in the head, repeatedly spraying Lysol on a different disabled child, and repeatedly calling the disabled children vile names, Pickens became hostile to Reddick, no longer welcomed Reddick into her class, and would have nothing to do with Reddick.

**Sharon Etris – ADA, Section 504, Conspiracy**

182.

Defendant Sharon Etris was the FCSD Instructional Support Teacher ("IST") at Holcomb Bridge when Pickens abused and cruelly punished (by hitting, slapping, hair pulling, screaming at, shoving, jerking, restraining,

isolating, and abandoning) significantly disabled children there during the 2002-2003 and 2003-2004 school years.

183.

As IST at Holcomb Bridge, Etris was the FCSD employee in charge of special education at Holcomb Bridge, and she reported to Defendants Shaffer and Pettes as well as Joy Schroeluck.

184.

As IST at Holcomb Bridge, Etris had the authority and duty to hire, supervise, and train special education staff; recommend for hiring, firing, dismissal, and suspension those employees; assign and re-assign special education teachers; place special education teachers in a classroom with other certified teachers; place special education teachers in classrooms where students can report abuse; report abuse; and protect disabled students.

185.

Etris was Pickens' direct supervisor during the time Pickens was a FCSD teacher at Holcomb Bridge.

186.

As IST at Holcomb Bridge, it was Etris' duty to ensure Pickens properly taught and did not harm the disabled students in her class and to

investigate, report, and prevent Pickens' harm to and abuse and physical punishment of the disabled students.

187.

As IST at Holcomb Bridge, it was Etris' duty to put in writing any report of any alleged abuse or excessive punishment of a disabled student at Holcomb Bridge and to have any witness provide a written report of any alleged abuse or excessive punishment.

188.

From August 2002 to May 2004, Etris received numerous reports of abuse and excessive punishment of disabled students by Pickens, yet, as part of the plan to allow Pickens to be a FCSD teacher and abuse and excessively punish significantly disabled students and not report properly, investigate, and stop the abuse and punishment but to cover it up, Etris did not report Pickens to the GaPSC, Department of Family and Children Services ("DFACS"), FCSD police, county or city police, or the children's parents, she did not have any employee who reported abuse to her to put the report in writing, and she did document any abuse and excessive punishment by Pickens of her disabled students but instead withheld the abuse from the children's parents, covered it up, and acted as if it never happened.

189.

Etris attended Individualized Education Program ("IEP") meetings with one or more parents of one or more of the disabled children Pickens abused and or excessively punished, and Etris intentionally did not inform and withheld from the parent or parents of Pickens' abuse and or excessive punishment even though the parents had to be informed to participate in the decision making process, protect their disabled children, and help them recover from the abuse and excessive punishment, and this failure to disclose was part of the plan.

190.

After she was told of Pickens' abuse and excessive punishment, Etris continued to allow disabled children to be abused and excessively punished by Pickens and to remain in Pickens' class.

191.

As IST, it was Etris' duty to assign disabled students in classes with teachers, and after Pickens' ongoing abuse and excessive punishment of significantly disabled students was reported to Etris, she still continued to place disabled children in Pickens' classroom.

192.

Etris knew that Pickens was abusing and excessively punishing a child named Corey Carlson, and Etris did not tell his mother but instead recommended the child be moved to a very restrictive, inappropriate psychoeducational setting even though he was being abused by Pickens.

193.

Etris discussed Pickens' abuse and excessive, cruel punishment of disabled children numerous times with Pettes, Faulkner, Butler, and Shaffer, and they all decided not to report Pickens to DFACS, the GaPSC, the abused children's parents, or the police, and they decided not to investigate it, not to put it in writing, and not to ask others to put in writing what they witnessed or reported, as the plan and agreement was to allow Pickens to teach and abuse and excessively punish disabled children, not investigate it, not report it, and cover it up.

194.

Etris allowed and covered up Pickens' abuse and excessive, cruel punishment of significantly disabled children due solely to their disabilities and she did not do so with non-disabled children or with disabled children who could report the abuse and punishment.

195.

While no one, including Etris, documented in writing Pickens for her abuse and physical punishment of disabled children at Holcomb Bridge, unless FCSD has destroyed them or otherwise refused to provide them, in Etris' annual evaluation dated 3/29/2004, her supervisor Coles wrote she should "take a more active role with at risk employees documenting your steps to assist them."

196.

Etris did not document Pickens' abuse and cruel punishment of disabled students because this was a part of the plan and understanding with Pettes, Faulkner, and Shaffer to allow Pickens to continue as an educator at FCSD of significantly disabled students and to continue abusing and punishing them improperly without investigation or report.

**Donna Faulkner – ADA, Section 504, Conspiracy**

197.

Up until sometime in 2003, Donna Faulkner was the FCSD IST or Instructional Teacher for all of FCSD for students with moderate and severe mental impairment.

198.

As a FCSD IST or Instructional Teacher for the FCSD moderate and severe mentally impaired program, Faulkner had the duty and authority to hire, fire, suspend, reprimand, train, supervise, assign and re-assign all special education staff in the FCSD mental and severe mental impairment program and to recommend the hiring, firing, suspension, reprimand, assignment, re-assignment of all such staff.

199.

As a FCSD IST or Instructional Teacher for the FCSD moderate and severe mentally impaired program, Faulkner had the duty and authority to report any child abuse or physical punishment by a teacher of a student to DFACS, the GaPSC, the police, and the child's or children's parents and to prevent and stop such abuse and punishment.

200.

Pickens' abuse, verbal and physical aggression, and excessive punishment of significantly disabled students was reported to Faulkner in 2002 and 2003, and Faulkner discussed Pickens' improper acts toward disabled children with Pickens, Etris, Shaffer, Shelley, and Pettes, and all these individuals, including Faulkner, as part of the plan and understanding that Pickens would continue to be a FCSD teacher of the significantly

mentally impaired and abuse and excessively punish the children, did not report the abuse and punishment to the children's parents, FCSD police, other police agencies, DFACS, GaPSC and did not investigate properly, write up, document, prevent, or stop the abuse and punishment.

201.

After Faulkner learned Pickens was abusing disabled children at Holcomb Bridge, Faulkner went into Pickens' classroom and shared with her teaching strategies, behavior management, programming, and data collection.

202.

In being in Pickens' classroom, Faulkner knew Pickens was not responding to any support and instruction being provided to Pickens.

203.

In being in Pickens' classroom, Faulkner knew Pickens required more training, supervision, and oversight but Faulkner failed to provide the necessary training, supervision, and oversight.

204.

In being in Pickens' classroom, Faulkner learned firsthand that Pickens was very angry.

205.

In being in Pickens' classroom, Faulkner learned firsthand that Pickens was not willing to do the things that were necessary to properly teach and support the disabled children in her classroom.

206.

In being in Pickens' classroom, Faulkner learned firsthand that Pickens was not following through on the proper teaching methods but was instead being abusive and excessively physically punitive to the children.

207.

Faulkner knew first hand and or it was reported to Faulkner that Pickens was hitting the significantly disabled children in Pickens' classroom at Holcomb Bridge, being rough with them, pulling at least one of the children's hair and or ear, yelling at them, and placing them alone in "time out" in a dark bathroom.

208.

Despite being Pickens' supervisor with the authority to recommend her for firing and with the duty to properly train and supervise her and investigate, document, and report alleged abuse and physical punishment by Pickens, Faulkner did not do any of these things, as she has formed a plan and understanding with Pettes, Etris, Pickens, Shelley, and Shaffer these

proper and necessary actions would not be taken, for the plan was for

Pickens to continue to teach and abuse and punish significantly disabled

children in the FCSD, which Pickens did until May 2007.

### Emmett Shaffer – ADA, Section 504, Conspiracy

209.

Shaffer was the FCSD principal at Holcomb Bridge when Pickens was

abusing and excessively, cruelly punishing disabled children.

210.

As a FCSD principal, Shaffer had the duty, responsibility, and

authority to hire and fire teachers and other employees; to reprimand

employees; to recommend the firing, reprimand, and suspension of

employees; to determine who taught at the school where he was the

principal; to make final determinations about staffing and teacher and

student placement; to reassign teachers; to place teachers in a co-teaching

classroom where there would be another adult certified teacher; to train and

supervise educators in his school; to investigate and report abuse and

physical punishment of students; to not allow any physical punishment in

the school; to implement FCSD policies, rules, and procedures; and to

permit student removal from class only in compliance with O.C.G.A. §§ 2-2-

737 and 20-2-738.

211.

Pickens abuse and cruel punishment of significantly disabled children was reported to Shaffer on multiple occasions while Pickens was at Holcomb Bridge.

212.

Shaffer did not care about or for the significantly mentally impaired children at Holcomb Bridge.

213.

Shaffer took absolutely no actions to report, investigate properly, or prevent or stop Pickens' abuse and excessive punishment of the significantly mentally impaired students in her class or to properly train or supervise Pickens, and he failed to document any of her abuse or excessive punishment of students or to require she comply with the law in removing students from her class, as this was the plan and understanding Shaffer had with Pettes, Young, Shelley, Pickens and others for Pickens to continue being a FCSD teacher of significantly disabled students and abusing and excessively punishing them, and Pickens in fact did so.

214.

Numerous times, Pettes discussed Pickens' improper, rough treatment of the significantly mentally impaired students in her class with Shaffer.

215.

On at least one occasion during the timeframe of 2003 to 2004, Pettes discussed Pickens improper treatment of the significantly mentally impaired students in her class, and Pettes recommended to Shaffer that Pickens not be re-hired, but according to Pettes, Shaffer told Pettes that it was Pettes' job to train Pickens and that Pickens would not be fired.

216.

Shaffer was advised by FCSD "administration" that Pickens was to continue teaching significantly disabled children in FCSD, despite the fact she was abusing and excessively punishing disabled students.

217.

Shaffer has subsequently untruthfully denied ever having been told that Pickens was mistreating significantly disabled children or having any discussions with Pettes about Pickens.

**Lance Young – ADA, Section 504, and Conspiracy**

218.

Defendant Lance Young was the FCSD Human Resources Administrator from 2003 to 2007 and in that position was responsible for hiring, firing, assigning, supervising, training, overseeing, reprimanding, reporting, and investigating all FCSD educators and other employees;

66

certification of FCSD educators; salaries of FCSD educators; and recommendations to the FCSD Board regarding all personnel issues and matters.

219.

In his role as FCSD Human Resources Administrator, Young reported to Ron Wade.

220.

As FCSD Human Resources Administrator, Young had the duty and authority to ensure any alleged abuse of a student by a FCSD educator was reported in writing to DFACS, the GaPSC, and the FCSD Board, and was reported to the parents of the child and the police.

221.

When Pickens was at Holcomb Bridge abusing and excessively physically punishing significantly disabled children from 2002 to 2004, upon information and belief, Young informed, at the least, Shaffer to continue Pickens as a FCSD teacher of significantly disabled students despite her abuse and excessive punishment of the children.

222.

When Pickens was at Holcomb Bridge abusing and excessively physically punishing significantly disabled children, Young did not

investigate, document, or report Pickens' abuse and cruel punishment of the disabled children but instead assured there was no documentation and no reports, as part of the overall plan and design to allow Pickens to continue teaching and abusing the significantly disabled children.

223.

In November 2004 when a FCSD nurse named Judy Reddick and one of her supervisors reported abuse and excessive punishment by Pickens when Pickens was at Hopewell, as part of the common plan and design, Young decided in communications with Vanairsdale, Denmark, Lynch, and Boyd that Pickens would not be fired, or put on an improvement plan, written up in her permanent personnel file, reported to DFACS or the police or other authorities for hitting Jake Marshall in the head hard frequently, calling him vile names, spraying Lysol on a child numerous times, and restraining a disabled child's arm to a chair but instead, in accordance with the plan, Pickens would continue to teach and abuse and punish disabled children, which she did until May 2007.

224.

When Reddick reported Pickens in November 2004, Young, Vanairsdale, Boyd, and Lynch had already determined what the outcome of the FCSD social worker's investigation would be, which was that Pickens

would not be reported to DFACS or the police or any other government agency so she could continue teaching significantly disabled children and abusing them, for, inter alia, they did not care for these children or about them and they did not want to recommend to the FCSD board to increase the pay to teachers of significantly disabled students so properly trained, non-abusive teachers and staff were hired, even though FCSD received more funding for the education of students with significant mental impairment.

225.

In November 2004, shortly after Reddick reported Pickens' abuse of Jake Marshall and other students, FCSD, Lynch, Denmark, Young, Reece, Boyd, and Vanairsdale made a decision that Pickens was not to be fired or given a "Needs Improvement" on her upcoming evaluation for hitting Jake Marshall hard in the head, for calling students vile names, for spraying a child with Lysol, and for restraining a child's arm to a chair, and these Defendants as well as Schuette, Beasley, Thompson, Pettes, Shelley, Merritt, McGee, and Boyd, at the least, all agreed with allowing, adopting, ratifying, and following that decision, as it was a part of the plan to allow Pickens to continue being a FCSD teacher of significantly mentally impaired students who could not report the abuse and to continue abusing and punishing them.

226.

In May 2007, Boyd was forced to file with the FCSD social worker department a report about only one incident on one day in May 2007 where Pickens had restrained, isolated in a different room, and abandoned Jake Marshall, which was really only one of hundreds of such incidents.

227.

In May 2007, Young received from the FCSD employee relations office, more particularly, Defendant Kanner, a complaint regarding Pickens treatment of Jake Marshall on one day in May, and for that time, he forwarded that complaint for investigation.

228.

The investigation of Pickens' abuse and excessive, unduly severe punishment of Jake Marshall on that one day in May 2007 revealed that Pickens had been abusing disabled children since 2002 in the FCSD and that she had abused Alex Williams as well as other children.

229.

Although the investigation revealed abuse and excessive, cruel punishment of other disabled children, the investigation was focused upon abuse of Jake Marshall **on one day in May 2014**, so there was no investigation of the abuse and excessive punishment by Pickens of Alex,

Repheka Persadi, Garrett Lee, Aaron Hatcher, or Corey Carlson, or any
other child Pickens had abused and cruelly punished.

230.

Despite it being Young's duty and obligation to investigate all alleged
abuse and report it to the authorities, including the police, and the child or
children's parents, Young did not authorize or allow an investigation into the
abuse by Pickens of the other children, including Alex, and he did not allow
the reporting of the abuse to the children's parents, including Alex's parents,
because a part of the mutual plan and common design was to cover up and
hide from parents and the authorities what Pickens was doing, at first so she
could continue to be a FCSD educator of significantly disabled children and
abuse and punish them and then so as to evade liability when she could no
longer be allowed to continue as a FCSD and abuse and cruelly punish
disabled children.

231.

In so making the decision and plan not to investigate the abuse by
Pickens of Alex and the other children and not inform Alex's and the other
children's parents so as to continue to hide and cover up Pickens' abuse and
excessive punishment of significantly disabled children who could not tell
their parents of the abuse and punishment, Young acted together in

communication and agreement with Defendants Wade and Wilson, at the least, to come to this determination and plan.

## **Sharon Butler – ADA, Section 504, Conspiracy**

232.

Defendant Sharon Butler has held the position of Behavior Interventionist with FCSD since 1996, although her position has been previously referred to as Behavior Specialist and Area IST for Behavior.

233.

During the time Pickens was abusing and cruelly punishing significantly disabled children from August 2002 to May 2004, Butler has had the duty and responsibility for reporting educators who abuse one or more students, making recommendations for hiring and firing, training FCSD special education staff, providing support to FCSD special education staff.

234.

During the time Pickens was abusing and cruelly punishing significantly disabled children from August 2002 to May 2004, Butler's supervisors were Pettes and Shelly.

235.

When Pickens was abusing, mistreating, and physically punishing disabled students at Holcomb Bridge during the time frame of 2002-2004, Butler was informed that Pickens was in fact being physically too rough with her significantly disabled students; restraining, isolating, and abandoning them; and screaming at them.

236.

Butler discussed Pickens' acts set forth in paragraph 235 above with, at the least, Pettes, Etris, and Faulkner.

237.

Butler learned through Pettes, Etris, and Faulkner that the plan and agreement was that Pickens would not be reprimanded, written up, investigated, reported, suspended, or fired for her abuse and punishment of disabled students but would instead be allowed to continue as a FCSD teacher of the significantly mentally impaired students, regardless of her abuse and its continuation, and Butler agreed with this plan and did nothing to prevent or stop the abuse, and did not report the abuse to authorities or parents.

238.

When Pickens was at Holcomb Bridge, Butler told Pickens that is was not lawful or allowed by FCSD for Pickens to restrain disabled students or place them in a room without supervision, as Butler knew Pickens was doing this.

239.

Butler knew that Pickens, however, continued to restrain, isolate, and abandon disabled students at Holcomb Bridge and then later at Hopewell, but again, Butler took no action to report this, investigate this, or have it investigated, as she had agreed and continued to agree with the plan not to do acts to have Pickens removed from teaching and abusing significantly disabled children who could not report Pickens abuse.

240.

Pettes told Butler that Pickens was still physically punishing disabled children and restraining them at Hopewell, but Butler did not provide training to Pickens even though that was Butler's job and duty.

241.

Butler knew Pickens had a short, quick temper with the significant disabled students and was not responding to any training, yet Butler took no action whatsoever to have Pickens transferred or re-assigned or removed

from the FCSD, as this the agreed upon plan was to allow Pickens to continue as a FCSD of the significantly disabled children and to continue abusing them.

## **Michael Vanairsdale – ADA, Section 504, Conspiracy**

242.

Defendant Michael Vanairsdale was the acting superintendent of FCSD from October 2003 to January 2004 and the superintendent of FCSD from January 2004 to February 2005.

243.

As acting superintendent and superintendent of FCSD, Vanairsdale had the duty and responsibility, inter alia, to supervise all FCSD employees, ensure the laws of the State of Georgia and the United States and FCSD policies and procedures are adhered to by all employees, ensure the safety and well being of all FCSD students, ensure the equal rights under the law of all FCSD students, ensure the proper supervision and training of all employees, ensure the thorough investigation and reporting of any abuse or suspected or reported abuse or mistreatment of any FCSD student, and to keep the FCSD board fully informed of any and all instances of FCSD employee abuse of students.

244.

In 2004, after Reddick reported Pickens hitting Jake Marshall hard on the head frequently, spraying Lysol on Repheka, and calling disabled students vile names, Boyd learned that Reddick's supervisor of FCSD nurses, Lynn Meadows, had reported Pickens to the FCSD social worker department after Boyd refused to accept the report from Reddick.

245.

After Boyd learned of the report regarding Pickens by Meadows, Boyd contacted Denmark, Vanairsdale, Lynch, and Reece or some combination thereof, and then collectively, the five of them agreed that Pickens would not be fired, would not be formally reprimanded with a letter in her permanent personnel file, would not be given a "Needs Improvement" on her annual educator review, would not be reported to DFACS or the police or the GaPSC, and would be allowed to continue to be a FCSD teacher of significantly mentally impaired students who could not report the abuse and continue her abuse and cruel punishment of those students and the matter would be covered up and not properly disclosed to all children's parents.

246.

Although Vanairsdale and the human resources department were not to be involved until after the social work department's investigation, they became involved at Denmark's and Boyd's request, and they, along with Reece, all decided the plan stated in paragraph 245 above and what the outcome of the social worker's report would be, which was that the matter would not be reported to DFACS or the GaPSC.

247.

Vaniarsdale, as all other Defendants, was a certified Georgia educator responsible for not encouraging the abuse of students and for reporting any suspected abuse to the GaPSC, yet he, along with Boyd, Denmark, Young, and Lynch all decided that Pickens frequently hitting a child hard in the head, spraying Lysol on a student, restraining a disabled child's arm to a chair, and calling disabled students "little f_ckers" and "little sh_ts" (the u and i are missing) would not be properly reported or investigated, but instead all this would be covered up and allowed to continue.

248.

Boyd had already been informed by Pettes in August 2004 or earlier that Pickens had a history in FCSD of roughing up and mistreating her significantly disabled students.

249.

Boyd did not like significantly disabled students and did not want to have them at Hopewell, so when Vanairsdale, Denmark, Reece, Young and she all agreed that there would be no meaningful consequences for Pickens' abuse of Jake and other disabled children in 2004 and it would be covered up and would continue, this plan of action, first started in FCSD in 2002, was strengthened, and Boyd was empowered with the ability to abuse her authority from the superintendent and other supervisors to violate the law and allow the horrific abuse and sadistic punishment of significantly disabled students to continue and worsen at Hopewell on the G Hall by Pickens for almost over two and one half more school years.

250.

Vanairsdale, acting with others, including Boyd, Denmark, Lynch, and Reece, in furtherance of the agreement and common plan to ensure Pickens continued to be a FCSD of significantly disabled students and continued to abuse them and to cover up the abuse, intentionally and maliciously made the decisions set forth herein.

## **Boyd – ADA, Section 504, Conspiracy**

251.

Alex also incorporates into these counts for Boyd paragraphs 107-121, 132-134, and 136-140 as if fully set forth herein.

252.

Defendant Boyd was the principal at Hopewell Middle School during from 2004 to 2007.

253.

Principal Boyd was Pickens supervisor and Boyd had the ability and duty, inter alia, to remove Pickens from Hopewell; remove her from being in a classroom without a certified teacher or administrator; remove her from a classroom with disabled children who could not report Pickens' abuse and excessive punishment; fire her; suspend her; recommend her for firing, suspension, or re-assignment; file a report of suspected or reported abuse to the GaPSC, DFACS, FCSD police, county police, and the abused children's parents complaint; undertake a proper and thorough investigation of Pickens' treatment of Alex and his peers; cooperate in any and all investigations into Pickens' abuse of disabled children; supervise and train Pickens; ensure Pickens complied with FCSD rules and policies and the laws

of the State of Georgia and the United States in her role as a FCSD

employee at Hopewell; and report Pickens' actions to Alex's parents.

254.

As the principal of Hopewell, it was also Boyd's duty to oversee all

operations at Hopewell, oversee staffing and hiring of staff at her school,

oversee placement of children with teachers, ensure the safety of students,

and protect students.

255.

Defendant Pettes informed Boyd prior to Pickens ever transferring

from Holcomb Bridge to Hopewell in August 2004 that Pickens had several

ongoing issues at Holcomb Bridge with her mistreatment and rough

treatment of significantly disabled students.

256.

At Hopewell, children with significant mental impairment, including

Alex, were placed on the G Hall, which was a segregated hallway of the

building where no non-disabled child was taught and where no significant

mentally impaired disabled child was taught.

257.

Boyd did not like the significantly disabled children who were placed

on the G Hall because of their significant disabilities, and Boyd stated to at

least three FCSD paraprofessionals (Cindy Eitmann, Amanda Mathis, and Judy Massey) that they "should have just pulled the plug" on those children a long time ago.

258.

The 2004 school year at Hopewell in FCSD began in August, and by September 2004, if not earlier, Boyd had been informed by one or more Hopewell employees that Pickens was abusing and excessively and unduly severely punishing the significantly mentally impaired children in Pickens' class.

259.

In November 2004, FCSD nurse Reddick informed Boyd that she had witnessed Pickens hit Jake Marshall hard in the head, in fact hard enough to hurt, frequently, spray Lysol on Repheka Persadi and roughly put her in the hall alone, and call disabled students vile names like "little sh_ts" and "little f_ckers" (an i and u are missing, respectively).

260.

When Reddick reported the above to Boyd, Boyd refused to accept or act on the report.

261.

Long before Alex ever was placed on the G Hall, Boyd had been informed that Pickens was putting her buttocks and breasts in one or more significantly disabled children's faces, that Pickens was depriving one or more significantly disabled children of lunch, that Pickens had thrown a camera at a significantly disabled child (Jake Marshall), for which he suffered a huge knot on his head, that Pickens was kicking Jake Marshall, that Pickens was restraining disabled children to chairs and isolating and abandoning them in rooms, including the bathroom, as a "time out," and other such abusive treatment.

262.

Before Alex was ever placed on the G Hall, Boyd had numerous conversations with Defendant Pettes about Pickens' temper and her physical and verbal improper acts to significantly disabled children.

263.

Before Alex was ever placed on the G Hall with Pickens, Boyd had numerous conversations with Defendant Merritt about Pickens' temper and her physical and verbal improper acts to significantly disabled children.

264.

One or more bus drivers (names unknown), one or more parents of non-disabled children (names unknown) who just happened to see the abuse and excessive punishment, two or more paraprofessionals (King and Eitmann), an IST (Merritt), one or more FCSD nurses (Reddick), one or more teachers (Averett), and a janitor (Coneway) reported Pickens' abusive acts and excessive punishment of significantly disabled students at Hopewell to Boyd, some multiple times, prior to Alex ever arriving at Hopewell, and Boyd never properly or truly investigated the reports, never required written reports of the abuse, and never reported the abuse to the parents of the disabled children, DFACS, the GaPSC, the FCSD social work department, the FCSD police, or the county police or other agency.

265.

After Alex was placed in Pickens' classroom during the 2006-2007 school year, a paraprofessional, Amanda Mathis Groover, went to Boyd and reported how Pickens was pushing Alex down on hard surfaces and otherwise abusing and excessively punishing Alex, including restraining him to a chair and isolating and abandoning him, and Ms. Groover was crying and begging Boyd to stop the abuse and excessive punishment of Alex.

266.

Boyd intentionally refused, however, to stop Pickens' abuse and excessive punishment of Alex and the other children, just as she had for the two prior school years when reports were made to her, as this was part of the plan and common design to allow Pickens to remain as a FCSD teacher of significantly disabled students, abuse them, and cover it up.

267.

Boyd intentionally lied to those who would report Pickens' abuse and excessive punishment by telling them the matter was being taken care of when in fact it never was being taken care of and Boyd was intentionally allowing Pickens to discriminate against Alex and his significantly disabled peers based solely on their disability.

268.

Boyd intentionally discriminated against Alex based solely on his significant disabilities and intentionally refused to protect him, investigate reported abuse and excessive punishment of him, follow up on reported abuse and excessive punishment of him, and report the abuse and excessive punishment of him.

269.

Boyd was deliberately indifferent to the fact Pickens was intentionally discriminating against her significantly disabled students as set forth herein and that due to the significant pattern and constant discrimination of Pickens of significantly disabled children, even before Pickens went to Hopewell and for two years while Pickens was at Hopewell before Alex was placed there, that there was a substantial risk Pickens would discriminate against Alex.

270.

Boyd told Merritt, the Hopewell IST, that Merritt was supposed to tell any parent who asked about abuse by Pickens that the matter was being addressed or taken care of by administration when in fact Merritt and Boyd both knew and agreed it was not being addressed, as this was part of the common plan and agreement to allow Pickens to continue being a FCSD teacher of significantly disabled children, to continue abusing them, and to continue covering it up.

271.

As part of the plan, Boyd took actions to intimidate and harass those who reported Pickens' abuse.

272.

When Reddick reported Pickens' abuse to Boyd and Boyd would not act on the report so Reddick told Lynn Meadows, Boyd told Reddick she was not pleased with Reddick had done so.

273.

After Reddick reported Pickens in 2004, Boyd did not wish for Reddick to continue teaching at Hopewell, Boyd told Reddick this, and Reddick transferred to a cluster of schools that did not include Hopewell.

274.

After Reddick reported Pickens' abuse of disabled children, Boyd told Pickens who had reported her, and Pickens was hostile to Reddick.

275.

After a FCSD nurse (Goodman) reported Pickens' abuse of disabled children, Boyd told Pickens that Goodman had reported her.

276.

When a Hopewell janitor, Coneway, reported to abuse of Jake Marshall, Merritt told Boyd, and Boyd had a meeting with the custodian warning Coneway he was to never call a parent about the mistreatment of a student, even though he told her he had not done so, and then Boyd sent him a letter, copying his supervisor on it and, reiterating, according to Boyd, "the

demand that Defendant Boyd herself be informed of any mistreatment of students" ironically and sadly, according to Boyd, "to ensure the safety of students."

277.

After Reddick reported Pickens and Meadows reported it to the FCSD social work department, Boyd refused to cooperate in the FCSD social work investigation and instead contacted Denmark, Vanairsdale, Reece, and Lynch or one or more of these individuals who contacted one or more until all were involved, thereby ensuring the plan continued and that no real consequences occurred to Pickens.

278.

After Reddick reported Pickens' abuse, Boyd did not timely provide a statement from Pickens and refused to even have Pickens provide a statement until Boyd had contacted Denmark and others and ensured Pickens would continue as a FCSD teacher of significantly mentally impaired students.

279.

Over the three years Pickens was at Hopewell, Boyd discussed Pickens' mistreatment of students with Pettes multiple times, and with Pettes and Pickens at least three times, and Pickens would always apologize and

say she would do better, but she never did, and Boyd and Pettes both knew this but allowed her to continue abusing and punishing the disabled children and they, along with many others, continued to cover it up and ensure it was not investigated or reported.

280.

In January 2006, a FCSD nurse named Goodman reported that Pickens told a disabled child his mother was a "crack-head," and she reported again when she saw Pickens "jack up" a disabled child.

281.

Goodman reported to Boyd and others that Pickens told a disabled child that his mother didn't "give a sh_t about" him (the i is missing).

282.

Goodman reported to Boyd and others that Pickens would scream or yell at disabled children in her class and bang the table to intentionally startle them, and the children would flinch.

283.

Goodman saw Pickens talk "nasty" about disabled children's parents to the disabled students, and she reported this to Boyd, as well as the fact that Pickens was placing disabled children, some with serious health issues, alone in a room by themselves.

88

284.

When Goodman went to Boyd to report Pickens, before Goodman ever said Pickens' name, Boyd asked, "Now what has Melanie done?"

285.

Defendant Averett reported Pickens' abuse to both Merritt and Boyd during the 2004-2005 and 2005-2006 school years, and they only agreed to cover it up, not report it, and allow it to continue, which it did until May 2007.

286.

A student witnessed Pickens push Alex down on the cement or concrete during the 2006-2007 school year, and this was reported to Boyd, who did not investigate it, report it, or prevent it from occurring again.

287.

One or more bus drivers witnessed Pickens push Alex down on a hard surface, and this was reported to Boyd, who did not investigate it, report it, or prevent it from occurring again.

288.

Although Boyd was informed that Pickens was hitting Jake hard in the head, Boyd and Pickens intentionally lied to Jake's mother in November

2006, claiming Pickens had only lightly tapped Jake two times on one occasion just to get his attention.

### 289.

When Boyd was told that Pickens threw a camera and hit Jake in the head, Boyd merely asked Pickens if such were the case and did not report it, properly investigate it, or inform Jake's mother of the reported abuse even though Jake had a huge knot on his head from the injury.

### 290.

Pickens has denied in formal pleadings in a suit filed by Jake Marshall ever doing one improper thing to any child, Boyd blames Merritt for there never being a proper investigation and proper reporting, and Merritt blames Boyd for there never being proper investigation and reporting, yet all three along with others as set forth above and below all agreed to allow Pickens to abuse and punish significantly disabled children, not report it, not properly investigate it, cover it up, and allow it to continue.

### 291.

Boyd and Merritt intentionally would not have FCSD reporters of Pickens' abuse put in writing, yet on a few occasions, Boyd did ask for a written report, but then she destroyed it.

292.

After Jake Marshall was found in May 2007 isolated and abandoned in a room restrained to a chair and covered in feces, Boyd stated, "They cleaned him up, but no one would have known anything, if they had cleaned under his fingernails."

293.

Boyd told Wadel that Goodman, a nurse who reported Pickens' wrongful acts to Boyd, was a "busybody."

294.

The GaPSC found Boyd had violated the GaPSC Ethics Code, committing child abuse, cruelty to children, or child endangerment; failing to properly report the abuse; acting unprofessionally and in a way detrimental to the health, welfare, discipline, or morals of students.

295.

Pettes informed Boyd numerous times of Hopewell staff's concerns about Pickens' abusive treatment of her disabled students.

296.

On November 3, 2006, Boyd informed Pickens in an email that she was not to use physical force to make Jake comply with her requests, yet Boyd knew Pickens continued to do so and allowed Pickens to continue to

do so, as that was a part of the agreement and common plan to allow Pickens

to continue as a FCSD teacher of significantly disabled students and abuse

and punish them all the while covering it up.

297.

On November 14, 2006, Boyd sent an email to Pickens, White, and

Sosebee, copying Merritt and the school secretary on it, and stating as

follows: "A parent called the school today to report that she saw a

disturbing scene on the G Hall where an adult was pulling a student down

the hall by the back of the coat.  I did not speak with her, but Anne assured

her that we would deal with it.  I tell you this because it is important that

people don't get the wrong impression."

298.

White wrote back, acting as if she had no knowledge of any abusive

employee on the G Hall, which was patently false, and then Boyd replied, "It

was just something during the day last week.  I don't want you to worry

about it.  I'm merely letting you know."

299.

Other than the email referenced above, all Boyd did was agree with

Merritt that if any parent asked about it, the parent would be told

administration would or was handling it, and no investigation was

undertaken, no report was submitted to anyone, and Pickens continued

abusing disabled children and it continued to be covered up, as that was the

mutual understanding of the Defendants and the common plan.

300.

Despite the fact Boyd and Merritt knew that at Hopewell, Pickens had

abused disabled children for three years and Alex for one year, it was the

plan of FCSD, Boyd, Merritt, White, Sosebee, McGee, McConnell, and

Thompson that Pickens would continue to be a teacher of significantly

mentally impaired children who could not report Pickens' abuse.

**Merritt – ADA, Section 504, Conspiracy**

301.

From 2004 to May 2007, Merritt was the IST over special education

at Hopewell, and she was the supervisor over the G Hall.

302.

As IST at Hopewell, Merritt had the ability and duty to hire,

recommend for hiring, suspend, recommend for suspension, remove from a

classroom without a certified teacher or administrator, remove from a

classroom with disabled children who could not report abuse and excessive

punishment, and recommend for firing special education teachers at

Hopewell as well as file a GaPSC, police, and DFACS report of known or

suspected abuse, undertake a proper and thorough investigation of Pickens'

abusive treatment and cruel punishment of Alex and his peers, report

Pickens to a social worker, report Pickens' actions to Alex's parents and to

the parents of the other disabled children in Pickens' classroom, and

supervise and train Pickens properly.

303.

Despite Merritt's duties and authority set forth in paragraph 303 above

and her ongoing knowledge of Pickens' horrific abuse and punishment of

significantly disabled children, Merritt never did any of the acts set forth in

paragraph 303, and this was for a three-year period.

304.

From August 2004 to August 2006, Pickens' shocking abuse and

cruel, excessive corporal punishment of significantly disabled children had

been reported to Merritt by many FCSD employees, including numerous

FCSD paraprofessionals (King, Baugh, Eitmann, Groover), a FCSD nurse

(Reddick), a Hopewell janitor (Coneway), several special education teachers

(White, Averett), and others, such as parents, regular education students, and

bus drivers, whose names are not known.

305.

In August to September 2004, a paraprofessional (King) informed Merritt more than once that Ms. King had seen Pickens kicking a significantly disabled student named Jake Marshall, passing gas in his face, rubbing her breasts in his face, and other abusive, excessively punitive acts to Jake.

306.

In response to interrogatories, however, when asked to report all communications about Pickens' abusive treatment of one or more of her students, Merritt failed to disclose King's reports to her.

307.

In November 2004, FCSD nurse Reddick informed Merritt that she had witnessed Pickens hit Jake Marshall hard in the head, in fact hard enough to hurt, frequently, spray Lysol on Repheka Persadi, and call disabled students vile names like "little sh_ts" and "little f_ckers."

308.

Before Alex was placed on G Hall, Merritt told Pettes Pickens was significantly abusing disabled students.

309.

Although Merritt has denied in formal discovery responses in a case filed against her by Jake Marshall ever discussing Pickens' abuse of Jake and other students with Pettes, Merritt started going to Pettes in 2004 with concerns about Pickens' abusive, excessive punishment of Jake and other significantly disabled students, and Merritt and Pettes had numerous conversations about Pickens' abusive treatment of disabled students at Hopewell.

310.

Before Alex was placed on the G Hall, Merritt herself saw Pickens kicking and kneeing Jake Marshall while he was on the floor, yet she has subsequently denied ever seeing Pickens abuse a disabled child.

311.

Merritt was informed during the 2006-2007 school year that Pickens was pushing, shoving, jerking Alex down, and Merritt knew Pickens was restraining Alex in a Rifton chair and abandoning him for long periods of time in a room without supervision as a "time out."

312.

As part of the common plan and design and in furtherance thereof, Merritt, as did Boyd, intentionally lied to those who would report Pickens'

abuse and excessive punishment by telling them the matter was being taken care of when in fact it never was being taken care of and Merritt was intentionally allowing Pickens to discriminate against Alex and his significantly disabled peers based solely on their disabilities.

313.

Merritt intentionally discriminated against Alex based solely on his significant disabilities and intentionally refused to protect him, investigate reported abuse and excessive punishment of him, follow up on reported abuse and excessive punishment of him, and report the abuse and excessive punishment of him.

314.

Merritt was deliberately indifferent to the fact Pickens was intentionally discriminating against her significantly disabled students as set forth herein and that due to the significant pattern and constant discrimination of Pickens of significantly disabled children, even before Pickens went to Hopewell and for two years while Pickens was at Hopewell before Alex was placed there, that there was a substantial risk Pickens would discriminate against Alex and abuse and excessively punish him, as she in fact did.

315.

Merritt agreed with Boyd to not properly report, investigate, or prevent and stop Pickens' abuse in furtherance of the common plan to allow Pickens to continue as a FCSD teacher of significantly impaired students, abuse those students, and cover it up.

316.

When two different parents (Ms. Lee and Mr. Hatcher) of disabled students (Garrett and Aaron) in Pickens' class reported their concerns about their children's well being at school, although Merritt knew Pickens was abusing her students, Merritt informed the parents everything was fine on the G Hall, as this was part of the plan and agreement.

317.

In May 2005, near the end of Garrett's first year at Hopewell, Garrett's mother called Merritt, informing Merritt of Garrett's mother's concerns about Garrett being unhappy, not wanting to go to school, and crying more and more.

318.

When Ms. Lee called Merritt in May 2005, Merritt was dismissive of Garrett's mother's concerns, and Merritt told Garrett's mother that none of

the children really wanted to attend school and basically that Ms. Lee should not be concerned.

### 319.

When Ms. Lee called Merritt in May 2005, Merritt assured Garrett's mother that Merritt would check into everything with Garrett and his class and if there were any problems or concerns, she would get back to Garrett's mother, and Merritt never got back to Ms. Lee, yet Merritt already knew there were significant problems of child abuse in Pickens' class.

### 320.

Merritt intentionally misled Aaron Hatcher's family during an IEP meeting on March 27, 2006 for Aaron when it was reported by Aaron's grandmother, father, or both that Aaron had come home from school with bruises on his face that looked like someone had forcefully grabbed Aaron's face on both checks.

### 321.

In response to Aaron's family's concerns about the bruises on Aaron's face and in furtherance of the common plan, Merritt intentionally lied to Aaron's family at the meeting, alleging falsely that she was on the G Hall daily and she had never seen any issues or concerns and had only seen care of Aaron.

322.

After that IEP meeting with Merritt referenced above, Aaron's family visited Aaron at school and found him isolated in a dark room, and Aaron was crying and distraught.

323.

On November 14, 2006, after Boyd had notified Merritt, White, Pickens, and Sosebee that a parent reported "that she saw a disturbing scene on the G Hall where an adult was pulling a student down the hall by the back of the coat" and after White inquired as to when it occurred, White responded by email as follows:  "Thanks Stacy, I think this may have been Tamez.  She always reports what he sees."

324.

As with all other reports, as part of the common design and agreement, Merritt did not investigate, report, or take action upon the parent report of an adult dragging a disabled student down the G Hall by his coat.

325.

As part of the plan and agreement, when staff reported Pickens' abuse to Merritt, she (Merritt) told them she or Boyd or the administration was handling the matter when in fact this was a lie and Merritt knew so.

326.

When Reddick reported Pickens' abuse, as part of the plan to intimidate and harass those who reported Pickens' abuse so it could continue and would be covered up, Merritt told Reddick Boyd was very upset with Reddick.

327.

When White reported Pickens' abuse of Alex, as part of the plan to intimidate and harass those who reported Pickens' abuse so it could continue and would be covered up, Merritt made White attend a meeting with Pickens and tell Pickens what White had reported about Pickens.

328.

Boyd gave Pickens a copy of Reddick's letter reporting Pickens for abusing disabled children.

329.

Ms. Groover repeatedly reported Pickens' abuse of disabled students to Merritt, and Merritt replied that she had gone to Boyd and "it was being handled," and this is what Ms. Groover "always got" when she reported Pickens to Merritt.

330.

After King reported Pickens' abuse several times to Merritt and Boyd, one or both of them told Pickens King had reported her, and Pickens told staff King was a "snitch" and treated her in a hostile manner.

331.

Ms. King asked Merritt why nothing was ever done, and Merritt told Ms. King that Merritt went to Frances [Boyd] and Merritt and Frances talked about it.

332.

Ms. White went to Merritt in 2005 about Pickens being too aggressive with Jake, and Ms. White saw Pickens' repeatedly continue to be too aggressive with Jake until Pickens resigned in May 2007.

333.

Merritt knew Pickens was placing disabled children restrained to chairs and alone in bathrooms and other rooms as a "time out."

334.

Merritt told Ms. King and others that when the new teacher (Ms. White) came to Hopewell in 2005, no one was to discuss anything with the new teacher in reference to what had been going on with Pickens and her treatment of the disabled children, and this was in furtherance of the plan.

335.

When Ms. King told Merritt about Pickens throwing a camera at Jake and hitting him in the head, Merritt did not ask Ms. King to write a statement about it.

336.

Merritt attended IEP meetings for disabled children Pickens abused, including attending IEP meetings for Aaron Hatcher, Garrett, and Alex, and Merritt never disclosed any of the abuse or excessive punishment by Pickens of Aaron, Garrett, Alex, or any other child, as this was a part of the plan and common design.

337.

When Pickens pushed Jake on the bus steps and he fell down, Pettes discussed this with both Merritt and Boyd, but both Merritt and Boyd deny discussing this with Pettes.

338.

Merritt informed Pettes more than once that Pickens was abusing her disabled students at Hopewell.

339.

Ms. Eitmann, a paraprofessional at Hopewell, reported Pickens' abusive actions to her students to Merritt, who told Ms. Eitmann "I'll handle it," but Merritt never did.

### **Stephanie Schuette – ADA, Section 504, and Conspiracy**

340.

Stephanie Schuette has been a FCSD social worker from 1998 until at least December 2014, and her supervisors have included Beasley and Shaffer.

341.

In 2004 when Schuette was a social worker, it was her duty to properly investigate any reports of student abuse, collect written statements from any witnesses, and report any suspected student abuse to DFACS, the GaPSC, and parents of the children involved.

342.

In November 2004, when Schuette was called upon to investigate Ms. Reddick's reports of abuse by Pickens, Schuette entered into the common plan and agreement to not report Pickens to outside entities, including the GaPSC, DFACS, or police.

343.

In November 2004, Schuette was told by Defendant Beasley, the FCSD head of social work services, to go to Hopewell, investigate the alleged abuse, and complete a report within 24 hours regarding the investigation.

344.

Before Schuette went to Hopewell to investigate, Vanairsdale, Reece, Young, Denmark, Boyd, and Lynch communicated about Reddick's report of abuse, decided to not fire Pickens, to not bring a dismissal action against her, to not write her up, not have her reported to DFACS or the GaPSC or the police, and to allow her to continue teaching, and these defendants, in some combination, and at least Boyd, Denmark, and Lynch, wanted Schuette at Hopewell at 2 p.m. on November 17, 2004, which was communicated to Schuette.

345.

Contrary to what Schuette was supposed to do and in furtherance of the common design and plan, in investigating Pickens' abuse in November 2004, Schuette did not collect statements from any witnesses other than one from Pickens.

346.

Contrary to what Schuette was supposed to do and in furtherance of the common design and plan, in investigating Pickens' abuse in November 2004, Schuette she did not thoroughly investigate Pickens' abuse of disabled students by taking statements or by talking with one or more visiting regular education high school students who had gone to Hopewell and saw some of Pickens' abuse.

347.

Schuette was informed by a FCSD speech therapist (Reddick) and a FCSD physical therapist (Lina) that they had both seen on multiple occasions Pickens hit a disabled child hard in the head and do other improper acts, like curse at the children and call them vile names, strap a disabled child's arm to a chair, while saying she knew restraint was not allowed.

348.

Schuette prepared an Investigation Report of the allegations of abuse on November 18, 2004, but Schuette altered that report after Beasley told her not to find the matter abuse and not report it to DFACS, the GaPSC, or the police when in fact Pickens' behavior was abuse and it was required to be reported to DFACS, the GaPSC, and the police.

349.

Schuette did not produce her original Investigation Report even though she had it in her computer, she emailed it to Beasley, had it in her file and she was served with a subpoena to produce all documents involving Pickens' abuse or alleged abuse, defined to include hitting a student.

350.

Although FCSD received a copy of the original Investigation Report, FCSD has never provided that report, even though it was subpoenaed.

351.

Schuette had a folder on Jake Marshall and the November 2004 investigation of abuse by Pickens, but FCSD did not produce that folder or the documents in it (except for a few) pursuant to subpoena at the IDEA due process hearing in this matter involving Alex even though the folder and its contents were responsive to the subpoena served upon FCSD.

352.

Schuette testified under oath that her investigation began on November 18, 2004 and ended on November 19, 2004, yet Schuette admitted to altering her Investigative Report on November 22, 2004, and Schuette did not note the document was an amended report or note the final

date of preparation, but instead she left the date of November 19 on the report.

353.

Even though abuse was alleged to have occurred to Repheka Persadi, Schuette did not inform Repheka's mother of any allegation of abuse even though it was Schuette's duty to ensure Repheka's mother was informed.

354.

Schuette never told Jake's mother the truth about the allegations, but instead, as part of the plan and cover up and to ensure Pickens continued her abuse, Schuette allowed Mrs. Marshall to be told that Pickens had only lightly tapped Jake on one occasion just to get his attention.

355.

Schuette never reported to Jake's mother that Pickens was cursing in front of and at Jake and calling him vile names.

356.

Schuette was aware that Pickens was abusing disabled children in November 2004 without intervention, but because Schuette entered into the plan and agreement to allow Pickens to continue to teach severely disabled children who could not report the ongoing abuse, even though Schuette had concerns about Jake's safety, and she allowed the administrative staff above

her to make decisions about Jake's placement and Jake's safety in that environment and to make decisions that she was required to make, such as finding or not finding Pickens' acts reportable abuse.

357.

Schuette was informed during her investigation that Merritt was aware of earlier abuse by Pickens, but Schuette never obtained a statement from Merritt or interviewed Merritt, and Merritt never provided a statement to Schuette.

358.

When Schuette was served with a subpoena to bring to Alex's IDEA due process hearing all documents involving in any way Pickens' abuse or alleged abuse of one or more disabled students, Schuette cut and pasted a few parts of a few responsive emails and then deleted all of the responsive emails from her computer.

359.

Even though Schuette was informed by two witnesses (a nurse and physical therapist) that they had seen on more than one occasion Pickens hit Jake on the head hard enough to hurt and by a paraprofessional that she had seen Pickens slap Jake's hands, in furtherance of the common plan and

agreement, Schuette prepared an amended final investigative report claiming this abuse was merely "poor choices and discipline strategies."

360.

Schuette omitted from her final report some important facts reported to her, such as Pickens slapping Jake's hands and putting him in a room alone and restrained to a chair as well as other such relevant information, and Schuette this in furtherance of the common plan and design to allow Pickens to continue to teach and abuse significantly disabled children and to cover it up, which continued to occur until May 2007.

361.

During her deposition, in reference to Schuette's involvement with Pickens' abuse of disabled children, Schuette was asked:  "Do you believe you have done anything wrong in this matter?" and Schuette replied, "I don't know how to answer that." When asked again, Schuette responded, "I can't answer that.  I don't know how to answer that." Then, when Schuette was asked, "Why can't you answer it?," Schuette replied, "I don't know how to answer it."

**<u>Vicki Denmark – ADA, Section 504, and Conspiracy</u>**

362.

Defendant Vicki Denmark was a FCSD Area Superintendent with supervisory responsibilities over, inter alia, Hopewell and Hopewell staff from 2004 to 2007 and was a GaPSC licensed educator at that time.

363.

Denmark had the duty and authority to hire, fire, suspend, assign, re-assign, supervise, train, report; investigate FCSD employees at Hopewell; to protect FSD students attending Hopewell, and insure FCSD employees abide by and implement FCSD policies and procedures, GaPSC rules, and the laws of the State of Georgia and United States.

364.

Vanairsdale was Denmark's supervisor as of November 2004.

364.

Denmark was informed in November 2004 that Pickens had physically and verbally abused one or more disabled children, including Jake Marshall, and Denmark took no action to report, prevent, or stop the abuse and harm of disabled children but instead communicated about the matter with Boyd, Vanairsdale, Reece, Lynch, and Young and agreed to allow

Pickens to continue being the teacher of and abusing disabled children who had significant mental impairment and could not report the abuse.

365.

Denmark also agreed with Vanairsdale, Reece, Boyd, Lynch, and Young not to report or have any other FCSD employee report Pickens' abuse to any authorities or agencies, not to fire Pickens, not to reprimand Pickens in any formal or meaningful way, not to give Pickens a "Needs Improvement" on her next annual review, not to place Pickens on a formal corrective educator plan, and not to conclude Pickens abuse was abuse or reportable abuse in a formal social work investigative report prepared by Schuette.

366.

When Mrs. Marshall was informed in May 2007 that Jake had been found left in a room alone with feces on himself and was seeking information about what had happened to her son, Denmark and Boyd decided to not tell Mrs. Marshall about the facts of the abuse and to not tell her about all the other abuses of Jake that had been disclosed by witnesses when DFACS finally came out in May 2007.

367.

Although Denmark learned, at least in November 2004, that Pickens was abusing numerous disabled students; Denmark took no action to stop or prevent the abuse, and she never reported this abuse to any agency or authority, including the GaPSC; and she never reported or ensured it was reported to the parents of the children abused.

368.

Denmark was friends with Boyd, had agreed with Boyd beginning in November 2004 that it was acceptable for Pickens to abuse significantly disabled children and that it was acceptable for Boyd to do nothing about this.

369.

When it could no longer be hidden that Boyd had allowed and sanctioned Pickens' abuse for three long school years, in 2007, Denmark, Vanairsdale, Reece, Lynch, and Young, who were all complicit with Boyd in that regard, approved of an agreement and recommended the agreement allowing Boyd to retire, effective June 30, 2008 as a curriculum support analyst even though Boyd never was employed or served as a curriculum support analyst for FCSD and Denmark, Vanairsdale, Reece, and Young all knew this.

370.

Although Boyd copied Denmark on a letter to Pickens in December 2007 about the abuse Ms. Reddick and others reported regarding Pickens, Denmark, Vanairsdale, Reece, Boyd, and Young, as part of the plan and agreement, never placed it in Pickens' FCSD personnel file.

## **Ralph Lynch – ADA, Section 504, and Conspiracy**

371.

Defendant Ralph Lynch was the FCSD Interim Superintendent and Director of Secondary Personnel as of November 2004, and prior to Lynch becoming the FCSD Superintendent of Secondary Personnel, he served as the Human Resources Director.

372.

In November and December 2004, Lynch had the duty and authority to hire, fire, suspend, assign, re-assign, supervise, train, report, and investigate FCSD employees; to protect all students at FCSD; and to insure FCSD employees abided by and implemented FCSD policies and procedures, GaPSC rules, and the laws of the State of Georgia and United States.

373.

In November and December 2004, Vanairsdale was Lynch's supervisor.

374.

Lynch was informed in November 2004 that Pickens had physically and verbally abused one or more disabled children, including Jake Marshall, and Lynch took no action to report, prevent, or stop the abuse and harm of disabled children but instead communicated about the matter with Boyd, Vanairsdale, Reece, Denmark, and Young and agreed to allow Pickens to continue being the teacher of and abusing disabled children who had significant mental impairment and could not report the abuse.

375.

Lynch also agreed with Vanairsdale, Reece, Boyd, Denmark, and Young not to report or have any other FCSD employee report Pickens' abuse to any authorities or agencies, not to fire Pickens, not to reprimand Pickens in any formal or meaningful way, not to give Pickens a "Needs Improvement" on her next annual review, not to place Pickens on a formal corrective educator plan, and not to conclude Pickens abuse was abuse or reportable abuse in a formal social work investigative report prepared by Schuette.

376.

Lynch, acting pursuant to an agreement with Vanairsdale, Boyd, Denmark, Reece, and Young, never reported Pickens' abuse to the GaPSC, DFACS, the FCSD police, parents of the disabled children abused, or any other criminal investigative authority.

377.

When it could no longer be hidden that Boyd had allowed and sanctioned Pickens' abuse for three long school years, in 2007, Denmark, Vanairsdale, Reece, Lynch, and Young, who were all complicit with Boyd in that regard, approved of an agreement and recommended the agreement allowing Boyd to retire, effective June 30, 2008 as a curriculum support analyst even though Boyd never was employed or served as a curriculum support analyst for FCSD and Denmark, Vanairsdale, Reece, and Young all knew this.

378.

Although Boyd copied Lynch on a letter to Pickens in December 2007 about some of the abuse Ms. Reddick and others reported regarding Pickens, Denmark, Vanairsdale, Reece, Boyd, and Young, as part of the plan and agreement, never placed it in Pickens' FCSD personnel file.

## **J. Randall Reece – ADA, Section 504, Conspiracy**

379.

Defendant J. Randall Reece was the FCSD Chief Human Resources Officer from 2004 to 2006, and he reported to Vanairsdale.

380.

From 2004 to 2006, it was Reece's duty and responsibility to hire, fire, place, assign, re-assign, investigate, supervise, train, and report all FCSD employees; to protect all FCSD students; to ensure all FCSD employees were properly trained and supervised; and to ensure FCSD employees abided by the GaPSC and the laws of the State of Georgia and the United States.

381.

In 2004, Shaffer informed Reece and perhaps Shelley told Reece about Pickens' abuse of disabled children with significant disabilities, and Reece decided and agreed with Shaffer, Shelley, Pettes, Etris, Butler, Faulkner, and Pickens that Pickens was not to be fired or non-renewed but instead her contract was to be renewed.

382.

In 2004, instead of reporting Pickens' abuse of disabled children, Reece agreed with Shaffer, Pettes, Shelley, Etris, Pickens, Faulkner, and Butler that Pickens would continue to be a FCSD teacher of significantly disabled children and continue to abuse and excessively punish them and FCSD would not ensure this stopped, would not report Pickens, and would not inform the parents of the children who had been and were to be abused and excessively punished.

383.

Reece became a part of the conspiracy to allow Pickens be the teacher of disabled children and to abuse them without meaningful consequence in 2004.

384.

Reece approved of the transfer of Pickens to Hopewell to the G Hall, which was a segregated hall where only significantly disabled children had classrooms, making it easier for Pickens to abuse significantly disabled children and less likely parents and regular education students would witness and report the abuse.

**Harvey Beasley – ADA, Section 504, Conspiracy**

385.

Defendant Harvey Beasley was the director of FCSD social work services and a GaPSC certified and licensed educator in 2004.

386.

In November 2004, Beasley's department received a report of abuse of students from either Reddick or her supervisor, Lynn Meadows, or both.

387.

When Beasley received the report of abuse, he assigned Schuette to investigate the abuse.

388.

After Vanairsdale, Boyd, Denmark, Lynch, Reece, and Young all decided and agreed that Pickens' abuse of her disabled students would not be reported to any authorities, would not be reported as abuse, and would not be stopped, and that no meaningful consequences would occur to Pickens, Beasley violated his department's protocol and usual policy and practice, and he instructed Schuette in November 2004 to make a finding that what Pickens had done (which included frequently hitting a disabled child hard in the head, so much so he cowered when Pickens neared him) was not abuse and would not be reported to DFACS.

389.

Acting in agreement with Vanairsdale, Reece, Young, Boyd, Lynch, and Denmark and in furtherance of the plan to allow Pickens to continue to be the teacher and abuser of significantly disabled children, Beasley violated his department's protocol and practice and instructed Schuette to alter her Investigative Report with a finding that what Pickens did was not abuse.

390.

Beasley did not retain a copy of the original Investigative Report, and he did not have Schuette put a notation that the amended Investigative Report was in fact an amended report or put the correct date on the amended Investigative Report, such that the final Investigative Report was dated November 19, 2004 when it was finalized on November 22, 2004.

391.

In Beasley's position as the head of the FCSD social work department and as a licensed social worker, he was required by law to report Pickens himself and to ensure she was reported to the GaPSC, DFACS, and the police, but Beasley, in furtherance of the agreement not to report Pickens and to cover up the abuse, did not report Pickens and ensure that others, including Schuette, did not report Pickens.

392.

In violation of FSCD social work department rules and practices and in furtherance of the agreement and common plan, Beasley allowed the FCSD human resource department staff and the superintendent, with others as set forth herein, to decide outside the investigative process and rules what the results of the Investigative Report would be and that Pickens would not be reported as having abused any students and would not be reported to any agency or authorities.

### Nancy Shelley – ADA, Section 504, Conspiracy

393.

Defendant Nancy Shelley was the Director of Instruction, Executive Director, or Interim Executive Director (hereinafter collectively referred to as "Executive Director") for the FCSD Services for Exceptional Children from 1998 to 2004.

394.

As Executive Director for the FCSD Services for Exceptional Children, Shelley had the authority and duty to hire, fire, suspend, assign, re-assign, train, supervise, report, and investigate any and all FCSD special education staff; to ensure special education staff were properly certified, trained, and supervised; to protect all special education students in the

FCSD; to report to parents and inform them of any suspected or alleged abuse of any special education children at FCSD; to ensure all special education students in the FCSD received an appropriate education; to report any educator to the GaPSC, DFACS, and the police for reported abuse or harm to a disabled child; to ensure all FCSD special education staff complied with FCSD rules and policies and the laws of the State of Georgia and the United States in fulfilling their duties as a special educator for the FCSD.

395.

Shelley directly supervised Pettes during her tenure as Executive Director.

396.

At multiple times between 2002 and 2004, Pettes reported to Shelley that Pickens was abusing and reported to be abusing her disabled students while Pickens was at Holcomb Bridge.

397.

In violation of the law and her duties and responsibilities as the FCSD Executive Director, Shelly intentionally did not report Pickens to the GaPSC, the FCSD police, DFACS, other agencies, or the child's or children's parents, and Shelley communicated with Pettes that the plan,

which Shelley agreed with and Pettes agreed with and followed throughout
Pickens' tenure with FCSD, which was to maintain Pickens as a teacher of
significantly disabled children who could not report Pickens' abuse and
cruel punishment, to allow the abuse and cruel punishment to continue, and
to cover it up and hide it.

398.

Shelley fully understood that other FCSD administration, including
FCSD's human resources officer and Shaffer, had agreed that Pickens would
continue to teach significantly disabled children as she continued to abuse
them, and Shelley agreed to this plan and intentionally and maliciously
abrogated her duties and responsibilities to protect FCSD disabled children
placed in Pickens' classroom, to ensure they receive a safe and appropriate
education, to report Georgia educator abuse and harm to children, and to
prevent and stop the abuse and inform parents so they could take necessary
actions.

399.

Over a two year span from 2002 to 2004, Pettes informed Shelley of
continued reports of mistreatment by Pickens, Pettes and Shelley had
ongoing conversations about Pickens' abuse of her disabled students, and
Shelley and Pettes (and others, as set forth herein) stayed with their plan and

123

agreement, and this allowed, sanctioned, promoted, and encouraged Pickens to continue to abuse the disabled children at Holcomb Bridge and then later at Hopewell and to do so without it being stopped or reported.

### Nancy Wadel – ADA, Section 504, Conspiracy

400.

Defendant Nancy Wadel was the Executive Director of FCSD Services for Exceptional Children from 2004 to 2008.

401.

As Executive Director for the FCSD Services for Exceptional Children, Wadel had the authority and duty to hire, fire, suspend, assign, re-assign, train, supervise, report, and investigate any and all FCSD special education staff; to ensure special education staff were properly certified, trained, and supervised; to protect all special education students in the FCSD; to report to parents and inform them of any suspected or alleged abuse of any special education students; to ensure all special education students in the FCSD received an appropriate education; to report any educator to the GaPSC for reported abuse or harm to a disabled child; to ensure all FCSD special education staff complied with FCSD rules and policies and the laws of the State of Georgia and the United States in fulfilling their duties as a special educator for the FCSD.

402.

Wadel directly supervised Pettes during her tenure as Executive Director.

403.

After Wadel became the Executive Director, Pettes informed Wadel of the situation with Pickens abusing disabled children at Hopewell and it continuing.

404.

After Wadel became the Executive Director, Pettes informed Wadel that there was an understanding and agreement that Pickens would continue to teach significantly disabled children while she abused them and Pickens would not be fired, demoted, re-assigned, written up, investigated, or reported.

405.

In violation of the law and her duties and responsibilities as the FCSD Executive Director, Wadel intentionally agreed with and adopted the plan set forth in paragraph 416 and  intentionally did not report Pickens to the GaPSC, the FCSD police, DFACS, other agencies, or the abused disabled child's or children's parents.

406.

Wadel fully understood that FCSD administration at the superintendent, assistant superintendent, and human resources level and Shaffer had agreed that Pickens would continue to teach significantly disabled children as she continued to abuse them, and Wadel agreed to this plan and intentionally and maliciously abrogated her duties and responsibilities to protect FCSD disabled children placed in Pickens' classroom, to ensure they receive a safe and appropriate education, to report Georgia educator abuse and harm to children, and to prevent and stop the abuse and inform parents so they could take necessary actions.

407.

Pettes informed Wadel of continued reports of mistreatment by Pickens from 2004 to May 2007, and Pettes and Wadel had ongoing conversations about Pickens' abuse of her disabled students at Hopewell, and Wadel (and Pettes and others) stayed with their plan and agreement, and she continued to allow Pickens to abuse the disabled children at Hopewell and to not report, prevent, or stop it.

**<u>Dorothy Pettes – ADA, Section 504, Conspiracy</u>**

408.

Defendant Dorothy Pettes was the FCSD Special Education Coordinator over middle schools throughout FCSD from 1998 to 2012, and during that time, two of her supervisors were Shelley and Wadel.

409.

In her position as a FCSD Special Education Coordinator, Pettes had the authority and duty to hire, fire, approve for hiring and firing, recommend for hiring and firing, suspend, assign, re-assign, train, supervise, report, and investigate any and all FCSD special education staff at the middle school level; to ensure special education staff at the middle school level were properly certified, trained, and supervised; to protect all special education students attending middle schools throughout the FCSD; to report to parents and inform them of any suspected or alleged abuse of any special education students in middle school; to ensure all special education students in middle school received an appropriate education; to report any educator to the GaPSC for reported abuse or harm to a disabled child; and to ensure all FCSD special education middle school staff complied with FCSD rules and policies and the laws of the State of Georgia and the United States in fulfilling their duties as a special educator for the FCSD.

410.

Pettes helped locate and hire Pettes as a special education teacher at Holcomb Bridge beginning in August 2002.

411.

At the time Pickens was hired in August 2002, she was not properly certified to teach as a lead teacher middle school children with significant mental impairment, and Pettes knew this.

412.

Shortly after Pickens began teaching at Holcomb Bridge, Pettes started receiving reports of Pickens abusing and harming her significantly disabled students.

413.

Teachers, paraprofessionals, and an IST at Holcomb Bridge started reporting to Pettes Pickens' abuse and cruel punishment soon after Pettes started teaching in the FCSD.

414.

Pickens' discussed the reports of Pickens' abuse of students at Holcomb Bridge with, at the least, Shelley, Shaffer, Etris, Pickens, Faulkner, and Butler, and all agreed that Pickens would continue being the teacher of significantly disabled students while she continued to abuse the children;

Pickens' would not be reported for her ongoing abuse of them; Pickens would not be reported to the GaPSC, DFACS, the police, any other agency; Pickens would not be reprimanded formally; Pickens would not investigated for her abuse; and Pickens' abuse would be covered up and hidden from the parents of the disabled children.

415.

In the Spring of 2003 or sometime near that time frame, Pettes talked to Shaffer about not renewing Pickens' contract with FCSD and or FCSD not rehiring Pickens, and Shaffer conveyed to Pettes that Pickens was to remain as a teacher of significantly disabled children and that the decision had been made by the human relations department, and Pettes entered adopted, ratified, and agreed with that decision and ensured that Pickens did stay and was not investigated or reported, all the while Pettes knew Pickens continued to abuse her disabled students.

416.

Beginning in 2004 and after Shelley left as Executive Director of special education in the FCSD, Pettes informed, as she had done Shelly, Wadel, the new Executive Director after Shelley left, of Pickens' prior abusive actions, and Pettes continued to inform Wadel of Pickens' abuse of disabled children until 2007, and both Pettes and Wadel understood the plan

129

to allow Pickens to continue teaching and abusing significantly disabled children, to not report the abuse, to not document the abuse in any meaningful way, to not stop the abuse, and to cover up the abuse.

417.

In August or September 2004, Pettes started receiving multiple reports from Hopewell employees and administration, reporting that Pickens was abusing disabled children at her new placement, yet Pickens intentionally and maliciously stayed with the plan and agreement she first agreed to in 2002, and Pettes did not report Pickens to the GaPSC, DFACS, the children's parents, the police, or any other outside agency; Pickens did not Pettes did not properly intervene; and Pettes did not prevent or stop the abuse and excessive punishment, so, as planned, it continued for years.

418.

While Pettes has blamed Shaffer, Merritt, and most recently Boyd for Pickens abusing and punishing and continuing to abuse and punish disabled children, Pettes was actually a part of the ongoing conspiracy almost as long as Pickens and FCSD, as Pettes was involved in allowing the abuse and covering it up from 2002 to May 2007.

419.

Pettes testified at the underlying due process hearing in this matter that Shaffer had reported Pickens to DFACS or otherwise had her so reported, but when Pettes so testified, she knew that was not true, as Shaffer never reported or had Pickens reported to DFACS, for that was in direct contravention to the common plan and agreement.

420.

Pettes met with Pickens and Boyd numerous times about Pickens' improper behavior to the disabled students in her class on the G Hall, including Alex, and Pickens never denied what she was accused of doing.

421.

Pettes was well aware well before Alex was placed at Hopewell that Pickens would continue harming and abusing disabled children placed in her class.

422.

Shortly after Pickens began teaching at Holcomb Bridge, Pettes knew Pickens had a short, quick temper and would get easily frustrated and angry at the disabled children in her class and abuse them and that this was also the case at when Pickens was at Hopewell.

423.

Pettes informed Boyd of Pickens' ongoing abuse of disabled children prior to Pickens relocating to Hopewell.

424.

Pettes was aware Pickens was hurting and harming disabled children in the FCSD for five years, and Pettes did not prevent, stop, or report it, as this was the common and mutual plan.

425.

Merritt and Pettes had numerous discussions over a three year period from 2004 to 2007 about Pickens' abusing disabled children, and so did Pettes and Boyd.

426.

Pettes intentionally lied to the GaPSC when she told its investigator Judy Franklin during a taped interview in 2008 that she (Pettes) did not know about any abuse by Pickens from November 2004 until the May 2007. incident.

427.

As the FCSD middle school special education coordinator, Pickens could have easily arranged for Pickens to be placed with a lead special education teacher or placed with verbal disabled children who could report

Pickens' abuse and excessive punishment, but Pettes never did this, for that was right the opposite of the agreement and plan to keep Pickens as a FCSD teacher of significantly disabled students who could not report the abuse while Pickens abused them and to cover up the abuse.

428.

Ms. Pettes was repeatedly informed over five years of Pickens abuse and cruel punishment, including but not limited to Pickens doing the following things to disabled children:  hitting; pushing and shoving; pushing and shoving down; throwing objects at, depriving of food, screaming at, passing gas and burping on, slamming into lockers; jacking up; shoving into lockers; cursing at; name calling, hair pulling, jerking; restraining to chairs and abandoning in bathrooms and other rooms; and other instances of abuse and punishment.

429.

Pettes was informed that Pickens abused one or more disabled children at FCSD elementary school during one or more summers during the FCSD extended school year program ("ESY").

430.

Pettes expressed the Hopewell staff's concerns about Pickens abuse and excessive punishment of her students to Boyd every time she was at

Hopewell and Boyd was in the building, but this was only to inform Boyd who was reporting Pickens' abuse, as the plan and agreement was to allow the abuse to continue, not report it, and cover it up, which Pettes intentionally did.

## Sara Ware – ADA, Section 504, Conspiracy

431.

From October 1999 to March 2009 Defendant Sara Ware Defendant Sarah Ware (hereinafter referred to as "Ware") was a FCSD Special Education Coordinator of elementary schools.

432.

In her position as a FCSD Special Education Coordinator over 17 elementary schools, including Woodland Elementary School, Pettes had the authority and duty to hire, fire, approve for hiring and firing, recommend for hiring and firing, suspend, assign, re-assign, train, supervise, report, and investigate any and all FCSD special education staff at 17 elementary schools in FCSD; to ensure special education staff at those schools level were properly certified, trained, and supervised; to protect all special education students attending those schools; to report to parents and inform them of any suspected or alleged abuse of any special education students in those school; to ensure all special education students in those 17 elementary

schools received an appropriate education; to report any educator to the GaPSC for reported abuse or harm to a child; and to ensure FCSD staff at those 17 elementary schools complied with FCSD rules and policies and the laws of the State of Georgia and the United States in fulfilling their duties as a special educator for the FCSD.

433.

Ware was responsible for the ESY program provided at Woodland Elementary School during the time period 2002 to 2007, and during one or more of the summer ESY programs at Woodland, one or more reports were made to Ware that Pickens had abused and or excessively punished a disabled child.

434.

Ware quickly learned at some time from 2003 to 2006 of the Defendants' mutual plan and understanding that Pickens was to be allowed to continue to work with significantly disabled children as she abused them, the abuse was not to be reported to the parents, police, DFACS, or the GaPSC; the abuse was not to be documented or if it was, the documentation was to be destroyed; and the abuse was to be covered up.

435.

Despite Ware being informed that Pickens abused and or excessively punished one or more disabled children in the FCSD ESY program from 2003 to 2006, Ware accepted, adopted, and agreed to the mutual plan and agreement as set forth in paragraph 432 above, and she intentionally did not report Pickens, did not prevent or stop Pickens' abuse, and covered up the abuse and punishment.

436.

Ware intentionally and maliciously and as part of the mutual, ongoing plan and agreement did not report Pickens' abuse to the GaPSC, DFACS, the parents of the disabled children abused, the FCSD police, or any other criminal investigative agency.

437.

During one of the ESY programs from 2003 to 2006, Plaintiff squeezed the penis of a disabled child so hard, Pickens caused the disabled child to suffer a penile embolism, Ware was made aware of this, and Ware never reported it.

438.

Ware now knowingly and dishonestly lies about not having been informed of Pickens harming one or more disabled students.

## **Templyn Averett – ADA, Section 504, Conspiracy**

439.

Defendant Templyn Averett was a education teacher of children with moderate, severe, or profound mental impairment on the G Hall at Hopewell from August 2004 to May 2006.

440.

During the time Averett was at Hopewell, Averett was the lead special education teacher on the G Hall and one of two co-department chairs of special education at Hopewell, serving as a liaison between the special education department and Hopewell administration, including but not limited to Thompson, Boyd, and Merritt.

441.

During the time Averett was at Hopewell, Averett witnessed firsthand Pickens abuse and excessively punish one or more of her disabled students by seeing Pickens kick, hit, slap, push, shove, jack up, and knee one or more students; scream and curse at students; and restrain, isolate, and abandon students.

442.

White, a special education teacher at Hopewell, saw Pickens slam Jake into a wall, push students, give Jake wedgies (pull his underwear up

tightly into his crotch), and kick Jake, and White reported this to Averett during the 2005-2006 school year.

443.

A FCSD nurse named Goodman told Averett that Pickens was too rough with the disabled children during the 2005-2006 school year, and Averett replied that the administration was well aware of that.

444.

Averett, as the lead teacher on G Hall that school year, reported to both Merritt and Boyd that Pickens was abusing disabled children, but Averett did not report Pickens to the GaPSC, DFACS, the FSCD police, any other criminal investigative agency, or the abused disabled children's parents, as Averett learned of and joined the agreement and plan to not report Pickens, to allow her to continue teaching while abusing significantly disabled children who could not themselves report Pickens, and to cover up the abuse from parents and others.

## Stacy White – ADA, Section 504, and Conspiracy

445.

Defendant Stacy White was a special education teacher at Hopewell from August 2005 to May 2007, and during that entire time, she was a GaPSC certified and licensed educator.

446.

White was the lead special education teacher for the G Hall during the 2006-2007 school year.

447.

From August 2005 to May 2007, White was aware that Pickens repeatedly and consistently abused significantly disabled children, but because White agreed with Pickens, Boyd, Merritt, Thompson, McGee, Sosebee, and Pettes to allow Pickens to teach and continue to teach significantly disabled children and abuse and punish them, not report the abuse and punishment outside Hopewell except to Pettes, and to cover up the abuse and punishment, White never once reported Pickens' abuse of disabled children to the GaPSC, DFACS, the FCSD police, any other criminal investigative agency, or the parents of the children abused but instead allowed it to continue for three school years at Hopewell.

448.

White personally witnessed Pickens slam Jake into a wall, push students, give Jake wedgies by pulling his underwear up tightly into his crotch, and kick Jake.

449.

White informed the GaPSC investigator Judy Franklin in 2008 that she had "never worked in a school when they basically looked the other way when a teacher was abusing a student and students," yet White did this repeatedly for three years by agreement with at least Boyd, Merritt, Pickens, Pettes, Thompson, Sosebee, and McGee.

450.

Shortly after White came to Hopewell in August 2005, White witnessed and reported to Averett Pickens' abuse of one or more disabled students, and it was at that time that White learned Hopewell administration was well aware of the abuse and allowed and sanctioned it, so White agreed to do the same and did so, only telling Hopewell staff who were not reporting Pickens' abuse and punishment outside of Hopewell except to Pettes, who was a major participant in the plan and agreement.

451.

By 2006, White had even agreed to adopt and implement the part of the plan where reporters of the abuse were told that administration was working on Pickens' abuse when White in fact knew that was not true.

452.

In January 2006, when a FCSD special education nurse named Goodman reported Pickens' abuse of disabled children White said to Goodman, "We're working on her, you know, on things."

453.

When a FCSD paraprofessional named Denise Baugh told White during the 2006-2007 school year that she had witnessed Pickens push Alex down on a hard surface, White told Baugh that it was being addressed by administration, but White knew this was not true and only made the representation to continue the plan to allow Pickens to continue to teach significantly disabled children as she abused and punished them and to cover it up and not have it reported to the authorities, GaPSC, or DFACS.

454.

White was well aware from August 2005 to May 2007 that Pickens was physically physically aggressing disabled students, screaming and cursing at them, and removing them from class, restraining them to chairs, isolating, and abandoning them for hours at a time, White joined the plan and agreed to not report Pickens to the GaPSC, DFACS, the police, or the children's parents and when she was made lead special education teacher in

2006-2007, White began to be more active in the plan and tell staff reporting abuse that it was or would be taken addressed.

455.

White knew that Pickens' abuse of at least one disabled child, Jake Marshall, was causing his behavioral manifestations to worsen.

456.

White knew Pickens was restraining Jake to a chair and isolating and abandoning him in a room five times a week.

457.

White knew Aaron Hatcher was a medically fragile child who required, due to his breathing issues, to be monitored at all times but that Pickens was removing him to a room and abandoning him there without necessary adult support, but White did not report this to anyone outside of Hopewell other than Pettes, not even informing the FCSD social work department, a FCSD nurse, or Aaron's parents because White agreed to not report Pickens as part of the plan and agreement.

458.

White knew Pickens was passing gas on disabled students and burping in their faces.

459.

White witnessed Pickens kick Jake many, many times, and she saw Jake "holler."

460.

White saw Pickens knee Jake in the shoulder on several occasions, and she saw Jake "holler about that too."

461.

White saw Pickens push Jake and all her students up against the wall face first; if Pickens thought her students were doing something wrong, she would "jack them up," which was Pickens term for pushing them into a hard surface and then lifting their feet off the floor.

462.

White saw Pickens slam significantly disabled children into the wall and then put her back into them and press ("squash" to use White's terminology) them into the wall hard enough not to feel good.

463.

From what White saw, Pickens put Jake restrained to a chair in a room by himself every day of the week for hours at a time and sometimes multiple times in a day from October 2006 until May 2007, and White never reported

Pickens for doing this or reported Pickens to the GaPSC, police, Jake's parents, a FCSD social worker, or a FCSD nurse.

464.

White saw Pickens restrain Jake to a chair and abandon him in a room isolated for up to four hours in one school day, yet White did nothing to report or prevent or stop this, as she had agreed not to do so.

465.

White knew it was illegal to restrain Jake, Alex, and other disabled children to chairs, remove them from the classroom, isolate them into rooms, shut the doors of the rooms, and abandon them.

466.

When staff reported Pickens' abuse to White, at times she would tell staff she would tell Merritt, but then she would not do so as part of the plan and agreement, as White knew Merritt would not address the issue.

467.

White told two paraprofessionals who reported Pickens' abuse and cruel punishment (Baugh and Groover) that the problem was being handled, as this was a part of the plan and agreement to stop further reporting and allow Pickens to continue as a FCSD teacher and abusing the significantly disabled children.

468.

White saw on more than one occasion Pickens shove Jake down and Jake would fall on hard surfaces.

### **Sosebee – ADA, Section 504, Conspiracy**

469.

Defendant Stephanie Sosebee was a FCSD special education teacher of students with moderate, severe, or profound mental impairment at Holcomb Bridge from at least August 2002 to May 2004 and from at least August 2004 to May 2007 at Hopewell.

470.

Sosebee was very close, good friends with Pickens, so she quickly and for her, easily, agreed to allow Pickens to be the teacher of and abuse and cruelly punish significantly disabled students if not daily, almost daily.

471.

Sosebee befriended Pickens at Holcomb Bridge when they taught there together and increased her friendship while they both taught at Hopewell.

472.

Sosebee did not care for or like the significantly disabled children she and Pickens taught, and Sosebee put her friendship and job with FCSD before the children's welfare and safety.

473.

Sosebee saw Pickens kick, knee, hit, slap, push and shove, push and shove down, scream at, pass gas on, burp on, deprive food from, call names, curse at, intimidate, slam into walls and lockers, restrain to chairs, remove from class, and isolate and abandon students, but Sosebee from the very beginning agreed to not report Pickens, allow and sanction Pickens' abuse and punishment of her significantly disabled peers, to cover up the abuse and punishment, and to lie about its existence when questioned about it.

474.

Sosebee attended an IEP meeting for Alex in the Spring of 2006 and recommended Alex attend Hopewell even though Sosebee knew Pickens was abusing and cruelly punishing her students daily.

475.

When Sosebee attended Alex's IEP meeting in the Spring of 2006 and recommended Alex be placed at Hopewell, Sosebee did not reveal but

instead intentionally hid and withheld the fact Sosebee was recommending a severely abusive and harmful setting for Alex.

476.

Had Sosebee been honest and not been a part of the plan to allow Pickens to abuse and punish disabled children and had she disclosed the truth about the G Hall at Hopewell, which White testified was "horrific," Alex's mother would never have allowed him to attend Hopewell or go anywhere near Pickens.

477.

Sosebee had a legal and ethical duty to protect Alex from abuse and to inform Alex's parents that the G Hall at Hopewell was an abusive setting but Sosebee kept that a secret and intentionally and maliciously hid it from Alex's parents and instead informed Alex's mother that Hopewell would be a good place for Alex, and this resulted in Alex being brutally abused and sadistically punished for an entire school year.

478.

After Sosebee learned that Ms. Tallant had reported Pickens' abuse of Jake, Sosebee went to Ms. Tallant's hospital room in the Fall of 2007 and even though Ms. Tallant was quite ill with complications due to her cancer and the treatment thereof, Sosebee told Tallant in a hostile manner that she

was very unhappy with Tallant for reporting Pickens, telling Ms. Tallant she should not have told on Pickens and should not have said anything at all.

479.

Sosebee accused angrily Ms. Tallant for causing "Melanie [Pickens] to lose everything."

480.

After Pickens was finally reported in May 2007 for abusing Jake on one day in May 2007, Sosebee wrote one or more letters of recommendation for Pickens, professing Pickens to be a wonderful teacher.

481.

Sosebee, acting together with Weinmann, McConnell, and Thompson, retaliated against Tallant during the 2006-2007 school year for Tallant reporting Pickens' abuse in May 2007 by participating in a plan to poorly review and evaluate Tallant, to remove Tallant from the G Hall, to not let Tallant be transferred to another school, and to place Tallant in a teaching position they all knew Tallant was not properly certified to teach.

**McGee – ADA, Section 504, Conspiracy**

482.

Defendant Kenneth McGee was a FCSD social worker at Hopewell at least from August 2004 to May 2007.

483.

As a Georgia educator during the time August 2004 to May 2007 and as a social worker, it was McGee's legal and ethical duty to protect students, insure proper reporting and investigation of reported or suspected child abuse, to inform the social works department head of any suspected or alleged abuse, and to report any alleged or suspected child abuse to the GaPSC, parents of the child, the police, and DFACS.

484.

While McGee worked at Hopewell, was informed on more than one occasion that Pickens was abusing and physically punishing disabled children on the G Hall, but as part of the plan to allow Pickens to work at FCSD and do this and to cover it up and not report it, McGee agreed not to take any actions, although he was well aware that Hopewell administration was not reporting the abuse or protecting the disabled students in Pickens' class.

485.

By May 2007, McGee and Boyd had discussed Pickens' abuse of her disabled students and or the reports of Pickens' abuse of her disabled students several times, and McGee knew the plan and agreement was to not report Pickens, to let her just continue teaching the significantly disabled

children and abusing them, and to not properly investigate or report the abuse and Pickens' severe misconduct, and he, by agreement, accepted, adopted, and ratified this plan and he himself failed to report the abuse, have it properly investigated, and protect the disabled children in Pickens' class.

### **William Thompson – ADA, Section 504, Conspiracy**

486.

Defendant William Thompson was an assistant principal at Hopewell from December 2008 to November 2008.

487.

As a Georgia educator and FCSD assistant principal, Thompson had the duty and authority to recommend hiring, firing, assigning, re-assigning, suspending, and reprimanding teachers; to train and supervise Hopewell educators; to reprimand educators; to assess educators' performance; to report educators for child abuse or suspected abuse and to ensure proper investigations of the reported or suspected abuse; to ensure Hopewell teachers in performing their duties follow FCSD policy and procedure and the laws of the State of Georgia and the United States; to report to parents suspected abuse at school of their children; and, inter alia, to protect students attending Hopewell.

488.

Shortly after Pickens began teaching at Hopewell, Thompson was informed that Pickens was reported to be abusing the significantly disabled students in her class.

489.

Boyd told Thompson about reports of abuse, and Reddick directly reported to Thompson Pickens' child abuse of more than one student.

490.

In 2004, Thompson, acting in agreement with Boyd and Merritt, decided that Pickens would be allowed to continue as a FCSD teacher and continue to abuse her disabled students and there would be no reporting of the abuse and no consequences for the abuse but instead it would be covered up without proper reporting.

491.

In November 2004, when Thompson was asked to cooperate and obtain a statement from Pickens for a social worker's investigation, Thompson refused and did not do so.

492.

Thompson, like Boyd and Sosebee, did not care for the significantly disabled children on the G Hall due to their disabilities, and when Thompson

evaluated Pickens on her annual evaluation in 2007, even though he knew Pickens had been abusing and cruelly punishing her disabled students for almost three school years at Hopewell, Thompson gave Pickens' a very positive evaluation and wrote, "We appreciate all that you do for your very special students."

493.

When Thompson referred on Pickens' annual teacher evaluation to Alex and his classmates as "special," he did not mean that at all in a positive way.

494.

Thompson sat in on some of the meetings Boyd had with Pickens regarding the reports of abuse by Pickens, and Thompson, Merritt, Boyd, Pickens, Sosebee, White, and Averett, Pettes all agreed it was fine for Pickens to abuse and cruelly punish her disabled students at Hopewell and they would do nothing to prevent or stop it, report it, or have it properly investigated and reported, and they would take active steps to cover it up.

495.

When Pickens' abuse and or cruel punishment of a student was reported to Thompson, he would tell the reporter it would be addressed or it was being handled, as this was part of the plan, common scheme, and

agreement to allow Pickens to continue as a teacher of disabled students while she abused them and to cover it up.

496.

When Pickens' abuse was reported to Thompson, he never once reported that abuse to the child's parents and he knew no one else had reported it from Hopewell.

497.

After Tallant reported Pickens' abuse on one day of Jake in May 2007 and after Pickens resigned and Boyd and Merritt left Hopewell, Thompson told employees on G Hall they were not allowed at all to talk about to anyone Pickens' abuse and punishment of disabled students, especially not saying a word about the abuse to any parent.

498.

Ms. Tallant would have reported to Alex's mother the abuse Alex had suffered had Mr. Thompson and Defendant Weinmann not insisted that the employees not talk about the former abuse the students suffer and they not disclose it to the children's parents, who had a real need to know so they could help their children and make informed decisions regarding their children, who could not tell their parents themselves what happened and the

horrific child abuse and verbal, sexual, emotional, and physical abuse and punishment they had suffered.

499.

After Pickens was investigated for her abuse of Jake on one day and witnesses revealed Pickens' ongoing, horrific abuse of significantly disabled children for three years at Hopewell and her abuse of children at Holcomb Bridge before that, Thompson provided to Pickens a letter of recommendation, representing Pickens to be an excellent teacher.

500.

Thompson continues to falsely deny that he had any knowledge of Pickens' reported abuse of disabled children in her class.

501.

Thompson, Weinmann, McConnell, and Sosebee retaliated against Tallant after and for Tallant's report of Pickens' abuse of Jake in May 2007, and they, acting together, wrongly negatively evaluated Tallant as a teacher, removed Tallant from the G Hall, refused to allow her to transfer to another school, and placed her in a teaching position they knew she was not certified to teach.

502.

When Tallant went to Thompson, reporting that she was not being treated fairly by Weinmann and Sosebee and begging to be allowed to transfer to another school, Thompson refused but instead placed Tallant in a teaching position he knew she was not properly certified under the law to teach.

**Sara McConnell – ADA, Section 504, Conspiracy**

503.

During the 2006-2007 school year, Defendant Sara McConnell was an assistant principal at Hopewell, in charge of special education at Hopewell.

504.

As a Georgia educator and FCSD assistant principal, McConnell had the duty and authority to recommend hiring, firing, assigning, re-assigning, suspending, and reprimanding special educators at Hopewell; to train and supervise Hopewell special educators; to reprimand special educators at Hopewell; to assess Hopewell special educators' performance; to report any educator for child abuse or suspected abuse and to ensure proper investigations of the reported or suspected abuse; to ensure Hopewell special education teachers in performing their duties followed FCSD policy and procedure and the laws of the State of Georgia and the United States; to

report to parents suspected abuse at school of their children; and, inter alia, to protect students attending Hopewell.

505.

During the 2006-2007 school year, McConnell, who was referred to as Sara Biegleson in 2006 and 2007, was informed of Pickens' abuse and reports of abuse of the disabled children in her class, but McConnell was quickly aware of the plan that Pickens' abuse would not be reported or properly investigated and that Pickens would be allowed to continue as a special education teacher of significantly disabled students while she abused them, and McConnell readily agreed to that plan and agreement, and she never reported Pickens' abuse, never prevented it, never stopped it, and allowed it to continue throughout the 2006-2007 school year and intended for it to continue the following year, as Pickens was returning to the G Hall at Hopewell the 2007-2008 school year until she resigned in late May 2007.

506.

Throughout the 2006-2007 school year, McConnell talked to Boyd, Merritt, and Thompson at times together and at times separately about Pickens' abuse of disabled students and the plan not to report or investigate it.

507.

McConnell, acting together with Weinmann, Sosebee, and Thompson, retaliated against Tallant for her reporting Pickens' abuse in May 2007 by participating in a plan to poorly review Tallant, to remove Tallant from the G Hall, to not let Tallant be transferred to another school, and to place Tallant in a teaching position they all knew Tallant was not properly certified to teach.

### Karen Weinmann –Conspiracy

508.

Karen Weinmann was the IST at Hopewell from 2006 to some years thereafter.

509.

As IST, Weinmann supervised Tallant and other special educators and aides on the G Hall.

510.

Weinmann told Tallant and other G Hall staff not to talk at all about Pickens and her abuse of disabled children and to not tell any of the children's parents, and this prevented Ms. Tallant from telling Alex's mom, who needed to know about the abuse Alex had suffered so she could obtain proper intervention, medical treatment, and support for Alex.

511.

Weinmann, acting together with Sosebee, McConnell, and Thompson,
retaliated against Tallant during the 2006-2007 school year for Tallant
reporting Pickens' abuse in May 2007 by participating in a plan to poorly
review and evaluate Tallant, to remove Tallant from the G Hall, to not let
Tallant be transferred to another school, and to place Tallant in a teaching
position they all knew Tallant was not properly certified to teach.

512.

In 2009, Weinmann had access to Pickens' and Merritt's emails from
2004 to 2007 and she read and reviewed all of them, printed some of them if
not all of them, and deleted some or all of them.

**Ronnie Wade – Conspiracy**

513.

Defendant Ronnie Wade was a FCSD Assistant Superintendent from
2004 to 2005 and a FCSD Chief Human Resources Officer from 2006 for
some years thereafter.

514.

Once Pickens' horrific abuse and cruel punishment was somewhat
disclosed through an investigation in 2007, Wade and Wilson acting together
and with Kanner decided that the prior plan to cover up Pickens' abuse and

cruel punishment would be continued, and they agreed that as in the past, Pickens' abuse and cruel punishment would not be disclosed to the disabled children's parents, including Alex's parents.

515.

Wade fully recognized that Alex's parents and Garrett's parents and the other disabled children's parents truly needed to be informed so they could help their children and provide them with necessary medical and other treatment, but that did not matter to Wade, Wilson, or Kanner, and instead they took and Wade continues to take actions to cover up what Pickens did to Alex and the other disabled children.

516.

In 2006 and thereafter, Wade, acting with Kanner and Wilson, agreed the abuse of Alex, Garrett, Repheka, Aaron, Corey, Kevin, Callie, and other disabled children would not be investigated, would not be reported to DFACS, would not be reported to the police, and would not be reported to the children's parents.

517.

Although it was Wade's, Kanner's, and Wilson's responsibility and job duty to ensure the abuse of Alex, Garrett, Repheka, Aaron, Corey, Kevin, Callie, and other disabled children was investigated and properly

reported, they agreed this would not happen and did not file the necessary report with the police or inform the parents.

518.

After Jake's mother herself filed a police report in 2009 reporting Pickens' abuse since Wade, Wilson, and Kanner refused to do so in violation of their duties and ethical obligations and the written policy but not the practiced and custom of FCSD, Wade met with Mark Muma; FCSD counsel; and former chief of FCSD police Chandi Green, also known as Chandi Ashmore (hereinafter referred to as "Ashmore"), and Wade told, directed, and ordered Ashmore that Pickens' abuse of disabled children was not to be investigated by the FCSD police department even though Jake's mother had filed a police report regarding Pickens' years of abuse with the FCSD police department.

519.

At the meeting referenced above, Wade directed Ashmore that the FCSD police department was to only look into whether the FCSD had reported the abuse by Pickens of disabled children to the FCSD police and then close the file.

520.

Because Wade, Wilson, and Kanner agreed to violate the written policy of FCSD and agreed to prevent a lawful criminal investigation, there was no criminal investigation in 2009.

521.

Finally, after pressure from the media and the Fulton County District Attorney's office, Wade agreed to allow somewhat of an investigation, but FCSD did not cooperate in that investigation, and it required the FDCD police department, which is a department of FCSD, to obtain a subpoena to obtain relevant documents.

522.

FCSD and Wade also abused the criminal investigation process by using it to undertake discovery for potential and pending civil cases and to obtain documents it would give to the District Attorney's office, knowing the District Attorney would have to provide them to Pickens' counsel if criminal charges were brought against Pickens.

523.

Wade and Wilson met with Jake's mother after Pickens' abuse was more fully revealed in 2007, and they did not inform her of all the abuse of Jake and they, by agreement, only allowed the investigator or FCSD to

provide Jake's mother with a redacted copy of the investigation so that she

could not determine the abuse to her son, as his name was redacted.

524.

Wade and FCSD, through its counsel, refused to provide Alex's

parents with a copy of the investigation, and Alex's parents had to hire an

attorney and incur significant costs to finally obtain a copy, which FCSD

made the family pay for and FCSD still redacted Alex's name, so his parents

could not discern what abuse he suffered.

**<u>Wilson – Conspiracy</u>**

525.

Wilson was the FCSD Superintendent from 2005 to 2008.

526.

As Superintendent for FCSD, Wilson had the responsibility and duty

to have any reported abuse of any FCSD student thoroughly investigated and

reported to DFACS, the criminal authorities including FCSD police for full

investigation, and the parents of the abused child, but Wilson, acting in

agreement with Wade and Kanner, decided to continue the cover up of

Pickens' abuse and continue the agreement not to inform parents of Pickens'

acts to their children.

527.

When Wilson learned of Pickens' abuse in 2007, by agreement with Wilson and Kanner, he ensured Alex's and other abused children's parents were not informed of the abuse and cruel punishment their children suffered.

528.

Wilson, acting with Wade and Kanner, continued the FCSD code of silence, and as Thompson, McConnell, McGee, Sosebee, and Weinmann were taking acts to ensure parents were not informed of what had happened to their children, Wilson and Wade and Kanner, by agreement, ensured parents did not learn by agreeing they would not be told and the matter would not be further investigated.

529.

In 2006 and 2007, Wilson agreed with Wade that no criminal investigation would occur and that parents would not be informed of the abuse, in violation of FCSD's written policy but in keeping with the conspiracy in this matter and FCSD's custom and practice when it came to the abuse of Alex and his other significantly disabled peers by Pickens.

530.

As an educator and superintendent of FCSD, Wilson knew Alex's parents had a right to be informed of the abuse their son had incurred for an

entire school year, but Wilson, along with Wade and Kanner, agreed to instead continue the agreement to hide and cover up the abuse.

531.

After Wilson left FCSD as its Superintendent, FCSD and Wade and Kanner continued the cover up of the abuse and actions to prevent disclosure and a proper criminal or other investigation.

532.

When Jake's mother met with Wilson and Wade in 2007, Wilson and Wade, by agreement, did not tell Jake's mother of the abuse Jake had suffered, and when FCSD released the investigative report, Wilson, Kanner, and Wade, by agreement, ensured the report had Jake's name almost completely redacted, preventing Jake's mother from being informed of the abuse Jake endured for three long, horrific school years.

## Cindy Kanner – Conspiracy

533.

Defendant Cindy Kanner was the confidential secretary to the FCSD Human Resources Department from 1986 to 1994, and she was a FCSD Human Resources Specialist from 1994 forward.

534.

In her position as a FCSD employee in 2007 forward, it was Kanner's obligation and duty to report for criminal investigation any reported or suspected child abuse by a FCSD employee to the FCSD police for criminal investigation.

535.

Wilson, Wade, and Kanner knew it was all their responsibility and duty to report to the FCSD police any suspected child abuse by a FCSD employee, but they agreed to continue the cover up of the abuse and punishment of Alex and his peers, and they agreed not to allow an investigation by the police and to not allow anyone to tell Alex's or the other parents about the abuse.

536.

Acting intentionally and in bad faith and by agreement with Wade and Wilson and for the purposes of improperly concealing the abuse of Alex and numerous other disabled children with moderate, severe, or profound mental impairment, Kanner did not report in May 2007 or thereafter Pickens' abuse to the FCSD police or any other criminal investigative agency, even though her position required she do so.

537.

Kanner also acted with others to alter government documents and destroy evidence, including tape recorded interviews and the outside investigative report of Pickens' abuse.  Alternatively, Kanner knows who did alter the investigative reports and why and who destroyed or kept certain taped interviews, and she will not disclose this information.  Either way, she was involved with the tapes disappearing and the investigative report of Pickens' abuse being altered.

538.

Kanner was also involved by agreement with Wade and Wilson in the refusal by FCSD to inform Alex's parents of the abuse Alex suffered and to only provide Alex's parents, after they had to retain counsel and expend funds, a redacted copy of the investigative report, with Alex's name redacted from the report so his parents would not know the abuse Alex suffered.

**FCSD – ADA, Section 504, Conspiracy**

539.

FCSD is liable to Alex for its violations of his rights as set forth in Counts Eleven through Twenty-One and for the acts set forth in Counts Eleven through Twenty-Two.

540.

Prior to Alex being placed by FCSD in the horrifically abusive and sadistically punitive setting at Hopewell, at least 27 different FCSD educators knew that Pickens had abused and cruelly punished disabled children, some of them knowing this for years, and FCSD and FCSD employees and educators still place Alex in that setting and allowed him to be sexually, verbally, physically, and emotionally abused and sadistically punished.

541.

FCSD is filled with mandated reporters by law and certification, yet FCSD, from its superintendent to its teachers, intentionally and maliciously approved, allowed, condoned, and covered up Pickens' abuse and cruel punishment of disabled children for years before then subjecting Alex to that treatment and then covering it up.

542.

 Just to begin to learn what happened to Alex, his parents had to hire an attorney, and even then, the records were not provide for months, and when they were after FCSD made Alex's parents pay for them, FCSD removed Alex's name from the report to continue the cover up.

## COUNT TWENTY-THREE

## SUPERVISORY LIABIILTY – NEGLIGENT HIRING AND SUPERVISION AGAINST DEFENDANTS NAMED HEREIN

543.

Alex incorporates by reference paragraphs 1, 4-10, 26-48, 58-68, 73-76, 79-83, 87-89, 91-95, and 165-542 and Counts Two through Twenty-Two as if fully set forth herein.

544.

Defendants Boyd, Merritt, Denmark, Lynch, Thompson, McConnell, Wadel, Pettes, Shelley, Shaffer, Faulkner, Vanairsdale, Reece, Young, and Ware individually and by mutual agreement are liable to Alex in their supervisory capacities for the wrongful actions and violations of Alex's rights set forth in Counts Two through Twenty-Two and the violations that occurred set forth in those counts.

545.

Each of the Defendants stated in paragraph 544 supervised Pickens during some time of her five years of severe abuse and sadistic punishment of significantly disabled children, including Alex, and some of the

Defendants, as set forth in this Complaint, supervised those who were Pickens' supervisors.

546.

Each of the Defendants stated in paragraph 544 had actual and constructive knowledge that Pickens and her supervisors, as set forth in this Complaint, were illegally and wrongfully abusing and excessively and unduly severely physically punishing significantly disabled children, including Alex, who could not report the abuse and cruel punishment, and the failed to take necessary and proper actions as Pickens' supervisors and as supervisors of Pickens' supervisors to stop and prevent those wrongful acts.

547.

Each of the Defendants stated in paragraph 544 had actual and constructive knowledge that any significantly disabled child placed in Pickens' classroom was in substantial danger and unreasonable risk of an injury to the rights set forth in Counts Two through Twenty-One herein and the injuries that occurred in those counts.

548.

Defendants Merritt, Boyd, Thompson, McConnell, Pettes, and Wade also had actual as well as constructive knowledge that Pickens was violating

Alex's rights set forth in Counts Two to Twenty-One and to the injuries set forth in those counts.

549.

Each of the Defendants stated in paragraph 544 intentionally and willfully took actions so inadequate to show a deliberate difference to any disabled child placed in Pickens' class, including Alex.

550.

The actions of the Defendants named in paragraph 544 directly and substantially and with intent resulted in the deprivations of Alex's rights as set forth in Counts Two through Twenty-One and to the injuries Alex suffered.

551.

The knowledge and intentional, wrongful actions taken as Pickens' supervisor and the facts giving rise to supervisor liability by **Boyd**, causing Alex the injuries and deprivation of rights set forth in Counts Two through Twenty-One are contained in paragraphs 251-300 above.

552.

The knowledge and intentional, wrongful actions taken as Pickens' supervisor and the facts giving rise to supervisor liability by **Merritt**,

causing Alex the injuries and deprivation of rights set forth in Counts Two through Twenty-One are contained in paragraphs 301-339 above.

553.

The knowledge and intentional, wrongful actions taken as Pickens' supervisor and the facts giving rise to supervisor liability by **Denmark**, causing Alex the injuries and deprivation of rights set forth in Counts Two through Twenty-One are contained in paragraphs 362-370 above.

554.

The knowledge and intentional, wrongful actions taken as Pickens' supervisor and the facts giving rise to supervisor liability by **Lynch**, causing Alex the injuries and deprivation of rights set forth in Counts Two through Twenty-One are contained in paragraphs 371-378 above.

555.

The knowledge and intentional, wrongful actions taken as Pickens' supervisor and the facts giving rise to supervisor liability by **Thompson**, causing Alex the injuries and deprivation of rights set forth in Counts Two through Twenty-One are contained in paragraphs 486-502 above.

556.

The knowledge and intentional, wrongful actions taken as Pickens' supervisor and the facts giving rise to supervisor liability by **McConnell**,

causing Alex the injuries and deprivation of rights set forth in Counts Two through Twenty-One are contained in paragraphs 503-507 above.

557.

The knowledge and intentional, wrongful actions taken as Pickens' supervisor and the facts giving rise to supervisor liability by **Wadel**, causing Alex the injuries and deprivation of rights set forth in Counts Two through Twenty-One are contained in paragraphs 400-407 above.

558.

The knowledge and intentional, wrongful actions taken as Pickens' supervisor and the facts giving rise to supervisor liability by **Pettes**, causing Alex the injuries and deprivation of rights set forth in Counts Two through Twenty-One are contained in paragraphs 408-430 above.

559.

The knowledge and intentional, wrongful actions taken as Pickens' supervisor and the facts giving rise to supervisor liability by **Shelley**, causing Alex the injuries and deprivation of rights set forth in Counts Two through Twenty-One are contained in paragraphs 393-399 above.

560.

The knowledge and intentional, wrongful actions taken as Pickens' supervisor and the facts giving rise to supervisor liability by **Shaffer**,

causing Alex the injuries and deprivation of rights set forth in Counts Two through Twenty-One are contained in paragraphs 209-217 above.

561.

The knowledge and intentional, wrongful actions taken as Pickens' supervisor and the facts giving rise to supervisor liability by **<u>Faulkner</u>**, causing Alex the injuries and deprivation of rights set forth in Counts Two through Twenty-One are contained in paragraphs 197-208 above.

562.

The knowledge and intentional, wrongful actions taken as Pickens' supervisor and the facts giving rise to supervisor liability by **<u>Vanairsdale</u>**, causing Alex the injuries and deprivation of rights set forth in Counts Two through Twenty-One are contained in paragraphs 242-250 above.

563.

The knowledge and intentional, wrongful actions taken as Pickens' supervisor and the facts giving rise to supervisor liability by **<u>Reece</u>**, causing Alex the injuries and deprivation of rights set forth in Counts Two through Twenty-One are contained in paragraphs 379-384 above.

564.

The knowledge and intentional, wrongful actions taken as Pickens' supervisor giving rise to supervisor liability by **<u>Young</u>**, causing Alex the

injuries and deprivation of rights set forth in Counts Two through Twenty-One are contained in paragraphs 218-231 above.

565.

The knowledge and intentional, wrongful actions taken as Pickens' supervisor and the facts giving rise to supervisor liability by **Ware**, causing Alex the injuries and deprivation of rights set forth in Counts Two through Twenty-One are contained in paragraphs 431-438 above.

566.

For the reasons set forth herein, the Defendants named herein are liable to Alex for the severe harm and irreparable damage he suffered in an amount in excess of $100,000,000, to be determined by a jury.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs request

That this Court exercise jurisdiction over Plaintiffs' claims;

That this Court enter an order granting Plaintiffs' costs and fees for the IDEA due process hearing in which they substantially prevailed, including costs and fees expended before this Court for recovery thereof, as allowed by law;

That Plaintiff Alex Williams be allowed a jury trial on Counts Two through Twenty-Two contained herein;

That judgment be entered in favor of Alex and against all Defendants for all damages Alex has incurred;

That Plaintiffs recover all attorneys' fees and litigation expenses and costs associated with this action; and

That this Court issue such other relief as may be just, equitable, and appropriate.

This 17th day of February 2015.


                                    *Chris E. Vance*
                                   Chris E. Vance
                                   Ga. Bar No. 724199

                                   Counsel for Plaintiffs


**CHRIS E. VANCE, P.C.**
Suite 100
2415 Oak Grove Valley Road
Atlanta, GA 30345
Tel:  (404) 320-6672
Fax: (404) 320-3412
chris@chrisvancepc.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that all Defendants have been served

through counsel by the electronic filing of the foregoing Second Amended

Complaint.


This 17th day of February 2015.


          *Chris E. Vance*
Chris E. Vance
Ga. Bar No. 724199

Counsel for Plaintiffs


**CHRIS E. VANCE, P.C.**
Suite 100
2415 Oak Grove Valley Road
Atlanta, GA 30345
Tel:  (404) 320-6672
Fax: (404) 320-3412
chris@chrisvancepc.com